UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NEW YORK COMMUNITIES FOR
CHANGE,

                   Plaintiff,

      - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION and NEW YORK CITY
SCHOOL CONSTRUCTION
AUTHORITY,

                Defendants.

-------------------------------------------------------X

**R E P O R T     AND
RECOMMENDATION**

11 CV 3494 (SJ)

On July 20, 2011, plaintiff New York Communities for Change ("NYCC") commenced this action against the New York City Department of Education ("DOE") and the New York City School Construction Authority (the "SCA"), alleging that there is widespread contamination in the New York City public schools caused by leaking polychlorinated biphenyls ("PCBs"), which are allegedly contained in light ballasts in T12 light fixtures present in numerous schools across the City.  Plaintiff brings this action under the citizen suit provisions of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601, et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq., to compel defendants to expedite removal of this dangerous condition.  (Am. Compl.[1] ¶ 1).  Defendants currently plan to replace the light fixtures over a ten-year period with more energy-efficient lights as part of the City's independent green energy initiative.  (Id.)

---

[1]Citations to "Am. Compl." refer to plaintiff's Second Amended Complaint, filed November 18, 2011.

On February 13, 2012, defendants filed a second motion[2] to dismiss plaintiff's claims, asserting several grounds:  1) the TSCA claim should be dismissed because the Environmental Protection Agency ("EPA") is already prosecuting the issue as demonstrated by a consent order entered into in January 2010; 2) plaintiff failed to comply with the notice requirements of TSCA and RCRA; 3) plaintiff's Amended Complaint fails to state a claim under either TSCA or RCRA; 4) since PCBs are regulated under TSCA, plaintiff's claim under RCRA must be dismissed; 5) plaintiff has no standing; and 6) plaintiff's claims are moot and barred by the doctrine of primary jurisdiction.  On February 22, 2012, defendants' motion was referred to the undersigned to prepare a report and recommendation.[3]

FACTUAL BACKGROUND

Plaintiff alleges that exposure to PCBs poses a serious health risk to children, by increasing their chances of developing diabetes, heart disease, liver disease, asthma, and childhood leukemia, among other diseases.  (Am. Compl. ¶¶ 23, 25).  Even low levels of exposure experienced over a period of time can pose a risk to a child's immune and nervous systems as the PCBs accumulate in the body.  (Id. ¶¶ 22, 27).[4]

---

[2]Defendants had initially filed a motion to dismiss in September 2011, but that motion was withdrawn on October 19, 2011 following the plaintiff's request to file a second amended Complaint.

[3]Following oral argument held before this Court on April 13, 2012, the parties submitted additional supplemental briefing in the form of letters dated May 7, 2012, and May 8, 2012.

[4]In its Statement submitted to the City Council Committee on Environmental Protection and Committee on Education (the "City Council Committee") for the April 13, 2011 Hearing, the EPA stated that it "has determined that PCBs are a probable carcinogen."  (Pl.'s Mem., Ex. C). Citations to "Pl.'s Mem." refer to the plaintiff NYCC's Memorandum of Law in Opposition to

In January 2010, defendants entered into an administrative Consent Agreement and Final Order ("CAFO") with the EPA to address the problem of caulk in New York City schools that had been found to contain PCBs.  (Defs.' Mem.[5] at 6; see In the Matter of the City of New York, New York and the New York City School Construction Authority, Consent Agreement and Final Order, Dkt. No. TSCA-02-2010-9201; Greene Decl.,[6] Ex. A).  As part of the CAFO, the defendants agreed to conduct a Pilot Program in which the defendants would select five schools to investigate and determine if there were other possible sources of PCBs in the caulk in the schools and to develop strategies to remediate and deal with these materials.  (Defs.' Mem. at 7).

In August 2010, pursuant to the Pilot Program testing, it was discovered that there were high levels of PCB contamination leaking from, or that had historically leaked from, light ballasts found in T12 fluorescent light fixtures in the schools.  (Am. Compl. ¶¶ 54, 55; Greene Dec., Ex. B).  These T12 light fixtures, which had been used extensively in the construction of many older buildings, were manufactured with capacitors containing PCBs.  (Compl. ¶¶ 29-31).  When the light ballasts fail, the PCBs, which are in liquid form inside the capacitor, can leak out, spilling onto the classroom floor, desks, and chairs, exposing the children to contamination through touch or ingestion.  (Id. ¶¶ 35, 36, 41, 67).  Children can also be exposed through breathing PCB dust which may form when heat generated by the light ballasts causes the PCBs to

_____

Defendants' Motion to Dismiss, dated January 27, 2012.

[5]Citations to "Defs.' Mem." refer to Memorandum of Law in Support of the Defendants' Motion to Dismiss All Complaints, or, In the Alternative, Stay the Proceedings, dated December 19, 2011.

[6]Citations to "Greene Decl." refer to the Declaration of Daniel Greene, dated December 19, 2011.

3

volatilize into the air.  (Id. ¶¶ 40, 42).  Failure to properly abate an historic leak can leave spills and smudges of PCB liquid to which children can be exposed.  (Id. ¶¶ 36, 55, 68, 73).

Plaintiff alleges that through the Pilot Program study, the DOE determined that at P.S. 199, on the Upper West Side of Manhattan, there were 181 actively leaking fixtures with leaking ballasts and 153 fixtures with currently non-leaking ballasts but with contamination from historical ballast leakage; and at P.S. 309 in Brooklyn, there were 114 replacement ballasts that, although labeled "No PCBs," contained leaked material from previous ballasts containing PCBs. (Id. ¶ 55).  One sample found at P.S. 309 was 50 times the established health-based benchmark for kindergarten children.  (Giorgio Decl.[7] ¶ 2, Ex. A).

Based on the levels of PCB contamination, defendants replaced all T12 light fixtures at three of the Pilot Program schools.  (Am. Compl. ¶ 54, n.4).  On December 1, 2010, the DOE disclosed that at least 772 school buildings in New York City were equipped with T12 lighting fixtures, which according to the DOE, "are very likely to contain PCB ballasts."  (Id. ¶ 62, Ex. C).  The DOE's estimate at that time was that there were as many as 564,000 T12 lighting fixtures with PCB ballasts still in use, with at least 100 such fixtures in over 90% of these schools.  (Id.)  Plaintiff reasons that because these ballasts have an average useful life of ten to fifteen years and the youngest ballasts still in use in the schools are 34 years old, over 500,000 of the DOE's PCB containing ballasts are at least 19 years beyond their life expectancy.  (Pl.'s Mem. at 5 (citing Giorgio Decl. ¶ 4, Ex. C)).  The EPA has stated that "as the ballasts age, the failure rate increases dramatically."  (Giorgio Decl. ¶ 4, Ex. C).

---

[7]Citations to "Giorgio Decl." refer to the Declaration of Christina Giorgio in Support of Plaintiff NYCC's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated January 27, 2012.

In January and February 2011, EPA Region 2 conducted physical lighting inspections at 7 of the 740 schools identified as likely to contain PCB ballasts.  (Am. Compl. ¶ 72, Ex. C). Leaking ballasts were found at every one of the inspected buildings.  (Pl.'s Mem. at 5).  "[T]he inspections showed active or unremediated historical PCB leakages in 63 of the 68 classrooms inspected – a 93% active contamination rate."  (Am. Compl. ¶ 73).  At one school in Staten Island, PCB liquid that had leaked from the light fixtures above, was found to have "severely" contaminated the floor tiles with PCBs.  (Id. ¶ 67).  Plaintiff alleges that although the EPA's detailed inspections determined that 100% of the seven schools inspected had leaking or historically leaked PCBs, the DOE's cursory inspection, which involved "visible signs" on the exterior of the fixtures only revealed leaks at 145 of 740 buildings.  (Id. ¶¶ 69-71; Giorgio Decl. ¶¶ 5-6, Exs. D, E).

On February 23, 2011, the City announced a plan to comply with Local Laws 87 and 88 requiring greater energy efficiency.  (Pl.'s Mem. at 7; Giorgio Decl. ¶ 7, Ex. F).  Among other things, Local Law 88 mandates lighting system upgrades in City buildings, but does not mention PCBs in light fixtures.  (Local Law 88 of 2009, Council Int. 973-A).  Entitled the "NYC Schools Comprehensive Plan:  Greener, Healthier Schools for the 21st Century" (the "Greener Schools Plan"), the Plan commits the City to upgrade every mechanical system in the City schools within a 10 year period.  (Giorgio Decl., Ex. F).

Plaintiff NYCC brings this action pursuant to the citizen suit provisions of TSCA and RCRA, seeking to restrain the City defendants from further violating TSCA through the maintenance of leaking PCB light ballasts.  Plaintiff argues that leaking PCB ballasts are "a clear violation of TSCA."  (Pl.'s Mem. at 11).  Plaintiff also contends that when leaking PCB ballasts

have been replaced without proper remediation or disposal of PCBs, this also constitutes a violation of TSCA.  (Id.)  Plaintiff argues that given the overwhelming number of PCB leaks and improperly remediated PCBs discovered in the Pilot schools, "it is more than plausible ("indeed it is a certainty") that a PCB ballast is currently leaking in one of the . . . 700 [New York City] schools that [currently] contain T-12 units."  (Id.)  Indeed, the EPA has found "there is a prevalence" of leaking ballasts throughout the New York City schools.  (Am. Compl., Ex. F).

Defendants move to dismiss, raising jurisdictional challenges to plaintiff's claims and arguing that plaintiff has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).

DISCUSSION

A.  Legal Standard:  Motion to Dismiss Pursuant to Rule 12(b)(1)

In determining whether there is subject matter jurisdiction over a claim, the court must examine whether the complaint states "a right to recover under the laws of the United States." Goldman v. Gallant Sec., Inc., 878 F.2d 71, 73 (2d Cir. 1989) (per curiam) (citing Bell v. Hood, 327 U.S. 678, 681 (1946)).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d 381, 386-86 (E.D.N.Y. 2007).

When considering a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the court must "accept as true all material factual allegations in the complaint." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citations omitted); see also Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d at 387; Country Rock Cafe, Inc. v. Truck

6

Ins. Exch., 417 F. Supp. 2d 399, 402 (S.D.N.Y.  2006).  While the court will "'draw all reasonable inferences in favor of plaintiff,'" Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d at 387 (quoting Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) (quoting Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000))), but see Forbes v. State Univ. of N.Y. at Stony Brook, 259 F. Supp. 2d 227, 232 (E.D.N.Y. 2003) (citations omitted) (holding that the court will not draw inferences favorable to the party asserting jurisdiction), the plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Makarova v. United States, 201 F.3d at 113; Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996).

In analyzing subject matter jurisdiction under Rule 12(b)(1), the court must "give the plaintiff's factual allegations closer scrutiny" than it would in the context of a motion to dismiss pursuant to Rule 12(b)(6), "[b]ecause subject-matter jurisdiction focuses on the court's power to hear the claim." Physicians Comm. For Responsible Medicine v. U.S. Environmental Protection Agency, 451 F. Supp. 2d 223, 228 (D.C. Cir. 2006) (citing cases).  The court is "not limited to the allegations contained in the complaint," id. at 228; see also Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (holding that a court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts"), and may consider materials outside the pleadings to resolve disputed jurisdictional facts.  Makarova v. United States, 201 F.3d at 113; Country Rock Café, Inc. v. Truck Ins. Exch., 417 F. Supp. 2d at 402.

B.  The Statutes - TSCA and RCRA

The TSCA was enacted to deal with the "unreasonable risk of injury to health or the environment" posed by man-made chemical substances.  15 U.S.C. § 2601(a)(2).  As of 1979, TSCA banned the manufacture, processing and distribution of PCBs and restricts their use under certain conditions.  15 U.S.C. §§ 2605(e)(2)(A) and (e)(3)(A).  The EPA has promulgated regulations for storing, handling, and disposing of PCBs and PCB waste materials.  See 40 C.F.R. § 761.  Under TSCA, a citizen may bring a suit against any person who is alleged to be in violation of Section 2605 or any rule promulgated thereunder.  15 U.S.C. § 2619(a)(1).

RCRA is a "comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste."  Mehrig v. KFC W., Inc., 516 U.S. 479, 483 (1996) (citing City of Chicago v. Environmental Defense Fund, 511 U.S. 328, 331-32 (1994)).  RCRA's primary purpose "is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'"  Id. (quoting 42 U.S.C. § 6902(b)).  Under RCRA, a citizen may bring suit "against any person, including . . . any past or present generator . . . who has contributed or who is contributing to the past or present handling . . . of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  Although the regulation of PCBs falls under TSCA, plaintiff argues that citizen suits may be brought under RCRA to restrain acts that "may present an imminent and substantial endangerment to health or the environment."  (Pl.'s Mem. at 9 (citing 42 U.S.C. § 6972(a)(1)(B))).

8

C.  The EPA is Diligently Prosecuting PCBs in the NYC Schools

Defendants first argue that plaintiff's claim under TSCA should be dismissed for lack of subject matter jurisdiction because the EPA has previously issued an order pursuant to Section 2615 of TSCA, which requires defendants to promulgate a city-wide plan to remediate PCBs in the City schools.  (Defs.' Mem. at 10).  Thus, defendants argue that because plaintiff cannot show that the EPA is not "diligently prosecuting" the issue, plaintiff's suit is barred for lack of subject matter jurisdiction.  (Id.)

1.  Standard for Determining "Diligently Prosecuting"

Both the TSCA and RCRA contain limitations on citizen's suits where a state or administrative agency is actively pursuing an action under the statute.  See 15 U.S.C. § 2619(b); 42 U.S.C. § 6972(b)(2)(C)(i).  Section 2619 of TSCA provides:

> No civil action may be commenced –
>
> (1) Under subsection (a)(1) of this section to restrain a violation of this chapter or rule or order
>
> > * * *
> > (B) if the Administration has commenced and is diligently prosecuting a proceeding for the issuance of an order under section 2615(a)(2) of this title to require compliance with this chapter, or with such rule or order.

15 U.S.C. § 2619(b).

RCRA also contains a prohibition on citizen suits where a state is diligently prosecuting an action.  Specifically, Section 6972(b)(2)(C)(i) of RCRA provides:

> No action may be commenced under subsection (a)(1)(B) of this section if the State. . .

9

(1) has commenced and is diligently prosecuting an action
under subsection (a)(1)(B) of this section. . . .

42 U.S.C. § 6972(b)(2)(C)(i).  Under RCRA, citizen suits "are prohibited only as to the scope

and duration of the administrative order."  Carrier Corp. v. Piper, 460 F. Supp. 2d 853, 857

(W.D. Tenn. 2006).

Although neither TSCA or RCRA or their implementing regulations explicitly define

"diligently prosecuting," courts have examined similar language found in the Clean Water Act

("CWA").  See, e.g., Friends of the Earth v. Consol. Rail Corp., 768 F.2d 57, 63 (2d Cir. 1985).

In examining the analogous citizen suit provision under the CWA, the Supreme Court in

Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, declared that "citizen suits are

proper only 'if the Federal, State, and local agencies fail to exercise their enforcement

responsibility.'"  484 U.S. 49, 60 (1971) (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 64

(1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3730).  Similarly, the Fourth Circuit in The Piney

Run Preservation Association v. The County Commissioners of Carroll County, Maryland,

analyzed the same section in the CWA, holding that citizen plaintiffs bear a high burden in

demonstrating that a government agency has failed to diligently prosecute a violation.  523 F.3d

453, 459 (4th Cir. 2008), cert. denied, 555 U.S. 885 (2008).  In examining the "diligently

prosecuting language" of Section 505(b)(1)(B) of the CWA, 33 U.S.C. § 1365(b)(1)(B), a district

court in the District of South Carolina held that "Congress intended to prohibit citizen suits

where the governmental enforcement agency is diligently prosecuting or has diligently

prosecuted a judicial action to enforce the same alleged violations of a particular permit,

standard, or limitation."  Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc., 890 F.

Supp. 470, 486 (D.S.C. 1995).

The main purpose of this limitation on citizen suits is to allow state and federal government agencies to remedy violations. "[T]he citizen suit is meant to supplement rather than to supplant governmental action.'" New York Coastal Fisherman's Ass'n v. N.Y.C. Dept. of Sanitation, 772 F. Supp. 162, 165 (S.D.N.Y. 1991) (quoting Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. at 60). "Citizen lawsuits under the CWA have a merely 'interstitial' role; Congress did not intend for them to be even 'potentially intrusive' on agency discretion." Karr v. Hefner, 475 F.3d 1192, 1197 (10th Cir. 2007). In Gwaltney, the Supreme Court explicitly stated that since "the great volume of enforcement actions [are intended to] be brought by the State, . . . citizen suits are proper only 'if the Federal, State and local agencies fail to exercise their enforcement responsibility.'" 484 U.S. at 60. Where the concerns of an analogous citizen's suit have already been addressed by a state or federal agency, the courts favor deference to the agency's plan. N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d 552, 557 (1st Cir. 1992).

Courts have made it clear, however, that the provision "does not require government prosecution to be far-reaching or zealous," Karr v. Hefner, 475 F.3d at 1197; nor can a citizen plaintiff "overcome the presumption of diligence merely by showing that the agency's prosecution strategy is less aggressive than he would like or that it did not produce a completely satisfactory result." The Piney Run Pres. Ass'n v. The Cnty. Comm'rs Of Carroll Cnty., MD, 523 F.3d at 459 (citing Karr v. Hefner, 475 F.3d at 1197); see also N. & S. Rivers Watershed Ass'n v. Scituate, 949 F.2d at 558 (holding that "[m]erely because the State may not be taking the precise action [plaintiff] wants it to or moving with the alacrity [plaintiff] desires does not

11

entitle [plaintiff] to injunctive relief").  A citizen may not "seek to recover fines and penalties that the government has elected to forego."  Atlantic States Legal Found. v. Eastman Kodak Co., 933 F.2d 124, 127 (2d Cir. 1991).[8]  Indeed, courts have held that when the agency has entered into a consent decree with a violator, courts "must be particularly deferential to the agency's expertise," The Piney Run Pres. Assoc. v. The Cnty. Comm'rs of Carroll Cnty., MD, 523 F.3d at 459, and the fact that the "agency has entered into a consent decree that establishes a prospective schedule of compliance does not necessarily establish lack of diligence."  Id. at 459 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 318 (1982)).  Thus, even though a violation continues despite the State's conduct does not mean that the State is not acting with diligence.  The diligent prosecution bar "does not require that the EPA succeed; it requires only that the EPA *try*, diligently."  Supporters to Oppose Pollution, Inc. v. Heritage Group, 973 F.2d 1320, 1324 (7th Cir. 1992) (emphasis in original).  "Particularly when the EPA chooses to enforce the CWA through a consent decree, failure to defer to its judgment can undermine agency strategy."  Karr v. Hefner, 475 F.3d at 1197.

    As the Second Circuit stated in Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co., "[i]f the state enforcement proceeding has caused the violations alleged in the citizen suit to cease without any likelihood of recurrence – has eliminated the basis for the citizen suit – we believe that the citizen action must be dismissed."  933 F.2d at 127.  Thus, a citizen suit "may not challenge the terms of the settlement . . . unless there is a realistic prospect that the violations

---

    [8]Some courts have held that the citizen's suit bar extends only to civil penalties but not injunctive relief.  See, e.g., Orange Env't, Inc. v. County of Orange, 860 F. Supp. 1003, 1018 (S.D.N.Y. 1994); but see N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d at 552.

alleged in [the citizen's suit] complaint will continue notwithstanding the settlement." Id. at 127. However, in Hudson River Fisherman's Ass'n v. County of Westchester, 686 F. Supp. 1044, 1052 (S.D.N.Y. 1988), the court found no preclusion where the government's consent order did not apply to the damage claimed by plaintiff.  The court held that because it could not be said "with any confidence that the conclusion of the government's litigation [would] address or encompass the specific claims of the plaintiff," plaintiff's citizen suit was not barred.  Id.

    2. Analysis

        Citing the CAFO, defendants contend that here the EPA and the defendants entered into a binding consent order, pursuant to Section 2615 of TSCA, thus demonstrating that the EPA is diligently prosecuting the issue of PCBs in the light ballasts.  (Defs.' Mem. at 11-12 (citing Green Decl., Ex. A)).  Although conceding that the CAFO was implemented to address the problems presented by PCBs in the caulk, defendants argue that the CAFO requires them to take actions to address other sources of PCBs.  (Id. at 11).  Thus, defendants contend that, as part of the Pilot Program, they were required to track down other sources of PCBs and develop measures to address them.  (Id. at 12).  Defendants note that the CAFO requires them to submit a Citywide PCB Management Plan to the EPA once the Pilot Program is completed and that this Plan must set forth a "[s]chedule for remedial action that maximizes health protection consistent with City resources and avoidance of disruption of school activities," and will also be subject to peer review and public comment.  (Id. (quoting Green Decl., Ex. A at III(C)(e))).  Among other things, the Plan must, "[w]here necessary for risk reduction, investigat[e] . . . potential significant non-caulk sources and appropriate remedial action."  (Id.)  Thus, defendants argue that while the

13

CAFO does not explicitly address PCBs in light ballasts, "the CAFO clearly encompasses these ballasts." (Id. at 12).  Defendants also contend that the Greener Schools Plan to replace all potential PCB ballasts was developed in response to the EPA's "strong recommendation that defendants commence a program to phase out PCB ballasts."  (Id. at 13).  Defendants argue that given the EPA's strategy to avoid the disruption of school activities and the need to consider an overall strategy to deal with the greatest risks first, to allow plaintiff's suit to proceed would "supplant the carefully balanced, risk-based strategy negotiated by the Defendants and the EPA." (Id.)

In response, plaintiff cites the plain language of the CAFO which states that it relates solely to PCB caulk:

> This is a civil administrative proceeding for the assessment of a civil penalty pursuant to Section 16(a) of [TSCA] . . . for the resolution of violations of regulations promulgated under the Act concerning use of polychlorinated biphenyls ("PCBs") *in caulk* ("PCB Caulk"). . . .

(Pl.'s Mem. at 26 (citing Greene Decl., Ex. A (Preliminary Statement) (emphasis added))).  Even the Pilot Study was established to "determine the most effective strategies for assessing and reducing potential exposure to PCBs *contained in PCB Caulk*. . . ."  (Id. (citing Greene Decl., Ex. A at II(A)) (emphasis added)).  Although the defendants were required to address non-caulk sources discovered during the Pilot Study, as plaintiff points out, that requirement was limited to non-caulk sources in the five Pilot Study schools; there is nothing to suggest that leaking PCB ballasts in other schools were intended to be addressed.  (Pl.'s Mem. at 27).

A review of the language of the CAFO itself makes it clear that the EPA was not reviewing the existence of PCBs in ballasts, nor does the CAFO require defendants to implement

any system-wide correction measures with respect to the ballast violations.  (See Greene Decl., Ex. A).  While the defendants were arguably required to address the violations found during the Pilot Study, there is nothing in the CAFO that requires the defendants to take any steps with respect to leaking ballasts that may exist in any school beyond the five Pilot Study schools. Indeed, the PCB Caulk Plan only requires the defendants to implement a Citywide PCB Management Plan "[i]f agreement is reached" between the EPA and defendants.  (Greene Decl., Ex. A at III(C)(a)).  If no agreement is reached, the Plan explicitly provides that defendants "will have no obligation to implement a Citywide PCB Management Plan under this CAFO and Work Plan . . . ."  (Id.)  Even though the defendants may be voluntarily establishing a plan for the ultimate replacement of these lights in the distant future,[9] the absence of any mandatory requirements for compliance in the CAFO demonstrates that the EPA was not pursuing, much less "diligently prosecuting," the issue of PCBs in light ballasts.  See Hudson River Fisherman's Ass'n v. Cnty. of Westchester, 686 F. Supp. at 1052 (holding that "diligent prosecution" does not bar a citizen's suit where "it appears that the Government's effort does not address the factual grievances asserted by private attorneys general").

Indeed, the EPA's April 13, 2011 Statement to the City Council Committee acknowledges that there is no enforcement mechanism in place with respect to the light ballasts.

---

[9]As plaintiff notes, the "Ballast Plan," or Greener Schools Plan, relied upon by defendants was not developed in response to the EPA's investigation into PCBs in the schools.  Instead, it was a general plan designed to achieve energy efficiency and cost savings as required by Local Law 88.  (Giorgio Decl. ¶ 8, Ex. G).  Not only is the Ballast Plan entirely voluntary, but the EPA has conceded that it has no authority to "approve or disapprove the City's proposal."  (Am. Compl., Ex. F).  Under these circumstances, there is no question that the PCBs in the lighting ballasts were not intended to be covered by the CAFO and the EPA admits that it has no authority to disapprove of the City's proposal.  (See Am. Compl., Ex. F; Greene Decl., Ex. A).

(Giorgio Decl., Ex. C).  In its Statement, the EPA explains that during the course of the caulk inspection, it discovered the existence of leaking ballasts and "recommended" that the City "develop a plan for assessing and addressing leaking ballasts in its schools city-wide."  (Id. at 2). In commenting on the City's Greener Schools Plan, the EPA stated:  "EPA recognizes this plan as a step in the right direction.  However, we have been consistent in saying that ten years is too long for the removal of all PCB-containing lighting fixtures throughout the school system."  (Id.) The EPA explicitly "recommend[ed] that the lighting replacements be completed in no more than five years."  (Id. at 1).

Contrary to defendants' arguments, this is not a case where the EPA is actively investigating and pursuing the issue of PCBs in lighting fixtures.  The EPA's own Statement reflects that the defendants' current plan to address PCBs in lighting fixtures is purely voluntary and, in fact, fails to comport with what the EPA has recommended.  Where, as here, the EPA has not commenced an investigation into this particular hazard, let alone initiated any sort of formal proceedings to remediate this particular hazard, it cannot be said that there is a "diligent prosecution."  Defendants' proposal to remove the ballasts over a ten-year period does not compel a different result because the CAFO does not provide for any consequences in the event that defendants fail to revise the plan in accordance with the EPA's recommendations or even fail to implement their current ten-year plan entirely.  Therefore, the Court does not have confidence that if defendants comply with the CAFO, the violations plaintiff complains of will cease.  See Atlantic States Legal Found. v. Eastman Kodak Co., 933 F.2d at 127.

Accordingly, the Court respectfully recommends that defendants' motion to dismiss plaintiff's TSCA claim as precluded by the EPA's "diligent prosecution" be denied.

16

D.  Failure to Comply with Notice Requirements

Defendants next contend that plaintiff failed to provide adequate notice of its intention to file suit under TSCA and RCRA, in accordance with 15 U.S.C. § 2619(b)(1)(A) and 42 U.S.C. § 6972(b)(2)(A).  Defendants assert that because pre-suit notice is a jurisdictional prerequisite, plaintiff's complaint should be dismissed for lack of subject matter jurisdiction.  See City of Newburgh v. Sarna, 690 F. Supp. 2d 136, 151-53 (S.D.N.Y. 2010), aff'd in part, appeal dismissed in part, 406 Fed. Appx. 557 (2011).


1.  Standards for Notice Requirements

Under TSCA, a citizen plaintiff is required to provide notice of any alleged violation to the EPA and to the person allegedly committing the violation at least sixty (60) days prior to the commencement of any citizen suit.  15 U.S.C. § 2619(b)(1)(A).  Pursuant to 40 C.F.R. § 702.62(a), the notice must include "sufficient information to permit the recipient to identify" the following:  1) the specific provision of TSCA alleged to have been violated; 2) the activity alleged to constitute a violation; 3) the person responsible for the alleged violation; 4) the location of the alleged violation; 5) the date or dates of the alleged violation; and 6) the name, address, and telephone number of the citizen providing the notice.

Similarly, under RCRA, a plaintiff pursuing a claim based on imminent and substantial endangerment must provide notice to the EPA, the State and the alleged contributor to the endangerment at least ninety (90) days in advance of commencing suit.  42 U.S.C. § 6972(b)(2)(A).  Like the TSCA notice requirements, the RCRA notice must provide "sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition,

17

requirement, or order which has been violated," along with information about the activity alleged

to constitute a violation, the persons responsible for the violation, the dates of the violation, and

information identifying the individual giving notice.  40 C.F.R. § 254.3(a).  The purpose of

providing notice to the alleged violator is to give the violator "an opportunity to bring itself into

complete compliance" and "thus render unnecessary a citizen suit."  Gwaltney of Smithfield, Ltd.

v. Chesapeake Bay Found., Inc., 484 U.S. at 60.


    2.  Analysis

    Defendants contend that the letters plaintiff sent failed to comply with the regulations in

that they failed to specifically identify the activity alleged to constitute a violation.  (Defs.' Mem.

at 15).  Defendants complain that instead of providing the "location of the alleged violation," 40

C.F.R. § 702.62(a)(4), the plaintiff merely pointed out that there were many schools containing

the PCB ballasts and that leakage "appears to be commonplace."  (Id. (citing Greene Decl., Ex. D

at 3, Ex. E at 4)).  Defendants argue that although plaintiff attached the list of schools that may

contain such ballasts that the DOE had previously provided to the EPA, "[p]laintiff's letters are

'hardly more helpful than a letter telling Defendants merely that they have violated the law.'"

(Defs.' Mem. at 16 (quoting Karr v. Hefner, 475 F.3d at 1201)).

    Defendants also complain that plaintiff's Complaint includes several types of conduct

that were not identified in the notice letters and therefore, the claims must be dismissed.  (Defs.'

Mem. at 16 (citing Brod v. Omya, 653 F.3d 156 (2d Cir. 2011) (affirming the dismissal of claims

based on contaminants not previously identified in the notice).  Specifically, defendants refer to

the allegations in the Complaint that there were "unremediated historic leaks," or "historically

leaked PCBs," and allegations in the Complaint based on "future" leaks, which are not referenced in the notice letters which focus solely on leaks from existing ballasts.  (Defs.' Mem. at 16-17 (quoting Am. Compl. ¶¶ 1, 7, 36, 37, 38, 39, 55, 73, 86, 87, 88(b)-(c))).

With respect to plaintiff's RCRA letter, defendants contend that the violations identified therein are narrower than the violations alleged in the Complaint.  (Id. at 17).  In this regard, defendants point out that the notice letter discusses the "disposal of a solid waste under RCRA" (id. (quoting Green Decl., Ex. E at 2)), while the Complaint alleges that the PCBS are "solid and/or hazardous waste."  (Id. (quoting Am. Compl. ¶ 85)).  Defendants also contend that any claims based on the storage of either solid or hazardous waste should be dismissed because the notice letters only refer to the "disposal" and "handling" of PCBs.  (Id. (quoting Green Decl., Ex. E at 2)).

Plaintiff disputes defendants' claim that the notice letters failed to provide "sufficient information to permit" defendants to identify the violation.  (Pl.'s Mem. at 30).  What constitutes "sufficient information" under TSCA has not been defined by the courts, although the Second Circuit addressed the issue in a RCRA case, Brod v. Omya, Inc., 653 F.3d at 167-68.  Noting that RCRA does not describe the required content of a notice of intent to sue, and that the Supreme Court has not defined the content requirement, the court held that the "content of a [Notice of Intent] must serve the purpose of giving 'the appropriate governmental agencies an opportunity to act and the alleged violator an opportunity to comply.'"  Id. at 166 (quoting Dague v. City of Burlington, 935 F.2d 1343, 1354 (2d Cir. 1991), rev'd in part on other grounds, 505 U.S. 557 (1992)).  In Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, the Second Circuit, in analyzing the analogous regulation under the CWA, noted, "[i]n the past, we

have refused to 'allow form to prevail over substance' in considering the content required of an NOI [Notice of Intent] letter, and have looked instead to what the particular notice given may reasonably be expected to accomplish."  273 F.3d 481, 487 (2d Cir. 2001) (quoting Dague v. City of Burlington, 935 F.2d at 1354), cert. denied, 549 U.S. 1252 (2007).

The notice requirement and the delay prior to the filing of a citizen suit was designed to afford government regulators an opportunity to act with respect to the violation and to give the violators an opportunity to comply with the law.  See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. at 59-61; see also San Francisco BayKeeper, Inc. v. Tosco Corp., 309 F.3d 1153, 1157 (9th Cir. 2002), cert. denied, 539 U.S. 924 (2003).  Although the Supreme Court in Hallstrom v. Tillamook County made it clear that a failure to give the required notice under the CWA required dismissal of the citizen suit, 493 U.S. 20, 27 (1989), and courts have "strictly construed" the notice requirements following that case, see, e.g., San Francisco BayKeeper, Inc. v. Tosco Corp., 309 F.3d at 1157, courts have also construed the regulation as to the content of the notice as not requiring "that plaintiffs 'list every specific aspect or detail of every alleged violation.'"  Id. (citations omitted).

Courts have held that the CWA's notice provisions and regulations required "no more than 'reasonable specificity.'"  San Francisco BayKeeper, Inc. v. Tosco Corp., 309 F.3d at 1155 (quoting Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d at 488) (holding that the notice letter "does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem").  Thus, courts have recognized a need to identify each of the pollutants allegedly discharged and differentiate them from the nonpollutants.  See, e.g., Brod v. Omya, Inc., 653 F.3d at 169;

20

<u>Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York</u>, 273 F.3d at 487-88 (noting that "[t]he rationale for [requiring the NOI to identify specific contaminants] is most apparent in the context of a suit alleging discharges in excess of NPDES permit limitations, in which the defendant may be discharging some pollutants lawfully and others unlawfully . . . Specific knowledge of the pollutants allegedly discharged unlawfully makes it easier for the defendants to promptly rectify the problem").

In this case, however, there is no question as to the nature of the contaminant alleged to be involved and the plaintiff's notice letters clearly state that the defendants' violations relate to PCBs leaking from the light ballasts of specific types of lights found in virtually all of the City schools. (Greene Decl., Exs. E, F). To the extent that defendants object to the failure of the notice letters to identify each and every leaking PCB ballast, the Court finds defendants' reliance on <u>Brod v. Omya, Inc.</u> to be misplaced. <u>See</u> 653 F.3d 156. Nothing in that decision discusses the requirement that the plaintiff identify each particular source of contamination. Instead, all the regulations require is that the notice be sufficient to provide defendants with information so that they can identify the problem. <u>See, e.g.</u>, <u>Ecological Rights Found. v. Pac. Gas & Elec. Co.</u>, No. C 09-3704, 2010 WL 1881595, at *3 (N.D. Cal. May 10, 2010) (denying motion to dismiss even though plaintiff did not provide specific geographic location of subject utility poles); <u>Pinoleville Pomo Nation v. Ukiah Auto Dismantlers</u>, No. C 07-02648, 2007 WL 4259404, at *4 (N.D. Cal. Dec. 3, 2007) (finding that plaintiffs' identification of defendants' "facilities" was sufficient even though the notice did not identify the location of each point source from which pollutants may have been discharged).

Defendants' argument is particularly specious in light of the fact that plaintiff does not

have access to the light ballasts or even the school buildings involved; only defendants, who control and supervise the maintenance of the City schools, have the ability to identify the leaking ballasts.  Given that all of these T12 ballasts contain PCBs and given that all are beyond the recommended age of usage and therefore more likely to leak, the plaintiff has provided adequate notice of the defendants' violation of TSCA.

Moreover, to the extent that defendants complain that the RCRA notice is not sufficient insofar as the Complaint deals with historic leaks or unremediated historic leaks, the plaintiff's notice letters specifically refer to the "past or present disposal, handling or storage under RCRA," and note that "both DOE and SCA have contributed to and continue to contribute to" such disposal, handling and storage.  The language clearly references past conduct and gives sufficient notice of past leaks, just as the language noting the "need for replacement of PCB-containing lighting" gives notice of present and future PCB leaks.  Finally, defendants' argument that the plaintiff did not give notice of its claims based on "hazardous waste" is belied by the NYCC RCRA notice letter which refers on its face to both "solid or hazardous waste."

Having reviewed the notice letters, the Court finds that they provide sufficient notice under the regulations and therefore the defendants' jurisdictional challenge on this basis fails. See City of Newburg v. Sarna, 690 F. Supp. 2d at 148-49 (denying motion to dismiss where there were no glaring deficiencies in the notice letter); see also Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp., 450 F. Supp. 2d 467, 480-81 (D.N.J. 2006).

Accordingly, it is respectfully recommended that defendants' motion to dismiss for lack of proper notice be denied.

E.  Doctrines of Primary Jurisdiction and Mootness

    1.  Doctrine of Primary Jurisdiction

Defendants also contend that plaintiff's claims are barred by the doctrine of primary jurisdiction, which dictates that "'whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body,'" Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir. 1996) (quoting United States v. W. Pac. RR Co., 352 U.S. 59, 64 (1956)), courts should refrain from entertaining claims so as not to interfere with the administrative agency's investigation.  Although defendants concede that "courts are often reluctant to apply the doctrine of primary jurisdiction to a RCRA claim, since the statute has conferred jurisdiction" by providing for citizen suits (Defs.' Mem. at 38 (citing DMJ Assocs., LLC v. Capasso, 228 F. Supp. 2d 223, 229-30 (E.D.N.Y. 2002))), they nonetheless contend that the doctrine should be applied in the instant case because the remediation of PCB ballasts involves issues within the EPA's particular field of expertise and discretion, and because the EPA, through the CAFO, is already "deeply involved in the Defendants' ongoing remediation projects."  (Id. at 39).  Defendants further suggest that any ruling from the Court would "either duplicate or could be inconsistent with" the defendants' already existing obligations.  (Id. (citing Nat'l Commc'ns Ass'n, Inc. v. Am. Tele. & Tele. Co., 46 F.3d 220, 222 (2d Cir. 1995)).

In National Communications Association, Inc. v. American Telephone and Telegraph Co., the Second Circuit set forth four factors to be considered in applying the primary jurisdiction doctrine:

      (1) whether the question at issue is within the conventional

> experience of judges or whether it involves technical or policy
> considerations within the agency's particular field of expertise; 2)
> whether the question at issue is particularly within the agency's
> discretion; 3) whether there exists a substantial danger of
> inconsistent rulings; and 4) whether a prior application to the
> agency has been made.

46 F.3d at 222 (citing Nat'l Commc'ns Ass'n v. Am. Tele. & Tele., Co., 813 F. Supp. 259, 263

(S.D.N.Y. 1993)).  The Court agrees that application of the four National Communications

Association factors here militates in favor of a judicial resolution.  (Pl.'s Mem. at 28).

First, violations of federal environmental statutes are well within the competency and

experience of judges, and the fact that both RCRA and TSCA contain provisions allowing for

citizen suits to be filed in federal court speaks to the view that Congress believed that federal

judges were capable of adjudicating these type of violations.  (See id. at 29).  Second, although

the issue of agency regulations is implicated here, as plaintiff points out, the EPA has already

interpreted the TSCA regulations at issue here, opining that "'[l]ight ballasts that are leaking

PCBs are in violation of the law and should be immediately removed and spills cleaned up.'"

(Id. at 29, n.35 (citing EPA PCB Ballast Site[10])).  Not only are judges capable of interpreting

regulations and do so all the time, but in this case, the section under which plaintiff is

proceeding, 42 U.S.C. § 6972(a)(1)(B), is an enforcement provision and deals with questions of

the relief to be awarded by the courts, and not by the agency.  (Id.)

With respect to defendants' argument that there is a risk of inconsistent rulings, as the

Court has already determined, the EPA is not actively pursuing the issue of PCBs leaking from

lights ballasts in the City schools and the CAFO contains no provision obligating defendants to

---

[10]http://www.epa.gov/epa.gov/epawaste/hazard/tsd/pcbs/pubs/ballasts.htm#ballast08a

provide inspection and cleanup beyond the five Pilot Program schools.  Finally, the fourth factor – "prior application to the agency" – is not applicable and therefore not a bar to this action.  See Nat'l Commc'ns Ass'n, Inc. v. Am. Tele. & Tele. Co., 46 F.3d at 222.  Thus, considering the four factors set forth in National Communications Association, the Court respectfully recommends that the defendants' motion to dismiss plaintiff's claims as barred by the doctrine of primary jurisdiction be denied.

2.  Mootness Issues

Defendants also contend that plaintiff's claims should be dismissed as moot because the defendants are already addressing the PCB ballasts in the City schools.  (Defs.' Mem. at 39).  Defendants contend that they have developed the "Greener Schools Plan"[11] to address the issue of possible PCB leaks from light fixtures and even though the Plan is voluntary, defendants argue that they are obligated under the CAFO to promulgate a Citywide PCB Management Plan.  However, as discussed supra, the City's plan to remove all PCB ballasts in the next ten years is entirely voluntary.  Moreover, defendants have only committed themselves to replacing all lights over a ten year period – 5 years longer that the EPA believes is advisable – and, even more importantly, the Plan entirely fails to address the imminent danger posed to New York City school children by currently leaking PCB ballasts that may not be inspected or replaced for years.  Although a citizen suit claim for relief is moot when "it is is absolutely clear that the allegedly

_____

[11]Defendants refer to the "Greener Schools Plan" as the "Ballast Plan" in their papers. However, the Plan includes a number of changes to New York City schools beyond lighting replacement, including boiler updates, installment of occupancy sensors, and installment of insulation.

wrongful behavior could not reasonably be expected to occur," Friends of the Earth, Inc. v. Laidlaw Envtl Servs. TOC, Inc., 528 U.S. 167, 189 (2000), in this case, there is nothing that guarantees that the violations are not continuing even today.  As plaintiff points out, the visual inspection program instituted by defendants is "completely voluntary" and has a "spotty track record:  custodians have detected leaks in only 19.6% of schools with PCB ballasts, compared to detection of leaks in 100% of the school buildings physically inspected by the Defendants and EPA where the information has been published."  (Pl.'s Mem. at 29)  More importantly, plaintiff notes that the defendants' claim of close oversight by the EPA does not apply to the Greener Schools Plan, which the City voluntarily adopted in order to comply with a local law on energy efficiency.  (Id.)  Thus, the Court finds that defendants have failed to carry their "heavy burden" of demonstrating that plaintiff's claims are moot because future PCB leaks cannot "be reasonably expected to recur."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. TOC, Inc., 538 U.S. at 189.

F.  Defendants' Challenge to NYCC's Standing

Defendants challenge plaintiff's standing, arguing that NYCC has neither organizational nor representational standing to bring these claims.

1.  Standing

Standing is one component of the Article III jurisdictional limit of federal courts to deciding "cases" or "controversies."  Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 85 (2d Cir. 2006).  "The Supreme Court has called Article III standing 'perhaps

the most important' of the case-or-controversy doctrines placing limits on federal judicial power." Id. (quoting Allen v. Wright, 468 U.S. 737, 750 (1984)).  In Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), the Supreme Court made it clear that a district court must "generally resolve material factual disputes and establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits."  See Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d at 85 (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. at 101).  Challenges to standing are properly brought as a motion under Rule 12(b)(1), rather than a motion for dismissal under Rule 12(b)(6) because a determination that there has been a failure to state a claim "is an adjudication on the merits with preclusive effect."  Id. at 88, n.6 (citing cases).

Defendants may make a facial challenge to the plaintiff's Article III standing that accepts the jurisdictional facts pleaded, but contests their sufficiency, or they may make a factual challenge, in which case the court has "leeway as to the procedure it wishes to follow."  Id. at 88 (citing Gibbs v. Buck, 307 U.S. 66, 71-72 (1939) (holding "[a]s there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court")).  Thus, courts may allow limited discovery on the jurisdictional issue, see Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990); may resolve the issue on affidavits, see Exchange Nat'l Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir. 1976); may conduct a hearing limited to the question of Article III standing, see Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d at 88; or "where the evidence concerning standing overlaps with evidence on the merits, the Court might prefer to proceed to trial and make its jurisdictional ruling at the close of the evidence."  Id.

27

The procedural posture of the case determines the standard by which the court assesses challenges to standing.  Here, the defendants have raised a facial challenge to the sufficiency of plaintiff's pleadings.  Given that there has been no discovery and no evidence presented in connection with the standing question, the Court "presume[s] the general factual allegations embrace those facts necessary to support the claim, . . . and [is] constrained not only to accept the truth of the plaintiffs' jurisdictional allegations, but also to construe all reasonable inferences to be drawn from those allegations in plaintiffs' favor."  Connecticut v. American Elec. Power Co., Inc., 582 F.3d 309, 333 (2d Cir. 2009), rev'd on other grounds, 131 S. Ct. 2527 (2011) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Warth v. Seldin, 422 U.S. 490, 501-02 (1975); Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001)).

In commenting on the fact that there is a lower bar for standing on a motion to dismiss at the pleading stage, the Supreme Court stated that "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  Lujan v. Defenders of Wildlife, 504 U.S. at 561.  Thus, the Second Circuit has made it clear in an environmental case, that where the defendants challenge the factual underpinnings of a plaintiff's standing, "'the argument is premature . . . [the] allegation of a credible risk may be sufficient at the pleading stage without further factual confirmation or quantification of the precise risk at issue.'"  Connecticut v. American Elec. Power Co., Inc., 582 F.3d at 333 (quoting Baur v. Veneman, 352 F.3d 625, 631 (2d Cir. 2003)).  If a more stringent test were required in environmental cases, the question of standing "'would essentially collapse . . . into the merits.'"  Id. (quoting Baur v. Veneman, 352 F.3d at 631).

28

"An organization can have standing to sue in one of two ways."  New York Civil

Liberties Union v. New York City Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012).  First, an

organization suing "on behalf of its members" has "representational standing" if "some particular

member of the organization would have had standing to bring the suit individually."  Id. at 294

(citing Warth v. Seldin, 422 U.S. 490, 511 (1975)).  The Supreme Court has provided the

following guidance with respect to representational standing:

> An association has standing to bring suit on behalf of its members
> when (1) "its members would otherwise have standing to sue in
> their own right;" (2) "the interests it seeks to protect are germane to
> the organization's purpose;" and (3) "neither the claim asserted nor
> the relief requested requires the participation of individual
> members in the lawsuit."

Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 477 U.S. 274,

275 (1986) (quoting Hunt v. Washington Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).

In addition to representational standing, an organization may "have standing in its own

right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities

the association itself may enjoy."  Warth v. Seldin, 422 U.S. at 511.  Under this "organizational

standing" approach, the plaintiff organization "must 'meet[ ] the same standing test that applies

to individuals.'"  New York Civil Liberties Union v. New York City Transit Auth., 684 F.3d at

294.  In other words, an organization may bring an action in its own right "so long as it can

independently satisfy the requirements of Article III standing as enumerated in Lujan."  Nnebe v.

Daus, 644 F.3d 147, 156 (2d Cir. 2011).  Specifically, in order to establish that it has

organizational standing at this stage, the NYCC must allege that it has:

> . . . suffered an 'injury-in-fact'– an invasion of a judicially
> cognizable interest which is (a) concrete and particularized and (b)

29

> actual or imminent, not conjectural or hypothetical; (2) that there
> be a causal connection between the injury and the conduct
> complained of – the injury must be fairly traceable to the
> challenged action of the defendant, and not the result of the
> independent action of some third party not before the court; and (3)
> that it be likely, as opposed to merely speculative, that the injury
> will be redressed by a favorable decision.

Lee v. Board of Governors of the Fed. Res. Sys., 118 F.3d 905, 910 (2d Cir. 1997) (quoting

Bennett v. Spear, 520 U.S. 154, 167 (1997)).  See also Lujan v. Defenders of Wildlife, 504 U.S.

at 560-61.

       NYCC claims that it has both organizational and representational standing; however, the

Court need only find one basis for the organization's standing to sue.  See New York Civil

Liberties Union v. New York City Transit Auth., 684 F.3d at 295 (holding that the NYCLU need

not show injury to its members because it was asserting organizational, rather than

representational, standing).


       2.  Analysis

       Plaintiff contends that it has representational standing on behalf of its members if:  1) at

least one member of the NYCC has standing to sue in his or her own right; 2) the interests are

germane to NYCC; and 3) participation of the individual member is not necessary to assert the

claims or to the requested relief.  (Pl.'s Mem. at 34).  Defendants argue that plaintiff does not

have representational standing because it cannot demonstrate that its members have suffered

injury in fact or that their alleged injury would be redressed by a favorable decision.  (Defs.'

Mem. at 34-37).

a. <u>Injury-In-Fact</u>

Plaintiff has submitted with its Amended Complaint nine declarations from parents with children who currently attend nine City schools in each of the five boroughs. (Am. Compl., Ex. A). Each declarant states that his or her child attends a New York City school that the DOE has identified as having T12 fixtures that are "very likely" to contains ballasts with PCBs. (<u>Id.</u>) Following oral argument on these motions, plaintiff filed an additional 16 declarations from parents whose children attend 16 additional New York City schools. (Docket Entry 45).

Defendants first argue that plaintiff lacks representational standing because NYCC cannot show that its members have suffered injury in fact. Citing <u>Lujan v. Defenders of Wildlife</u>, defendants argue that a plaintiff must demonstrate that the party seeking to bring the lawsuit is "'himself among the injured.'" 504 U.S. at 563 (quoting <u>Sierra Club v. Morton</u>, 405 U.S. 727, 734-35 (1972)). Defendants' argument with respect to the plaintiff's alleged injury is twofold. First, defendants argue that NYCC members "have not alleged injury in fact with respect to the overwhelming majority of these schools" because the NYCC has only submitted declarations from members regarding nine specific New York City schools. (Defs.' Mem. at 35). Second, defendants claim that, even with respect to these nine schools, plaintiff's declarations are insufficient to demonstrate standing because there are "no allegations of actual injuries, or even allegations that the lighting fixtures in any of these nine schools have been actually determined to contain PCBs." (<u>Id.</u> at 36).

"To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be 'concrete and particularized' as well as 'actual or imminent, not "conjectural" or "hypothetical."'" <u>Baur v. Veneman</u>, 352 F.3d 625, 632 (2d Cir. 2003) (citing <u>Lujan v. Defenders</u>

of Wildlife, 504 U.S. at 560).  In evaluating whether a plaintiff alleges injury sufficient to confer

standing, courts are concerned with whether the "injury 'affect[s] plaintiff in a personal and

individual way' . . . to avoid having the federal courts serve as 'merely publicly funded forums

for the ventilation of public grievances or the refinement of jurisprudential understanding.'"  Id.

(citing Lujan v. Defenders of Wildlife, 504 U.S. at 560 n.1; Valley Forge Christian College v.

Americans United for Separation of Church & State, 454 U.S. 464, 473 (1968)).

      Defendants attempt to frame NYCC's members' claimed injury as a "generalized

grievance;" however, this claim is easily disposed of.  Specifically, defendants contend that

"[p]laintiff's generalized grievance about the possibility of PCBs in nine older school buildings

does not establish an injury in fact . . . [O]therwise, anyone who enters any number of buildings

built before . . . PCBs were phased out . . . could allege standing to bring suit . . . ."  (See Defs.'

Mem. at 36).

      The Court notes that although NYCC may be an environmental plaintiff, the injury

claimed by NYCC members is not the sort of environmental injury that typically raises concerns

that the court will be used to air a public grievance.  See Friends of the Earth, Inc. v. Gaston

Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (distinguishing between

environmental injuries that "can be demarcated as a traditional trespass on property or tortious

injury to a person" and those that involve only damage "to an individual's aesthetic or

recreational interests," and noting that because the latter category of environmental injuries "may

be widely shared, the Supreme Court has cautioned that environmental plaintiffs must

themselves be 'among the injured'").  Moreover, by identifying themselves as parents of New

York City school children who attend schools that are likely to contain PCB ballasts and by

raising concerns about the specific health risks faced by their children as a result of potential exposure to PCBs (Am. Compl., Ex. A), the NYCC members who submitted declarations have alleged facts sufficient to set themselves apart from members of the general public who have no personal stake in the City's approach to the problem of PCBs in the City's schools.  See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d at 156 (holding that a plaintiff "must somehow differentiate himself from the mass of people who may find the conduct objectionable only in an abstract sense.  In other words, the alleged injury 'must affect plaintiff in a personal and individual way'").  As plaintiff points out, the fact that the school children are required by law to attend these schools for extended periods of time, dramatically increasing their chances of exposure to highly toxic substances, further distinguishes NYCC's member-parents from the general population.  (Pl.'s Mem. at 37).

The more difficult question in this case is whether the injury alleged by NYCC's member-parents is sufficiently "actual or imminent" to confer standing.  Not only is the presence of leaking PCBs in any particular light ballast somewhat uncertain, but the increased health risks faced by children exposed to PCB leaks is also unclear.  "Threats or increased risk . . . constitutes cognizable harm.  Threatened environmental injury is by nature probabilistic."  Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d at 160; see also Natural Res. Def. Council v. EPA, 464 F.3d 1, 6 (D.C. Cir. 2006) (noting that "[e]nvironmental and health injuries often are purely probabilistic").  Therefore, courts "have generally recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes."  Baer v. Veneman, 352 F.3d at 633 (citing cases).

For example, in Baer v. Veneman, the Second Circuit held that "in the context of food

and drug safety suits, . . . [injuries in the form of an enhanced risk] are cognizable for standing purposes, where plaintiff alleges exposure to potentially harmful products, . . . [in part because] [l]ike threatened environmental harm, the potential harm from exposure to dangerous food products or drugs 'is by its nature probabilistic.'" Id. at 634-35 (citing Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d at 160). The Second Circuit went even further in New York Public Interest Research Group v. Whitman, 321 F.3d 316 (2d Cir. 2003), relying on plaintiff's allegation that the EPA's failure to enforce Clean Air Act ("CAA") permit requirements led to "uncertainty as to whether . . . [its members were being exposed to] excess air pollution" and holding that this was "sufficient to establish injury-in-fact" since the members lived near facilities subject to the CAA permit requirements. Id. at 325. The Whitman court reasoned that the distinction between the personal and economic injury caused by uncertainty, as alleged by the plaintiffs, and the injury alleged in cases involving actual exposure to excess pollutants was "a superficial one [for purposes of standing . . .] since both cause personal and economic harm." Id. at 326 (noting that "the injury-in-fact necessary for standing 'need not be large, an identifiable trifle will suffice'"). See also Natural Res. Def. Council v. EPA, 464 F.3d 1, 6 (D.C. Cir. 2006) (holding that an increased lifetime risk that NRDC members would develop skin cancer as a result of the EPA's rule relating to the production and consumption of methyl bromide was sufficient to confer standing on NRDC).

Given that the case is at the pleading stage and plaintiff has had no discovery to date, the Court considers the allegations in the Complaint to be true and finds that plaintiff has sufficiently alleged injury-in-fact. The probability that the NYCC members' children are currently being exposed to toxic PCBs that have leaked from ballasts in their schools is extremely high given that

leaking ballasts have been found in 100% of the schools inspected by the EPA and in 100% of the Pilot Schools.  (Pl.'s Mem. at 36).  Moreover, the likelihood that these ballasts will leak in the future becomes even higher as the ballasts continue to age over the next ten years.  (Id. at 37).  Plaintiff's Complaint characterizes PCBs as "among the most poisonous man-made compounds" and lists the various health risks posed by exposure to PCBs, noting that children are especially vulnerable.  (Am. Compl. ¶¶ 20-27).  Indeed, defendants do not challenge plaintiff's characterization of the serious health risks posed by exposure to PCBs.

Instead, defendants cite only two cases in support of their argument that NYCC's allegations do not support a finding of injury vis-a-vis the 25 schools mentioned in the parents' declarations.  (Defs.' Mem. at 36 (citing Doyle v. Town of Litchfield, 372 F. Supp. 2d 288, 303 (D. Conn. 2005), and Wademan v. Concra, 13 F. Supp. 2d 295, 305 (N.D.N.Y. 1998)).  However, defendants' reliance on Doyle v. Town of Litchfield and Wademan v. Concra is misplaced.  In both of those cases, plaintiffs were found to have alleged injury-in-fact sufficient to confer standing, but their claims were dismissed for lack of standing based on their failure to establish redressability.  See Doyle v. Town of Litchfield, 372 F. Supp. 2d at 302; Wademan v. Concra, 13 F. Supp. at 301-02.

Defendants also claim that the declarations from the parents whose children attend only the represented schools cannot confer standing to sue with respect to the other schools.  (Defs.' Mem. at 35 (citing P.R. Campers' Ass'n v. P.R. Aqueduct & Sewer Auth., 219 F. Supp. 2d 201 (D.P.R. 2002); and Lujan v. Defenders of Wildlife, 504 U.S. at 565-66).  Defendants cite to the holding in P.R. Campers' Association, where the plaintiff organization was found to lack standing with respect to its claims relating to the Sabana River, despite sworn statements from its

members regarding possible contamination at other waterbodies. 219 F. Supp. 2d at 212-13. Defendants argue that the plaintiff here similarly cannot demonstrate standing at any of the schools in the public school system beyond the 25 mentioned in the parents' declarations. Defendants cite Conservation Law Foundation of New England, Inc. v. Reilly, 950 F.2d 38, 43 (1st Cir. 1991), where the First Circuit held that "[b]ecause plaintiffs have ties to only a few federal facilities, they have failed to carry their burden of showing injury-in-fact sufficient to grant them standing to obtain nationwide injunctive relief." In so holding, the court reasoned that "[t]he absence of plaintiffs from the majority of regions in the country . . . demonstrates the lack of 'concrete factual context conducive to a realistic appreciation of the consequences of judicial action.'" Id.

     However, given the nature of plaintiff's claims in this case, the Court finds Alaska Center for the Environment v. Browner, 20 F.3d 981 (9th Cir. 1994), more instructive. In Alaska Center, the Ninth Circuit upheld the standing of four environmental organizations that sought enforcement of the CWA in all waters in the State of Alaska, reasoning that the EPA's duty to establish total maximum daily loads for the State of Alaska was a singular "precise duty" and that all state water bodies were interrelated for standing purposes. Id. at 985-86.

     Here, the declarations come from parents with children who attend schools in all five New York City boroughs; each alleges the common problem of PCBs leaking or potentially leaking from the light ballasts. (Am. Compl., Ex. A). Defendants manage and control the operation of not only the 25 schools mentioned in the declarations, but all the New York City schools that allegedly contain similarly dangerous light fixtures. Indeed, the City's own Plan for remediation deals with all of the schools in one single program. In addition, like the waterbodies

in Alaska, New York City schools are interrelated – a parent and her child have an interest in the safety of schools beyond the particular school the child attends.  As a child progresses in her studies, she will move from one school building to another.  In addition, participation in sports and other recreational activities regularly lead children to enter schools they do not attend during regular school hours.  Accordingly, in light of Alaska Center, defendants' contention that plaintiff only has standing to challenge the City defendants' practices with respect to the 25 schools mentioned in the declarations is unavailing.

Accordingly, the Court finds that, at this stage of the proceedings, the plaintiff has sufficiently alleged injury-in-fact to survive defendants' motion to dismiss.


b. Redressability

Defendants also contend that the injury alleged here will not be redressed by a favorable decision in this Court because the ongoing program that the City has in place to address these leaking ballasts is sufficient and any relief ordered here would "do little more than interfere with those programs."  (Defs.' Mem. at 36).  Plaintiff contends that not only is there no guarantee that the City's voluntary program will be implemented, but even if it proceeds as planned, the replacement of these potentially harmful lights will not be completed for ten years, which is twice the time period recommended by the EPA.  (Pl.'s Mem. at 39).  Plaintiff argues that discovery is needed in order to determine what a reasonable timeframe would be, but notes that 41 members of the City Council have urged replacement in a two-year period.  (Id.)

Given that the Court might very well determine that a shorter period of time was necessitated by the potential harm posed by leaking PCBs, the Court finds that the plaintiff has

alleged sufficient facts to withstand a challenge on grounds of redressability and respectfully recommends that defendants' motion to dismiss for lack of standing be denied.  As the Court finds that NYCC has representational standing to bring suit on behalf of its members, it has not addressed the parties' arguments with respect to organizational standing.[12]

G.  Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants have also moved to dismiss both plaintiff's TSCA and RCRA claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that plaintiff has failed to allege sufficient facts to state a plausible claim for relief.

---

[12]Defendants contend that plaintiff's claimed interest in the "access to quality schools" is not sufficient to allege a concrete injury sufficient to confer organizational standing.  (Defs.' Mem. at 34, n.16 (citing Simone v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 (1976))). Plaintiff has submitted the Declaration of Jon Kest, Executive Director of NYCC, in which he states that "[t]he PCB Program draws heavily on the resources of NYCC" and that these efforts "have required NYCC to pull services and resources away from NYCC's other projects, in general, and our non-PCB school work, in particular."  (Kest Decl. ¶ 9).  Citing Nnebe v. Daus, plaintiff contends that it need only allege a "'perceptible impairment' of its activities," which it contends it has shown by alleging "'an expenditure of resources that could be spent on other activities.'"  (Pl.'s Mem. at 35 (quoting Nnebe v. Daus, 644 F.3d at 157 (internal citations omitted))).  However, Nnebe does not support plaintiff's position because in that case, the plaintiff-organization, the New York Taxi Workers Alliance ("NYTWA"), expended resources to assist its members who were facing summary suspension.  Nnebe v. Daus, 644 F.3d at 157.  The Second Circuit noted that the NYTWA had organizational standing based on the "perceptible opportunity cost expended" by the organization, which the court found was not a result of "manufactured litigation" and "'constitute[d] far more than simply a setback to [NYTWA's] abstract social interests.'"  Id. (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).  Whether the problem of PCBs in public schools is one of NYCC's major policy efforts and whether the resulting allocation of NYCC resources is sufficient to meet the standard in Nnebe is unclear, but the Court need not reach this issue given the NYCC's representational standing in this case.

1. <u>Legal Standard</u>

When deciding a motion to dismiss a complaint for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6), the Second Circuit has stated that a court must "accept

as true the factual allegations of the complaint, and draw all inferences in favor of the pleader."

<u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1174 (2d Cir. 1993); <u>see also</u> <u>Gorman v. Consol.</u>

<u>Edison Corp.</u>, 488 F.3d 586, 591-92 (2d Cir. 2007), <u>cert. denied</u>, 553 U.S. 1093 (2008).  In

addition, the court must give plaintiff's claims "a liberal construction."  <u>Johnson v. New York</u>

<u>City Transit Auth.</u>, 639 F. Supp. 887, 891 (E.D.N.Y. 1986) (citing <u>Haines v. Kerner</u>, 404 U.S.

519, 520-21 (1972)), <u>aff'd in part and vacated in part on other grounds</u>, 823 F.2d 31 (2d Cir.

1987).  However, the court is not required to accept the truth of legal conclusions couched as

factual allegations.  <u>See</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986).

In <u>Bell Atlantic Corporation v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, the Supreme Court

clarified the pleading standards under which courts are to evaluate a motion to dismiss, "arguably

shift[ing] pleading standards from 'simple notice pleading' to a 'more heightened form of

pleading.'"  <u>Barbosa v. Continuum Health Partners, Inc.</u>, 716  F. Supp. 2d 210, 214 (S.D.N.Y.

2010) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662,

667 (2009)).

Now, when deciding a Rule 12(b)(6) motion to dismiss, the court should consider

whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 677 (quoting <u>Bell Atl. Corp. v.</u>

<u>Twombly</u>, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678; see also Hayden v. Paterson, 594 F.3d

150, 160-61 (2d Cir. 2010).  Under this heightened pleading standard, labels, conclusions, and

mere recitation of the elements of a cause of action will not suffice.  Ashcroft v. Iqbal, 556 U.S.

at 679; see also Bell Atl. Corp. v. Twombly, 550 U.S. at 545.  Instead, a plaintiff must provide

enough factual support that, if true, would "raise a right to relief above the speculative level."

Bell Atl. Corp. v. Twombly, 550 U.S. at 555.  However, "plausibility" does not rise to the level

of probability but requires "'more than a sheer possibility that a defendant has acted

unlawfully.'"  Barbosa v. Continuum Health Partners, Inc., 716  F. Supp. 2d at 215 (quoting

Ashcroft v. Iqbal, 556 U.S. at 678).  "The issue is not whether a plaintiff will ultimately prevail

but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes,

416 U.S. 232, 236 (1974); see also Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d

Cir. 1995), cert. denied, 519 U.S. 808 (1996).  Ultimately, when the well-pleaded facts allow no

more than an inference of a "mere possibility of misconduct" and plaintiff has only alleged,

rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not

been satisfied.  Ashcroft v. Iqbal, 556 U.S. at 679.


   2.  Failure to State a Claim under TSCA

   Defendants move to dismiss plaintiff's claims under TSCA, arguing that the Complaint

contains only conclusory allegations which fail to identify a single school building or light fixture

where leaking PCBs are known to exist and where defendants have not already taken steps to

remedy the violation.  Defendants argue that plaintiff relies on the mere existence of these T12

ballasts in 700 City schools, and yet the use of these PCB containing ballasts is permissible under

TSCA.  (Defs.' Mem. at 18).  Defendants contend that although plaintiff may petition the EPA to

amend its TSCA regulations, the mere presence of these ballasts does not give rise to a claim of

improper disposal or use violation, nor does it justify a presumption that there is an ongoing

violation.  (Id. at 18-19).  Defendants argue that the fact that leaks have been identified at 11

schools "cannot be extrapolated to sustain a claim alleging unspecified violations at almost 700

other schools, and in over 500,000 other light fixtures."  (Id. at 19).  Thus, in the absence of

specificity, defendants contend that plaintiff's claims fail to satisfy the strict pleading

requirements of Iqbal and Twombly.  (Id.  at 18).

     Plaintiff contends that the suit is not based on the existence of T12 light fixtures in the

schools; rather, the claims are based on the fact that "[l]eaking PCB ballasts are a clear violation

of TSCA," and "it is a certainty," given the overwhelming number of leaks already identified,

that "a PCB ballast is currently leaking."  (Pl.'s Mem. at 11).  Indeed, plaintiff notes that

defendants do not dispute that, as the EPA found, "'there is a prevalence'" of leaking PCB lights

throughout the City school system.  (Id.)  According to the EPA, leaking PCB ballasts constitute

an improper disposal of PCBs in violation of TSCA and "should be immediately removed and

spills properly cleaned up."  (Am. Compl., Ex. D).  See 40 C.F.R. § 761.3 (defining PCB

disposal as "intentionally or accidently to discard, throw away or otherwise complete or

terminate the useful life of PCBs and PCB Items.  Disposal includes spills, leaks and other

uncontrolled discharges of PCBs. . .").  Plaintiff contends that although defendants complain that

plaintiff has failed to identify a single currently leaking ballast, only defendants have access to

conduct the inspections necessary to locate each specific leaking light ballast.  (Id. at 11).

     Although plaintiff's Complaint does not identify the specific location of each leaking

light ballast, defendants' argument, seeking to dismiss plaintiff's Complaint under Rule 12(b)(6)

conflates the notice requirements of TSCA with the pleading standards of the Federal Rules.

Even under the heightened pleading standards of <u>Iqbal</u> and <u>Twombly</u>, plaintiff need only allege

"sufficient factual matter," which the court must "accept[] as true," to state a claim that is

plausible on its face.  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at

570.  Here, plaintiff has alleged the existence of numerous leaking light ballasts throughout the

City schools.  Assuming those facts as true, and drawing all inferences in favor of plaintiff, as the

Court must on a motion to dismiss, <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d at 1174, the Court

finds that plaintiff has adequately pleaded a plausible claim under TSCA and respectfully

recommends that defendants' motion to dismiss plaintiff's TSCA claim be denied.


      3.  <u>Failure to State a Claim Under RCRA</u>

      Defendants also move to dismiss plaintiff's RCRA claim under Rule 12(b)(6).  To

establish a prima facie case of RCRA liability under 42 U.S.C. § 6972(a)(1)(B), plaintiff must

prove that defendants (1) are "persons" (2) who "contributed . . . to the past or present handling,

storage, treatment, transportation or disposal" (3) of any "solid or hazardous waste which may

present an imminent and substantial endangerment to health or the environment."  <u>See</u> 42 U.S.C.

§ 6972(a)(1)(B).  <u>See also</u> <u>Aiello v. Town of Brookhaven</u>, 136 F. Supp. 2d 81, 104 (E.D.N.Y.

2001).

      Defendants contend that the Complaint fails to contain any specific allegations, other than

a recitation of statutory language, as to the nature of the defendants' conduct that arguably

contributes to the improper "storage," "treatment," "handling," "transportation," or "disposal" of

waste as required by the statute.  (Defs.' Mem. at 20 (citing 42 U.S.C. §§ 6903(33)-(34))); see also 42 U.S.C. § 6903(3).  In addition, defendants argue that:  "(a) the alleged presence of leaking PCB ballasts in buildings does not give rise to contributor liability under RCRA; (b) the leakage of PCB dielectric fluid inside of light fixtures does not constitute 'disposal' under RCRA; and (c) in-use, legally authorized PCB ballasts and light fixtures are not 'solid waste' and thus not actionable under RCRA."  (Defs.' Mem. at 20).

### a.  Contributor Liability Under RCRA

Plaintiff alleges that with unremediated past PCB leaks, present PCB leaks, and future PCB leaks in City schools, "defendants have contributed to and/or are contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  (Am. Compl. ¶ 87).  With respect to unremediated past PCB leaks, plaintiff alleges that "[i]n many cases, . . . defendants replaced a failed, leaking PCB ballast with an intact ballast, but continued to use the overall fixture housing the ballast, which the ballast leak had contaminated."  (Id. ¶ 36).

Turning first to defendants' argument that the RCRA claim must be dismissed because plaintiff has failed to allege what affirmative conduct of defendants constitutes "contributor" liability under RCRA, the Court notes that "[t]he 'contributed to' language . . . has been held to 'expressly specif[y] that there is no liability without a causal relationship between a defendant and an imminent and substantial endangerment.'"  Zands v. Nelson, 797 F. Supp. 805, 809-10 (S.D. Cal. 1992) (noting, however, that "[i]ndividuals are liable under RCRA without regard to fault or negligence").  One court has observed that the legislative history of RCRA "reveals two

noteworthy points:  first, that Congress intended the phrase 'contributing to' disposal to be interpreted in a liberal, not a restrictive, fashion; and second, that Congress realized that past acts could presently be contributing to an endangerment and intended those acts to be within the ambit of the statute."  United States v. Price, 523 F. Supp. 1055 (D.N.J. 1981), aff'd, 688 F.2d 204 (3d Cir. 1982).

Defendants argue that in order for there to be contributor liability under RCRA, there must be a showing of more than passive conduct.  See Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d 847, 854 (7th Cir. 2008), cert. denied, 129 S. Ct. 2002 (2009) (stating "the vast majority of courts that have considered this issue read RCRA to require affirmative action rather than merely passive conduct . . . for handling or storage liability"); see also Ecological Rights Found. v. Pac. Gas & Elec., 803 F. Supp. 2d 1056, 1064 (N.D. Cal. 2011) (holding that the law "rejects the notion that the hazardous material can be 'discarded' without any action by defendant").  In Delaney v. Town of Carmel, 55 F. Supp. 2d 237, 256 (S.D.N.Y. 1999), the court noted that the "term ['contributed to'] has been universally held to infer something more than mere ownership of a site; some level of causation between the contamination and the party to be held liable must be established."

Defendants argue that plaintiff's RCRA claim is based on defendants' failure to take any affirmative steps to address the PCB leaks and that these allegations involve only passive conduct that does not suffice to allege contributor liability.  (Defs.' Mem. at 21).  Given that the EPA authorized the unconditional use of PCB ballasts, defendants contend that there can be no RCRA contributor liability in the absence of any allegation that defendants ever even touched these ballasts.  (Id. at 23).  Citing Ecological Rights Foundation v. Pacific Gas & Electric Co.,

44

defendants note that if liability under RCRA could attach under these circumstances, "'virtually any owner of any building or structure . . . would be subject to liability;' '[s]uch a result is clearly well beyond what Congress intended in enacting RCRA.'" (Defs.' Mem. at 23 (citing 803 F. Supp. 2d at 1065)).

Plaintiff challenges the defendants' reliance on cases that require "active" involvement by defendants in order for there to be RCRA liability.  (Pl.'s Mem. at 14).  Noting that only one of the cases relied on by defendants is from this Circuit, plaintiff argues that even that case, Delaney v.Town of Carmel, has been called into question by subsequent decisions.  In Aiello v. Town of Brookhaven, this Court expressly rejected the holding in Delaney that required "active involvement," stating that "Delaney cannot be relied upon as giving appropriate consideration or content to the meaning of 'contribute to' for purposes of RCRA."  136 F. Supp. 2d at 113.  In so holding, the Aiello court noted that the Delaney court "summarily concluded," "[i]n cryptic fashion," that there was no RCRA liability, relying on a "lack of 'active involvement' that precluded CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act] arranger liability," a notion that "had been rejected by the Second Circuit in General Electric."  Id. at 12-13 (citing General Electric v. AAMCO Transmissions, Inc., 962 F.2d 281, 286 (2d Cir. 1992) (holding that "it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision")).  In Niagara Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 178 (2d Cir. 2003), the Second Circuit noted that the "process of 'leaking' seems to need no human agency," a finding supportive of the holding in Aiello.

Even cases outside this Circuit have made it clear that some level of control over the waste disposal process, rather than active involvement in disposal, is sufficient to constitute "contributing" for RCRA purposes.  See, e.g., Hinds Inus. L.P. v. Angioli, 654 F.3d 846, 852 (9th Cir. 2011) (holding that "to state a claim predicated on RCRA liability for 'contributing to' the disposal of hazardous waste, a plaintiff must allege that the defendant had a measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process"); United States v. Valentine, 885 F. Supp. 1506, 1512 (D.Wyo. 1995) (denying summary judgment on the basis that "it is not necessary that a party have control over the ultimate decisions concerning waste disposal . . . to be found to be a contributor within the purview of RCRA").

As plaintiff points out, at least one court has held that owners of underground storage tanks (USTs) at the time of a leak are responsible for "contributing to disposal" because they are deemed to have the requisite control and authority over the tanks.  See Zands v. Nelson, 797 F. Supp. at 810 (holding that owners of gas stations are responsible for leaks from the tanks and that "the direct relationship between the leakage and the equipment owned or operated for use at the gas station is sufficient to prove the element of 'contribution'").  See also Agric. Excess & Surplus Ins. Co. v. A.B.D. Tank & Pump Co., 878 F. Supp. 1091, 1099-1100 (N.D. Ill. 1995) (stating that "this Court cannot hold as a matter of law that . . . the manufacturer and designer of the UST which allegedly leaked petroleum . . . does not fall within [the § 6972(a)(1)(B) definition of one who is contributing to the disposal of any solid waste").  Based on defendants' ownership of and control over the ballasts and their knowledge of the EPA's finding of a "prevalence of leaking PCB ballasts in the City's school system" (Am. Compl., Ex. F), plaintiff

argues that the Amended Complaint sufficiently alleges a basis for RCRA's "contributing to" component.  (Pl.'s Mem. at 16).

Plaintiff also points out that a number of other cases defendants cite in support of their restrictive interpretation of "contribution" hold only that "passive migration" of contamination that had occurred prior to the owner's acquisition of the land does not create liability on the part of the owner.  (Pl.'s Mem. at 16).  For example, defendants cite Interfaith Community Organization v. Honeywell International, Inc., 263 F. Supp. 2d 796 (D.N.J. 2003), aff'd, 399 F.3d 248 (3d Cir.), cert. denied 545 U.S. 1129 (2005), for the proposition that "a straight forward reading of RCRA compels a finding that only active human involvement with the waste is subject to liability."  Id. at 831.  However, in that case, the court held that the current owner of property that had been contaminated by the prior owner was not a contributor subject to RCRA liability for contamination to neighboring land resulting from the migration of chemicals through the soil.  Id. at 813-14, 846.  Similarly, defendants cite Delaney v. Town of Carmel, for the proposition that "the term ['contributed to'] has been universally held to infer something more than mere ownership of a site."  55 F. Supp. 2d at 256.  However, the Delaney court made that observation in the course of holding that neither a municipality nor a property developer are "contributors" under RCRA where they became owners of the property after the dumping of allegedly hazardous substances occurred.  Id.; cf. Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d 847, 854 (7th Cir. 2008), cert. denied, 129 S. Ct. 2002 (2009) (holding that the sale of a building with a boiler system that contained asbestos was not "disposal" where the release of asbestos occurred prior to the owner's acquisition of the property).

Plaintiff also argues that there is a distinction between the leaking and spillage of PCBs

47

that has occurred in this case and the passive migration of contaminants through the soil in the

cases cited by defendants.  (Pl.'s Mem. at 17).  Plaintiff contends that RCRA liability is

contemplated for "the discharge of hazardous waste leaked or spilled out from a container

intended to hold the waste."  (Id. (quoting Ecological Rights Found. v. Pac. Gas & Elec. Co., 803

F. Supp. 2d at 1065 (referring to Zands v. Nelson, 779 F. Supp. at 879))).  In Carson Harbor

Village Ltd. v. Unocal Corp., the court explained the difference as follows:

> [O]f the terms defining "disposal," the only one that might
> remotely describe the passive soil migration here is "leaking."  But
> under the plain and common meaning of the word, we conclude
> that there was no "leaking."  The circumstances here are not like
> that of the leaking barrel or [UST] envisioned by Congress . . . or a
> vessel or some other container that would connote "leaking."

270 F.3d 863, 879-80 (9th Cir. 2001), cert. denied, 535 U.S. 971 (2002).

Based on a review of the plaintiff's allegations with respect to defendants' "contribution

to" the alleged RCRA violations, the Court declines to find that the allegations are insufficient as

a matter of law.  First, despite defendants' attempt to frame their conduct as merely passive,

notably, plaintiff's Complaint alleges active conduct on the part of defendants with respect to

unremediated past PCB leaks.  Specifically, plaintiff alleges that "[i]n many cases, . . . defendants

replaced a failed, leaking PCB ballast with an intact ballast, but continued to use the overall

fixture housing the ballast, which the ballast leak had contaminated."[13]  (Am. Compl. ¶ 36).  If

this treatment of PCB ballasts constitutes improper disposal of a solid or hazardous waste under

---

[13]Defendants have relegated their response to this allegation to a footnote in their
Memorandum of Law, arguing only that "the claim set forth in this allegation should be
dismissed for failure to provide adequate notice."  (Defs.' Mem. at 20, n.11).  However, as
discussed supra at 17-23, the Court finds that plaintiff provided adequate notice of its RCRA
claim.

RCRA, then surely defendants "contributed to" that RCRA violation.

Moreover, as in the context of UST leaks, defendants may be liable for their more passive conduct with respect to the PCB ballasts based on their authority and control over the fixtures.  If leaking PCBs constitute a RCRA violation, defendants cannot point to anyone more responsible for that violation than themselves; their theory of contributor liability would require the Court to hold that despite the RCRA violation, no one could be held liable pursuant to RCRA's enforcement provision.  Indeed, none of the cases defendants cite in support of their limited construction of "contributed to" take the position that defendants now ask this Court to take – namely, dismissal of claims against a defendant based on a lack of causation, even though a RCRA violation may have occurred and the court cannot identify any entity more responsible for the alleged violation than that defendant.  See Interfaith Cmty. Org. v. Honeywell Int'l Inc., 263 F. Supp. 2d 796; see also Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d 847; Ecological Rights Found. v. Pac. Gas & Elec. Co., 803 F. Supp. 2d 1056;  Delaney v. Town of Carmel, 55 F. Supp. 2d 237.


b.  Storage or Disposal of Leaked PCBs

To make out its RCRA claim, plaintiff must also show that defendants contributed to "the past or present *handling, storage, treatment, transportation or disposal*" of solid or hazardous waste.  See 42 U.S.C. § 6972(a)(1)(B) (emphasis added).  Defendants argue that the Complaint "contains no allegations which could reasonably be construed as activities concerning the 'storage,' 'treatment,' or 'transportation' of waste as those terms are used in the statute," and that the leakage of PCB dielectric fluid inside of lighting fixtures does not constitute "disposal" under

RCRA.  (Defs.' Mem. at 20 (citing 42 U.S.C. § 6903(33)-(34))).

RCRA defines "disposal as:

> the discharge, deposit, injection, dumping, *spilling, leaking*, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3) (emphasis added).  Defendants contend that where, as in this case, the waste exposure is only inside a building and not onto "land or water," there is no disposal and therefore no RCRA violation.  (Defs.' Mem. at 24 (quoting Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d at 850-53)).  See also 3550 Stevens Creek Assocs. v. Barclays Bank of Cal., 915 F.2d 1355, 1360-61 (9th Cir. 1990), cert. denied,  500 U.S. 917 (1991) (holding that the use of asbestos in construction did not constitute disposal in part because "any resulting hazard is within the building"); George v. Reisdorf Bros., Inc., 696 F. Supp. 2d 333, 344 (W.D.N.Y. 2010), aff'd, 410 Fed. Appx. 382 (2d Cir. 2011) (dismissing RCRA claim because evidence of fertilizer residue contained on wagons used to transport fertilizer did not demonstrate disposal onto land or water).

Plaintiff asserts that leaked PCBs constitute "disposal" or "handling" when school custodians improperly remediate PCBs that have leaked onto the floor, desks, chairs, etc.  (Pl.'s Mem. at 18 (citing Am. Comp. ¶¶ 36, 55, 68, 73)).  Moreover, as plaintiff's counsel noted during oral argument, leaked PCBs are carried out of the school buildings onto the land when children and teachers step on leaked PCB fluid and track it out of the school into the environment.  (Tr.[14]

---

[14]Citations to "Tr." refer to the transcript of the oral argument before the Court on defendants' Motion to Dismiss, dated April 13, 2012.

at 69-70).  In addition, PCBs will also volatilize, and dust contaminated by volatilized PCBs could enter the schools' ventilation systems.  (Pl.'s Mem. at 19).

Numerous decisions belie defendants' cramped interpretation of "disposal," finding that "Congress intended the term 'land' to encompass buildings and other types of real estate."  BCW Assocs., Ltd. v. Occidental Chem. Corp., Civil Action No. 86-5947, 1988 U.S. Dist. LEXIS 11275, at *45 (E.D. Pa. Sept. 29, 1988) (interpreting the meaning of "disposal" as it appears in CERCLA[15]); Ermhardt Indus., Inc. v. Duracell Int'l Inc., 665 F. Supp. 549, 574 (M.D. Tenn. 1987) (holding that the spilling of PCBs during manufacture constitutes disposal).  In Reading Co. v. City of Philadelphia, 823 F. Supp. 1218 (E.D. Pa. 1993), the court denied defendants' motion for summary judgment on plaintiff's CERCLA claim, finding that there was a possible release into the environment because even though the PCBs migrated into an enclosed market space, the people who used the space could carry the contaminated material into the environment on their clothing.  Id. at 1238-39; see also BCW Assocs., Ltd. v. Occidental Chem. Corp., 1988 U.S. Dist. LEXIS 11275, at *46 (holding that there was a "release or threatened release" into the environment under CERCLA where contaminated lead dust in a warehouse may be tracked into the environment on people's clothing and packages).

Plaintiff argues that even if the Court were to adopt defendants' more restrictive interpretation of "disposal" to find that leaking PCBs from ballasts into an enclosed portion of the fixture does not constitute disposal, then such containment of the leaked ballasts constitutes "storage" of PCBs.  (Pl.'s Mem. at 20).  RCRA provides that:

---

[15]CERCLA directly incorporates RCRA's definition of "disposal."  See 42 U.S.C. § 9601(29); Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d at 853 (noting that "[t]he definition of 'disposal' is the same under RCRA and CERCLA").

> [t]he term "storage" when used in connection with hazardous
> waste, means the containment of hazardous waste, either on a
> temporary basis or for a period of years, in such a manner as not to
> constitute disposal of such hazardous waste.

42 U.S.C. § 6903(33).  Plaintiff argues that if defendants' conduct with respect to the leaking

ballasts does not constitute disposal, "then the waste would, by definition, continue to be

'contained' or stored until such time as defendants remove the waste."  (Pl.'s Mem. at 21).

Defendants argue that plaintiff may not bring a RCRA claim for defendants' alleged

waste "storage" because plaintiff did not provide sufficient notice of such a claim and they

reiterate their contention that RCRA liability requires affirmative action, rather than merely

passive conduct.  (Defs.' Reply at 10).  Defendants cite Connecticut Coastal Fishermen's

Association v. Remington Arms Co., 989 F.2d 1305 (2d Cir. 1993), in support of their argument,

but that case has no application here.  Connecticut Coastal Fishermen's Association involved

"lead shot and clay targets . . . scattered in the waters of Long Island Sound."  Id. at 1316.  Since

the lead shot and clay targets were not being contained or held, the Second Circuit held that there

was no RCRA liability for "storage."  Id.  The instant case is easily distinguishable, as defendants

contend that any PCB leaks are contained "inside the lighting fixtures," and that such "leaks onto

interior, largely inaccessible electrical equipment do not constitute placement of waste onto

either 'land or water.'"  (Defs.' Mem. at 25).

The Court agrees with plaintiff that defendants can not have it both ways – either the PCB

leaks are contained within the fixtures, constituting "storage" of the leaked PCBs, or the PCBs

leak outside of the fixtures and into the classroom and beyond, constituting "disposal" for the

purposes of RCRA.  Plaintiff alleges sufficient facts to suggest that the presence of PCB leakage

from failed ballasts in classrooms and defendants' attempts to remediate past PCB leaks may

constitute either disposal or storage of waste pursuant to RCRA.  Given that there is an issue as

to whether the PCB contamination from the ballasts has in fact been dispersed either through the

cleaning process or on the feet and clothing of people within the school, it is a question that is

more appropriately considered after discovery has been conducted.


      c.  <u>Leaked PCBs as Solid or Hazardous Waste</u>

Defendants argue that plaintiff cannot obtain the requested relief – namely replacement of

all in-use fixtures, under 42 U.S.C. § 6972(a)(1)(B) – because "the cause of action pertains only

to solid or hazardous waste, not in-use equipment."  (Defs.' Mem. at 25).  Defendants appear to

concede that PCBs that have leaked constitute RCRA solid waste, but they argue that PCB

ballasts that have not yet leaked cannot constitute solid waste under RCRA.  (<u>Id.</u> at 26).

Accordingly, defendants contend that "at a minimum, the Court should strike any relief in the

Complaint directed at in-use electrical equipment, including relief directed to prevent 'future

leaks.'"  (<u>Id.</u>)

RCRA defines solid waste as:

> any garbage, refuse, sludge from a waste treatment plant, water
> supply treatment plant, or air pollution control facility and other
> discarded material, including solid, liquid, semisolid, or contained
> gaseous material resulting from industrial, commercial, mining,
> and agricultural operations, and from community activities . . . .

42 U.S.C. § 6903(27).

Plaintiff argues that RCRA applies in this case because the PCBs that have leaked or

dripped from these ballasts constitute a "solid waste" and defendants, as "past and present

generators of the waste and owners and operators" of the ballasts, "have contributed or [are] contributing" to the handling, storage, or disposal of RCRA waste.  (Pl.'s Mem. at 12-13).  While plaintiff concedes that the PCB fluid contained within intact non-leaking ballasts is not a RCRA waste (id. at 13), plaintiff argues that once the fluid leaks, it has been "discarded" and becomes a RCRA waste.  (Id.)

Citing to cases exploring the scenario of leaking gasoline storage tanks, plaintiff argues RCRA's enforcement provision "has long been used to require remediation" of gasoline once it leaks from a storage tank, becoming a solid waste under RCRA.  (Id. (citing Zands v. Nelson, 779 F. Supp. at 1262 (noting that "solid waste is defined very broadly.  Indeed, solid waste is 'any discarded material'"); Albany Bank & Trust Co. v. Exxon Corp., 310 F.3d 969, 972 (7th Cir. 2002); Agri Excess & Surplus Ins. Co. v. A.B.D. Tank & Pump Co., 878 F. Supp. 1091, 1094-95 (N.D. Ill. 1995))).  In Reading Co. v. City of Philadelphia, 823 F. Supp. 1218, 1236-37 (E.D. Pa. 1993), a CERCLA case, the court found that dielectric fluid containing PCBs that had leaked from within transformers was discarded waste:

> There is a huge distinction between the use of dielectric fluid within transformers and the expulsion of portions of this fluid from transformers into the environment. How this emission of fluids can be characterized as other than the discarding or disposal of waste remains a puzzle to the court.

Id. at 1236-37.

In response to defendants' argument that in-use ballasts that have not leaked do not constitute "solid waste" under RCRA, plaintiff contends that the Court has broad discretion to take any such action "as may be necessary" to abate an imminent and substantial endangerment pursuant to RCRA's enforcement provision, 42 U.S.C. § 6972(a)(1)(B).  (Pl.'s Mem. at 21).

Plaintiff argues that the only means of preventing ballasts from leaking is to replace them before they have a chance to leak.  (Id.)

Even if in-use ballasts containing PCBs that have not leaked are not "solid waste," plaintiff has alleged facts that raise a number of scenarios where leaky ballasts may constitute disposal or storage of solid waste.  While it is unclear to the Court how RCRA, "a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste," Meghrig v. KFC Western, Inc., 516 U.S. 479, 483 (1996), can be extended to govern the use of substances that are not yet considered waste, the Court declines to recommend that any portion of plaintiff's request be dismissed at this time.  Although plaintiff has provided evidence suggesting that many, if not all, New York City schools contain fixtures with PCB leaks, the scope of the problem is not yet known.  Moreover, given the age of the lights, the number of ballast leaks is practically guaranteed to increase throughout the course of this litigation.  In the absence of any expert discovery or analysis regarding the likelihood of future leaks, and the effects on the health of the City's school children, the Court respectfully recommends denying defendant's request to "strike any relief in the Complaint directed at in-use electrical equipment, including relief directed to prevent 'future leaks'"(Def.'s Mem. at 25), pending discovery.

Plaintiff's Amended Complaint adequately alleges facts, which assumed to be true, constitute a claim sufficient to withstand defendants' motion on the pleadings and accordingly, the Court respectfully recommends that defendants' motion to dismiss the RCRA claims under Rule 12(b)(6) be denied.

4.  <u>Dismissal of RCRA Claim as Foreclosed by TSCA Regulations</u>

Defendants argue that plaintiff's RCRA claim should be dismissed because the issues

raised by these PCB electrical light ballasts and associated waste management are regulated

under TSCA.  (Defs.' Mem. at 26 (citing 40 C.F.R. § 261.8)).  In enacting RCRA, Congress was

attempting to regulate the management, transport and disposal of solid or hazardous wastes, 42

U.S.C. § 6902, but did not include any specific language dealing with PCBs.  42 U.S.C. § 6901,

<u>et. seq</u>.  By contrast, TSCA was enacted to regulate the "manufacture, processing, distribution . . .

, use, or disposal" of "chemical substance[s] or mixture[s]," 15 U.S.C. § 2605(a), and included

specific provisions requiring the EPA to promulgate regulations relating to the use and disposal

of PCBs and PCB waste.  15 U.S.C. § 2605(e).  Both RCRA and TSCA contain integration

provisions.  RCRA directs the EPA Administrator to "integrate all provisions of this Act for

purposes of administration and enforcement and [to] avoid duplication, to the maximum extent

practicable."  42 U.S.C. § 6905(b).  Section 2608(b) of TSCA similarly requires the

Administrator to "coordinate actions taken under [TSCA] with actions taken under other Federal

laws administered . . . by the Administrator."  15 U.S.C. § 2608(b).

Defendants argue that pursuant to these provisions, the EPA issued a statement noting a

preference to "merge the TSCA PCB rules into the final RCRA regulations," 45 Fed. Reg.

33,084, 33086 (May 19, 1980), and determined that the "handling and disposal of waste PCBs

will continue to be regulated under TSCA and other EPA statutes."  <u>Id</u>.  Thus, in 1990,

continuing the separate treatment of PCB wastes under TSCA, the EPA crafted an exemption for

PCB wastes, exempting PCB dielectric fluid and electrical equipment from the RCRA regulatory

scheme based on a concern that "new regulation of these wastes under RCRA may be disruptive

56

to the mandatory phaseout of PCBs in certain electrical transformers and capacitors."  55 Fed.

Reg. 11,798 (Mar. 29, 1990).  Defendants argue that because plaintiff's RCRA claim is an

attempt to regulate the use, handling and disposal of PCB electrical equipment and dielectric

fluid, which is already regulated under TSCA, the RCRA claim should be dismissed.  (Defs.'

Mem. at 30).

       Citing a number of decisions in this and other circuits, defendants contend that regulatory

decisions by the EPA based on RCRA's non-duplication provisions constitute a bar to RCRA

enforcement actions, including citizen suits where the activities at issue are subject to

comprehensive regulation under other environmental laws.  (Id. (citing Coon v. Willet Dairy, LP,

02-CV-1195, 04-CV-917, 2007 U.S. Dist. LEXIS 51718, at *14-17 (N.D.N.Y. July 17, 2007),

aff'd, 536 F.3d 171, 174 (2d Cir. 2008) (holding that an "imminent and substantial

endangerment" RCRA citizen suit was barred by section 6905(a)); Jones v. E.R. Snell Contr.,

Inc., 333 F. Supp. 2d 1344, 1350 (N.D. Ga. 2004), aff'd, 120 Fed. Appx. 786 (11th Cir. 2004),

and cert. denied, 544 U.S. 962 (2005) (dismissing RCRA citizen suit when issue subject to

regulations under the CWA); Long Island Soundkeeper Fund v. N.Y. Athletic Club, 94 CV

04346, 1996 U.S. Dist. LEXIS 3383, at *32-33 (S.D.N.Y. Mar. 22, 1996) (same).  Indeed, in

Brewer v. Ravan, the court considered the question at issue here and held that because PCBs are

"not 'hazardous wastes' under RCRA, but are regulated exclusively under other federal statutes,"

the citizen's RCRA suit should be dismissed.  680 F. Supp. 1176, 1181 (M.D. Tenn. 1988).

Similarly, the court in United States v. Burns, 512 F. Supp. 916, 918-20 (W.D. Pa. 1981),

reached the conclusion that a RCRA enforcement action brought by the EPA was barred by

Section 6905(b) because the EPA had elected to regulate PCBs under TSCA.

While plaintiff concedes that the EPA carved out some regulatory requirements for PCBs, plaintiff argues that "RCRA's statutory coverage is broad and continues to govern the PCB-related claims that are not specifically carved out by those regulations, including claims brought under RCRA § [6972]." (Pl.'s Mem. at 22). Plaintiff contends that the integration provision of RCRA does not serve as a complete bar to claims relating to PCBs. (Id.) Plaintiff contends that Section 6905(b) is only "'an exhortation to the EPA to avoid unnecessary and overlapping regulation,' and 'a general admonition against wasteful regulation.'" Id. at 24 (quoting United States v. Vineland Chem. Co., Inc., 692 F. Supp. 415, 420-21 (D.N.J. 1988)). Indeed, TSCA explicitly states in Section 2605(e) that it is not intended to "limit the authority of the [EPA] under . . . any other Federal law, to take action respecting any [PCB]." 15 U.S.C. § 2605(e)(5). Where the PCB waste "may present an imminent and substantial endangerment," Kentucky Oil & Ref. v. W.E.L. Inc., Civil Action No. 7:09-148, 2010 U.S. Dist. LEXIS 20517, at *7-10 (E.D. Ky. Mar. 8, 2010), courts have imposed liability under RCRA. See also United States v. Union Corp., 259 F. Supp. 2d 356, 399-400 (E.D. Pa. 2003).

Plaintiff argues that the fact that the EPA chose to regulate a small subset of PCB claims under TSCA instead of RCRA, limited to certain PCB dielectric fluids, does not mean that the EPA intended to exempt PCBs entirely from coverage under Section 7002 of RCRA. (Pl.'s Mem. at 23). Plaintiff contends that while the EPA determined to exempt PCB dielectric fluid from RCRA regulations, there is nothing to suggest that the EPA intended to exempt PCBs from liability provisions for waste that presents "an imminent and substantial endangerment to health or the environment." (Id.) See, e.g., Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Co., 138 F. Supp. 2d 482, 486 (S.D.N.Y. 2001) (rejecting argument that TSCA preempts RCRA claim

where there is an imminent hazard caused by PCB mixture); see also United States v. Union Corp., 259 F. Supp. 2d at 399-400 (holding no preemption by TSCA and finding liability under RCRA for PCB leaks into soil and groundwater).

According to plaintiff, the decisions relied upon by defendants in urging preemption were "'wrongly decided.'"  (Pl.'s Mem. at 24 (quoting United States v. Vineland Chem. Co., Inc., 692 F. Supp. at 421 (referring to United States v. Burns, 512 F. Supp. 916))).  In Vineland Chemical Co., the court analyzed the integration provisions of RCRA and noted that the final sentence of Section 6905(b) clearly states that "'[s]uch integration shall be effected *only to the extent that it can be done in a manner consistent with the goals and policies expressed in this Act*. . . .'"  692 F. Supp. at 420 (emphasis in original) (quoting 42 U.S.C. § 6905(b))).  The court interpreted this sentence to indicate that Section 6905(b) was not intended to create a right in a defendant to resist regulation; "rather it constitutes an exhortation to the EPA to avoid unnecessary and overlapping regulation."  Id.  Dismissing the Burns case as "wrongly decided," the Vineland court stated that although the district court in Burns believed that the RCRA claims in that case impermissibly overlapped claims under TSCA, "[t]he problem with the Burns decision . . . is that the legislative history of TSCA indicates that, . . . . '[t]he Administrator's determination that it is in the public interest to use this Act, is a completely discretionary decision not subject to judicial review.'"  Id. at 420-21 (quoting H. Conf. Rep. No. 1679, 94th Cong., 2d Sess. 85, reprinted in 1976 U.S. Code Cong. & Admin. News 4491, 4570).

The Court agrees with the analysis in Vineland.  The clear import of Section 6905(b) was to have the EPA integrate the regulation of solid and hazardous wastes with the provisions of other environmental statutes so as to avoid duplicative and possibly conflicting regulations.  See

42 U.S.C. § 6905(b).  However, at the same time, Congress indicated that this integration should be accomplished "only to the extent that it can be done in a manner consistent with the goals and policies expressed in [RCRA]."  Id.  In Burns, the district court held, without an explanation of its reasoning, that the integration language of RCRA was "inconsistent with the position that the Government can pick and choose its enforcement mechanism;" thus, since PCBs were regulated under TSCA, the government could not bring an action under RCRA.  United States v. Burns, 512 F. Supp. at 918.  The court further held that since TSCA regulations of PCBs apply only to owners and operators, and since RCRA must be integrated with other environmental laws, "it is doubtful that Congress intended to give the Government broader enforcement power reaching non-owners and non-operators under RCRA.  Rather it is more likely that Congress intended PCB regulations to be limited to owners and operators."  Id. at 919.  Apart from speculating that it was "more likely" that Congress' intent was to limit PCB regulations to owners and operators, the Burns court did not provide any basis for this conclusion.

Similarly, the other decision relied on by defendants to support their claim that PCBs are not hazardous wastes subject to RCRA – Brewer v. Ravan – is equally short on analysis.  In holding that PCBs are not subject to RCRA, but "regulated exclusively under other federal and state environmental statutes," the court in Brewer relied on the holding in Burns.  Brewer v. Ravan, 680 F. Supp. at 1181.  The court further noted that the EPA has never listed PCBs as "hazardous wastes," and therefore, unless plaintiff's RCRA claims were based on storage or disposal of other hazardous waste, plaintiff's RCRA claims were foreclosed by regulation under TSCA.  Id.

Both Burns and Brewer fail to address the explicit provision in TSCA that states that

regulation under TSCA is "without prejudice to regulation under other application statutes."
United States v. Vineland Chem. Co., Inc., 692 F. Supp. at 421.  Nor do the courts consider the
argument raised in Vineland, that while the RCRA regulatory scheme should be integrated with
other statutes to the extent possible consistent with RCRA policies and goals, Section 6905(b)
says nothing about immunizing defendants from enforcement provisions of the law.  Indeed,
Section 7002(a)(1)(B) of RCRA, which authorizes citizen suits "against any person . . . who has
contributed to. . . the past or present handling, storage, treatment, transportation, or disposal of
any solid or hazardous waste . . . ,"42 U.S.C. § 6972(a)(1)(B), contains no language requiring
that this enforcement provision be integrated with the enforcement provisions of other statutes.
If the integration clause was intended only to encourage a limit on the duplication of regulations,
rather than to place a limit on enforcement options, then the Vineland decision was correctly
decided and plaintiff's claim under RCRA would not be preempted.

 Moreover, while the court in Brewer noted that PCBs have not been listed as "hazardous
wastes" by the EPA, not even defendants deny that RCRA's definition of "solid waste" appears
to encompass PCBs that have leaked or spilled from light ballasts.  Under RCRA, "solid waste"
is defined as "any . . . discarded material, including solid, liquid, semisolid or contained gaseous
material. . . ."  42 U.S.C. § 6903(27).  As discussed earlier, once the PCB fluid leaks from the
ballasts such that it may pose "an imminent and substantial endangerment to health or the
environment," 42 U.S.C. § 6972(a)(1)(B), it has been "discarded," and therefore constitutes a
waste governed by RCRA.  While the EPA has at various times considered merging the TSCA
regulations governing PCBs into RCRA, it has indicated a concern due to the complexity of the
regulations that because the "TSCA rules for waste PCBs are in place, and they are well

understood by the regulated community. . . . [a] major effort to integrate the PCB rules now could be confusing to the regulated community and could be inefficient." 47 Fed. Reg. 2,379 (Jan. 15, 1982). Thus, the EPA Administrator denied a petition to transfer all PCB regulations from TSCA to RCRA. Id. To avoid the potential problems created by a wholesale transfer of the PCB disposal program established under TSCA, including "the disruptive influence on the orderly disposal of large quantities of PCB waste," 53 Fed. Reg. 37,436 (Sept. 26, 1988), and the "mandatory phaseout of PCBs in certain electrical transformers and capacitors," 55 Fed. Reg. 11798 (Mar. 29, 1990), the EPA exempted PCB dielectric fluid and electrical equipment from the RCRA regulatory scheme. 40 C.F.R. § 261.8. However, the EPA has also stated that the "handling and disposal of waste PCBs will continue to be regulated under TSCA and *other EPA statutes*." 45 Fed. Reg. 33,086 (May 19, 1980) (emphasis added).

Nothing in the language of any of these regulatory determinations discusses the situation presented here where the concern is not whether there has been compliance with the disposal regulations or the phaseout of the use of these PCB containing ballasts; rather, the issue here is whether PCBs have in fact leaked and become a substantial and imminent danger to the health of children attending school in New York City. In acknowledging the difficulty in merging the regulatory aspects of TSCA and RCRA as concerns PCBs, the EPA opined that it "believes that the regulation of these wastes under TSCA is adequate to protect human health and the environment." 55 Fed. Reg. 11,798. While the EPA may have believed the regulatory scheme was adequate, it says nothing about precluding the RCRA enforcement mechanism that would be available in the event of a threat to human health. Under these circumstances, the Court respectfully recommends that defendants' motion to dismiss plaintiff's RCRA claim based on

preemption by TSCA be rejected.

CONCLUSION

Accordingly, having considered the papers submitted by the respective parties, the Court respectfully recommends that:  1) defendants' motion to dismiss the plaintiff's claims under TSCA for lack of subject matter jurisdiction based on the EPA's "diligent prosecution" be denied; 2) defendants' motion to dismiss plaintiff's TSCA and RCRA claims for inadequate notice be denied; 3) defendants' motion to dismiss under the doctrines of primary jurisdiction and mootness be denied; 4) defendants' motion to dismiss for lack of standing be denied; 5) defendants' Rule 12(b)(6) motion to dismiss both the TSCA and RCRA claims be denied; and 6) defendants' motion to dismiss the RCRA claims as preempted by TSCA be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report.  Failure to file objections within the specified time waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
August 29, 2012

/S/   CHERYL L. POLLAK
_____
Cheryl L. Pollak
United States Magistrate Judge