CV-11-3494 (Hon. Sterling Johnson Jr. (SJ)) (CLP, M.J.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NEW YORK COMMUNITIES FOR CHANGE,

Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION
and NEW YORK CITY SCHOOL CONSTRUCTION
AUTHORITY,

Defendants.

**DEFENDANTS' OBJECTIONS TO THE REPORT AND
RECOMMENDATION RECOMMENDING TO DENY, IN
ITS ENTIRETY, DEFENDANTS' MOTION TO DISMISS
ALL COMPLAINTS OR, IN THE ALTERNATIVE, STAY
THE PROCEEDINGS**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for All Defendants*
*100 Church Street, Rm. 6-128*
*New York, N.Y.  10007*

*Of Counsel:  Daniel Greene*
*Tel:  (212) 788-1568*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................... 1

STANDARD OF REVIEW....................................................................................................... 2

STATUTORY AND  REGULATORY FRAMEWORK GOVERNING PCBS ........................ 2

ARGUMENT

    POINT I

        DEFENDANTS OBJECT TO RECOMMENDATIONS CONCERNING PLAINTIFF'S REPRESENTATIONAL STANDING FOR NON-MEMBER SCHOOLS.........................................................5

    POINT II

        DEFENDANTS OBJECT TO RECOMMENDATIONS CONCERNING DEFENDANTS' DILIGENT PROSECUTION AND PRIMARY JURISDICTION DEFENSES .................................................................................. 8

        A   Defendants Respectfully Object to the R&R's Interpretation of the CAFO ..............................................................9

        B.   Defendants Respectfully Object to the R&R's Analysis of the CAFO Under the Diligent Prosecution Doctrine.................................................................................12

        C.   Defendants Respectfully Object to the R&R's Analysis of the CAFO Under the Primary Jurisdiction Doctrine.................................................................................12

    POINT III

        DEFENDANTS OBJECT TO THE RECOMMENDATIONS CONCERNING THE ADEQUACY OF PLAINTIFF'S TSCA AND RCRA NOTICE LETTERS ...............................................................13

        A.   Defendants Respectfully Object to the Recommendation Concerning Notice of Claims Based Upon Factual Allegations Not Contained in Mandatory Pre-Suit Notice Letters ...............................13

B. Defendants Respectfully Object to the Recommendation that the RCRA Notice Letter Provided Sufficient Notice of Plaintiff's "Storage," "Treatment," and "Transportation" Claims .......................................................14

POINT IV

DEFENDANTS OBJECT TO THE RECOMMENDATION CONCERNING DEFENDANTS' MOTION TO DISMISS THE TSCA CLAIM .........................................................14

POINT V

DEFENDANTS OBJECT TO THE RECOMMENDATIONS CONCERNING DEFENDANTS' MOTION TO DISMISS THE RCRA CLAIM.........................................................16

A. Defendants Respectfully Object to Recommendations Concerning the Scope of Contributor Liability Under RCRA.......................................................................................................16

B. Defendants Respectfully Object to Recommendations Concerning RCRA "Disposal" and "Storage" of Leaked PCBs..............................................................................................19

a. Objection to Recommendations Concerning the RCRA "Disposal" Claim...............................................................................19

b. Objection to Recommendations Concerning the RCRA "Storage" Claim...............................................................................21

C. Defendants Respectfully Object to Recommendations Concerning Claims for In-Use, Non-Leaking Ballasts .....................................22

D. Defendants Respectfully Object to the Recommendation that Plaintiff's RCRA Claim is Not Foreclosed by the TSCA Regulations .............................................................23

a. Statutory and Regulatory History...............................................................................23

b. As PCB Waste and PCB Electrical Equipment Are Regulated Under TSCA and Not RCRA, Defendants Respectfully Object to the R&R's Recommendation that Plaintiff Can Proceed Under RCRA...............................................................................26

**Page**

POINT VI

  DEFENDANTS OBJECT TO CERTAIN
  CHARACTERIZATIONS MADE IN THE R&R.................................................. 28

  A. Defendants Respectfully Object to the R&R's
   Characterization of the Greener Schools Plan ................................................28

  B. Defendants Respectfully Object to the R&R's
   Characterizatins of Defendants' Positions on Certain
   Issues...............................................................................................................29

CONCLUSION ...................................................................................................... 30

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                     <u>**Pages**</u>

*3550 Stevens Creek Assocs. v. Barclays Bank,*
    915 F.2d 1355 (9th Cir. 1990)................................................................. 20

*Alaska Center for the Environment v. Browner,*
    20 F.3d 981 (9th Cir. 1994)............................................................... 6, 7, 8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................... 15

*BCW Assoc., Ltd. v. Occidental Chemical Corp.,*
    1988 U.S. Dist. LEXIS 11275 (E.D. Pa. Sept. 30, 1988).................... 20, 21

*Brod v. Omya,*
    653 F.3d 156 (2d Cir. 2011)............................................................... 14

*Carrier Corp. v. Piper,*
    460 F. Supp. 2d 853 (W.D. Tenn. 2006)............................................. 12

*Center for Community Action & Environmental Justice v. Union Pacific Corp.,*
    2012 U.S. Dist. LEXIS 83051 (C.D. Cal. May 29, 2012)..................... 27

*Central & South West Services, Inc. v. EPA,*
    220 F.3d 683 (5th Cir. 2000)............................................................... 4

*Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,*
    989 F.2d 1305 (2d Cir. 1993)........................................................... 21, 22

*Conservation Law Foundation v. Reilly,*
    950 F.2d 38 (1st Cir. 1991) ................................................................ 6

*Davies v. National Cooperative Refinery Ass'n,*
    963 F. Supp. 990 (D. Kan. 1997) ...................................................... 13

*DM Research, Inc. v. College of American Pathologists,*
    170 F.3d 53 (1st Cir. 1999) .............................................................. 16

*Ecological Rights Foundation. v. Pacific Gas & Electric Co.,*
    2011 U.S. Dist. LEXIS 37230 (N.D. Cal. March 31, 2011) ............ 17, 18, 19

*Emhardt Indus., Inc. v. Duracell International, Inc.,*
    665 F.Supp. 549 (M.D. Tenn. 1987) ................................................ 21

*Friends of Santa Fe County v. Lac Minerals,*
    892 F. Supp. 1333 (D.N.M. 1995) .................................................... 13

*Friends of the Earth, Inc. v. Laidlaw Environmental Services,*
    (TOC), Inc., 528 U.S. 167 (2000) ................................................... 5-6, 8

iv

**Cases**                                                                                      **Page**

*G.J. Leasing Co. v. Union Eletric Co.,*
   54 F.3d 379 (7th Cir. 1995).................................................................................. 20

*George v. Reisdorf Bros.,* 696 F. Supp. 2d 333 (W.D.N.Y. 2010),
   *aff'd,* 410 Fed. Appx. 382 (2d Cir. N.Y. 2011)........................................................ 20

*Hinds Investments, L.P. v. Angioli,*
   654 F.3d 846 (9th Cir. 2011)............................................................................... 17

*Hudson River Fishermen's Ass'n v. County of Westchester,*
   686 F.Supp. 1044 (S.D.N.Y 1988)........................................................................ 12

*Hudson Riverkeeper Fund, Inc. v. Atantic Richfield Co.,*
   138 F. Supp. 2d 482 (S.D.N.Y. 2001).................................................................. 27

*Interfaith Community Organization v. Honeywell International, Inc.,*
   263 F. Supp. 2d 796 (D.N.J. 2003) ..................................................................... 19

*Karr v. Hefner,*
   475 F.3d 1192 (10th Cir. 2007)........................................................................... 14

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)............................................................................................ 6

*McCormick v. Halliburton Co.,*
   2012 U.S. Dist. LEXIS 46661 (W.D. Okla. Apr. 3, 2012) ................................. 13

*P.R. Campers' Ass'n v. P.R. Aqueduct & Sewer Authority,*
   219 F. Supp. 2d 201 (D. Puerto Rico 2002)......................................................... 6

*Reading Co. v. City of Philadelphia,*
   823 F. Supp. 1218 (E.D. Pa. 1993) ..................................................................... 21

*Sierra Club v. Morton,*
   405 U.S. 727 (1972)............................................................................................ 6

*Sycamore Indus. Park Assocs. v. Ericsson, Inc.,*
   546 F.3d 847 (7th Cir. 2008).................................................................17, 19, 20, 21

*United States v. Commonwealth Edison Co.,*
   620 F. Supp. 1404 (N.D. Ill. 1985) ....................................................................... 4

*United States v. Union Corp.,*
   259 F. Supp. 2d 356 (E.D. Pa. 2003) .................................................................. 26

*United States v. Vineland Chemical Co.,*
   692 F. Supp. 415 (D.N.J. 1988) ....................................................................26, 27

**Cases**                                                                                   **Page**

*Wash. Toxics Coalition v. EPA,*
    2002 U.S. Dist. LEXIS 27654 (W.D. Wash. July 2, 2002)...................................................... 6, 7

*Wyble v. Gulf S. Pipeline Co., L.P.,*
    308 F.Supp. 2d 733 (E.D. Tex. 2004) ................................................................................. 6, 7

*Zands v. Nelson,*
    779 F. Supp. 1254 (S.D. Cal. 1991) ..................................................................................... 18

**Statutes**                                          **Page**

15 U.S.C. §§ 2601, et seq. ................................................................................ 1

15 U.S.C. § 2605(a) ......................................................................................... 23

15 U.S.C. § 2605(e), et seq. ............................................................................ 23

15 U.S.C. § 2605(e)(2)(A) ................................................................................. 2

15 U.S.C. § 2605(e)(2)(B) ................................................................................. 2

15 U.S.C. § 2608(b) .......................................................................................... 24

15 U.S.C. § 2615 ............................................................................................... 9

42 U.S.C. §§ 6901 *et seq.* ................................................................................ 1

42 U.S.C. § 6902 .............................................................................................. 23

42 U.S.C. § 6903(3) .......................................................................................... 20

42 U.S.C. § 6905(b) .......................................................................................... 24

42 U.S.C. § 6905(b)(1) ..................................................................................... 26

42 U.S.C. § 9601 et seq .................................................................................... 20

42 U.S.C. § 9601(a) .......................................................................................... 20

42 U.S.C. § 9601(a)(22) .................................................................................... 21

42 U.S.C. § 9607(a) .......................................................................................... 21

42 U.S.C. § 9607(a)(2) ...................................................................................... 20

Fed. R. Civ. P. 12(b)(6) .................................................................................... 15

New York City Local Law 87 ..................................................................... 28, 29

New York City Local Law 88 ..................................................................... 28, 29

**Regulations**                                          **Page**

40 C.F.R. § 254.3(a) ......................................................................................... 13

40 C.F.R. § 261.8 .............................................................................................. 26

40 C.F.R. Parts 280-82 ..................................................................................... 18

40 C.F.R. § 702.62(a)(2) ................................................................................... 13

40 C.F.R. §761, Subparts D, G..................................................................................... 27

40 C.F.R. §761.3 .......................................................................................................... 3

40 C.F.R. §761.30 (a) - (u) .......................................................................................... 3

40 C.F.R. §761.30(p)..................................................................................................... 27

40 C.F.R. § 761.50......................................................................................................... 5

40 C.F.R. § 761.60......................................................................................................... 5

45 Fed. Reg. 33,084 (May 19, 1980).......................................................................... 24

47 Fed. Reg. 17,426 (Apr. 22, 1982)...................................................................... 2, 4

47 Fed. Reg. 2,379 (Jan. 15, 1982)........................................................................... 24

47 Fed. Reg. 37,342 (Aug. 25, 1982)............................................................ 3, 4, 16, 18

53 Fed. Reg. 37,436 (Sept. 26, 1988)................................................................... 23, 25

54 Fed. Reg. 52,716 (Dec. 21, 1989)....................................................................... 25

55 Fed. Reg. 11,798  (March 29, 1990)................................................................... 25

59 Fed. Reg. 62,788 (Dec. 6, 1994)........................................................................... 4

63 Fed. Reg. 35,384 (June 29, 1998)......................................................................... 5

75 Fed. Reg. 17,645 (April 7, 2010)......................................................................... 5

75 Fed. Reg. 34,076 (June 16, 2010)......................................................................... 5

**Other Authorities**                                                                                          **Page**

EPA, Polychlorinated Biphenyls (PCBs), Basic Information, Dec. 29, 2010, *available at*
    http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/about.htm. .......................................... 2

EPA, Proper Maintenance, Removal, and Disposal of PCB-Containing Fluorescent Light
    Ballasts:  A Guide for School Administrators and Maintenance Personnel, Dec. 29, 2010,
    *available at* http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/ballasts.htm.......................... 3, 4, 5, 29

EPA, Revisions to the PCB Question and Answer Manual (January 2009), *available at*
    http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/qacombined.pdf.......................................... 16

## PRELIMINARY STATEMENT

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, Defendants the New York City Department of Education ("DOE") and the New York City School Construction Authority ("SCA") (collectively, the "Defendants") respectfully submit objections to the Report and Recommendation ("R&R"), dated August 29, 2012, issued by the Honorable United States Magistrate Judge Cheryl L. Pollak. The R&R recommends that Your Honor deny Defendants' motion to dismiss or, in the alternative, stay the action filed by New York Communities for Change ("Plaintiff") under the citizen suit provisions of the Toxic Substances Control Act ("TSCA") 15 U.S.C. §§ 2601 et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq. R&R, at 63. This lawsuit concerns thousands of T-12 fluorescent light fixtures located throughout 655 New York City public school buildings that use or used electrical ballasts containing polychlorinated biphenyls ("PCBs").[1] Both Plaintiff and Defendants agree that these fixtures should be removed and, in 2011, Defendants commenced an $844 million plan that will, among other things, remove these fixtures from the entire school system in no more than nine years from now.[2] Defendants have also commenced a visual inspection program to take corrective action with respect to individual ballast leaks.

Plaintiff – an advocacy organization representing twenty-five guardians of children who attend twenty-five school buildings – believes that this timeline is too long and the visual inspection program is not rigorous enough, and has filed this lawsuit seeking an "order compelling Defendants to abate all TSCA violations and to take any additional action that may be necessary to remedy the imminent

---

[1] Defendants maintain a survey of school buildings with light fixtures that may contain PCBs. The most recent update was released on September 14, 2012 and identified 655 such school buildings. This survey is available at http://www.nycsca.org/Community/Programs/EPA-NYC-PCB/PCBDocs/SurveyofSchoolBuildingswithOlderT12.pdf.

[2] Two City programs are relevant to this lawsuit. First, Defendants are obligated to perform work under a January 2010 Consent Agreement and Final Order with EPA, which is described in Point II *infra* and annexed to the Greene Declaration ("Green Decl."), dated December 19, 2011, as Exhibit A. Second, Defendants initiated a ten-year voluntary plan that will remove all light fixtures that use or used PCB light ballasts in conjunction with other energy efficiency improvements. This plan is discussed in Point VI.A *infra*.

and substantial endangerment of health presented by current, unremediated historical, and future PCB leaks in [City] schools, including but not limited to the replacement of all T12 lighting." Am. Compl. ¶ 88(b). For the reasons set forth below, Defendants respectfully request that Your Honor reject the R&R's recommendation to deny Defendants' motion, and respectfully request that Your Honor grant Defendants' request that the Complaint be dismissed, or, in the alternative, to stay the proceedings.

## STANDARD OF REVIEW

In reviewing a report and recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where no objection has been filed, the district court "'need only satisfy itself that that there is no clear error on the face of the record.'" *Gesualdi v. Mack Excavation & Trailer Serv.*, 2010 U.S. Dist. LEXIS 23620, at *3 (E.D.N.Y. Mar. 15, 2010) (citation omitted). To the extent that a party makes specific objections, the court must make a de novo determination. 28 U.S.C. § 636(b)(1)(C).

## STATUTORY AND REGULATORY FRAMEWORK GOVERNING PCBS

PCBs are chemicals first manufactured in the United States in 1929. Am. Compl. ¶ 28.[3] PCBs were widely used in construction materials and in electrical products such as fluorescent light ballasts. *See* EPA, Polychlorinated Biphenyls (PCBs), Basic Information, Dec. 29, 2010, *available at* http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/about.htm. When TSCA took effect in 1978, hundreds of millions of pieces of electrical equipment containing PCBs were in use. *See* 47 Fed. Reg. 17,426 (Apr. 22, 1982) at Tables 1 & 2. In enacting TSCA, Congress allowed PCB use to continue indefinitely so long as the use was in a "totally enclosed manner." 15 U.S.C. § 2605(e)(2)(A). Congress also provided EPA with the authority to issue regulations allowing the sale and use of PCBs other than in a totally enclosed manner if EPA first made a determination that the sale and use of specific PCB products "will not present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(e)(2)(B).

---

[3] As in the R&R, citations to "Am. Compl." refer to Plaintiff's Second Amended Complaint, filed November 18, 2011.

In one of the first TSCA rulemakings, EPA stated:

> EPA has decided that no electrical equipment uses should be categorized as use in a totally enclosed manner. The leakage data . . . show[s] that all types of electrical equipment leak during normal operation. Since this leakage could result in some detectable exposure of humans and the environment to PCBs, EPA believes that it is not appropriate to classify the use of this equipment as use in a totally enclosed manner.

47 Fed. Reg. 37,342 (Aug. 25, 1982).

Thus, EPA evaluated whether to authorize the continued use of various PCB electrical equipment as non-totally enclosed activities. In order to balance "the probability that harm will occur from the use against the benefits to society of the proposed regulatory action," EPA considered the following factors: (i) the effects of PCBs on human health and the environment; (ii) the magnitude of PCB exposure to humans and the environment; (iii) the benefits of using PCBs and the availability of substitutes for PCB uses; and (iv) the economic impact resulting from the rule's effect. 47 Fed. Reg. 37,342 (Aug. 25, 1982). EPA promulgated use authorizations for several categories of "non-totally enclosed PCB activities," including authorizations for the primary PCB component of ballasts: small capacitors. 40 C.F.R. § 761.30 (a) – (u).

Small capacitors are devices "for accumulating and holding a charge of electricity" that consist of "conducting surfaces separated by a dielectric." 40 C.F.R. § 761.3; *see also* EPA, Proper Maintenance, Removal, and Disposal of PCB-Containing Fluorescent Light Ballasts: A Guide for School Administrators and Maintenance Personnel, Dec. 29, 2010, *available at* http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/ballasts.htm ( "Ballast Guidance"). They can be found in fluorescent light ballasts, which are defined as devices "that electrically control[] fluorescent light fixtures and that include[] a capacitor containing 0.1 kg or less of dielectric." 40 C.F.R. § 761.3. Small capacitors used in ballasts contain about 1 to 1.5 ounces of PCB fluid. *See* Ballast Guidance. In its TSCA rulemaking, EPA did not place any conditions on the use of small capacitors. In the proposed rule, EPA stated:

> Small PCB Capacitors . . . . are used in fluorescent light ballasts, household appliances, and industrial equipment. In most applications, the

> equipment containing the small capacitor in its circuitry cannot function without it. . . . EPA is not aware of any information which indicates that these capacitors have a different propensity to leak than other electrical equipment. Because of the widespread and scattered nature of their use and the small amount of PCBs contained within each individual small capacitor, all regulatory approaches targeted at controlling releases from these capacitors are very expensive when compared to the potential quantity of PCBs kept from the environment. Consequently, EPA has not identified a reasonably cost-effective regulatory alternative that would result in significantly reducing the risks associated with the remaining small PCB Capacitors in service. Therefore, EPA is not proposing any restrictions regarding the use of PCBs in small capacitors. . . .

47 Fed. Reg. 17,426 (Apr. 22, 1982). EPA issued the final use authorization for small capacitors:

> [N]o comments have identified any practical and cost-effective use restrictions regarding the use of PCB Small Capacitors. Because of the widespread and diverse nature of their use and the small amount of PCBs contained within each individual small capacitor, all regulatory approaches targeted at controlling releases from these capacitors are very expensive when compared to the potential quantity of PCBs kept from the environment. Consequently, EPA has not identified a reasonable cost-effective regulatory alternative that would result in significantly reducing the risks associated with the remaining PCB Small Capacitors in service. Therefore, this final rule does not require any restrictions regarding the use of PCBs in small capacitors. . . .

> Since these capacitors contain small quantities of dielectric fluid and significant amounts of absorbent material such as paper, and because many of these capacitors are encapsulated, PCBs are rarely released from these capacitors during their use or from the equipment using the capacitors. Therefore, exposure risks to humans, food, feed, water, or the environment from the use of these capacitors are low. In conclusion, EPA finds that the use of small capacitors containing PCBs is not unreasonable because their use provides society with the benefits from the use of millions of pieces of electronic equipment and consumer products, it avoids billions of dollars in replacement costs, and there appear to be no practical, cost-effective risk reduction measures.

47 Fed. Reg. 37,342 (Aug. 25, 1982); *see also Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 694 (5th

Cir. 2000) (noting small capacitors "are essentially viewed as non-PCB equipment" under TSCA

regulations); *United States v. Commonwealth Edison Co.*, 620 F. Supp. 1404, 1407 n.5 (N.D. Ill. 1985)

(noting "small capacitors" containing PCBs "are not regulated").[4]

---

[4] In 1993, EPA discovered that some ballasts also contain PCBs in their "potting material," *see* 59 Fed. Reg. 62,788 (Dec. 6, 1994), which encapsulates the internal electrical components. *See Ballast Guidance.*

-4-

In December 2010, EPA issued a guidance document on PCB ballasts in schools.  *See* Ballast Guidance.  This guidance provides advice on the potential risks of PCB ballasts, recommendations on how to handle and dispose of such ballasts, and strategies on how to retrofit light fixtures.  The Ballast Guidance states that "intact PCB-containing ballasts pose no immediate health threat," but notes that such ballasts are likely to fail over time.  *Id.*  Therefore, EPA "recommends that these older lighting ballasts should be removed."  *Id.*  Apart from this guidance, TSCA's regulations contain no requirement that PCB ballasts be inspected for leakage, or that PCB ballasts be phased out.[5]

## ARGUMENT

### POINT I

#### DEFENDANTS OBJECT TO RECOMMENDATIONS CONCERNING PLAINTIFF'S REPRESENTATIONAL STANDING FOR NON-MEMBER SCHOOLS

The R&R recommends that this Court find that Plaintiff has representational standing to bring claims concerning alleged TSCA and RCRA violations in 655 separate public school buildings, based on factual declarations from twenty-five members of Plaintiff organization whose children attend a total of only twenty-five schools.  R&R, at 35-37.  Plaintiff's members do not allege any connection to, or injury from, the other separate and distinct schools that potentially contain PCB light ballasts (the "non-member schools").  *See* Am Compl., Ex. A, Declarations.  Defendants respectfully request that Your Honor reject the R&R's recommendation.

To have standing, a plaintiff must demonstrate an "actual or imminent, not conjectural or hypothetical" threat of a "concrete and particularized" injury in fact.  *Friends of the Earth, Inc. v. Laidlaw*

---

TSCA's regulations only address potting material in the context of disposal.  *See* 40 C.F.R. §§ 761.50; 761.60.  EPA does not require building owners or operators to test potting material in light fixtures, or remove ballasts thought to possibly contain such material prior to the end of their useful life.  *See* 63 Fed. Reg. 35,384, 35,404 (June 29, 1998).

[5] In 2010, EPA announced that it was reassessing the use authorizations and investigating "whether some authorized uses of PCBs should be eliminated or phased-out and whether more stringent use and servicing conditions would be appropriate."  75 Fed. Reg. 17,645, 17,650 (April 7, 2010); *see also* 75 Fed. Reg. 34,076 (June 16, 2010) (extending the comment period).

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  "Particularized" means "that the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992).  A general interest in a broad issue is not sufficient.  Indeed, "the injury in fact test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured." *Id.* at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) (internal quotation marks omitted)).  Thus, "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." *Id.* at 565-66 (internal citation omitted).

Defendants' motion argues that Plaintiff cannot meet the injury in fact test for any school not attended by its members' children because these children have not used the affected areas. *See* Mem. Supp. Defs.' Mot. Dismiss, at 34-35 ("Defs.' Br.").  None of the members allege that their children have been exposed to PCBs other than in the schools that their children attend. *See* Am Compl., Ex. A. Defendants cited several cases holding that plaintiffs do not have standing to assert claims unless they have alleged an actual injury related to the area affected by the purported violation. *See Conservation Law Found. v. Reilly*, 950 F.2d 38, 40-43 (1st Cir. 1991); *Wyble v. Gulf S. Pipeline Co., L.P.*, 308 F. Supp. 2d 733, 742-43, 752-53 (E.D. Tex. 2004); *P.R. Campers' Ass'n v. P.R. Aqueduct & Sewer Auth.*, 219 F. Supp. 2d 201, 212-13 (D. Puerto Rico 2002); *Wash. Toxics Coalition v. EPA*, 2002 U.S. Dist. LEXIS 27654, at *33-37 (W.D. Wash. July 2, 2002).  The R&R's conclusion that Plaintiff has established representational standing for the  non-member school buildings turns exclusively on *Alaska Center for the Environment v. Browner*, 20 F.3d 981 (9th Cir. 1994).  The *Alaska Center* decision, however, is distinguishable.

In *Alaska Center*, plaintiffs brought suit under the Clean Water Act ("CWA") to compel EPA to comply with its statutory obligation to establish a state-wide total maximum daily loads ("TMDLs") regulatory program for Alaskan water bodies.  20 F.3d at 982.  While the plaintiffs demonstrated injury in fact through their use of some waterways, they could not establish that they used all waters affected by the state-wide program. *Id.* at 985.  The Ninth Circuit held that the plaintiffs had

representational standing based on its interpretation of the CWA. The Ninth Circuit stated that the plaintiffs' injury "is the result of EPA's failure to comply with the CWA to establish TMDLs for the State of Alaska; the CWA imposes no narrower obligation." *Id.* (citing 33 U.S.C. § 1313(d)(2)). Furthermore, the Ninth Circuit opined that "for [CWA] regulatory purposes, all waters within a state are interrelated." *Id.* Given the CWA's framework, the Court determined that limiting the plaintiffs' suit to the specific waterways that they actually used "would unduly interfere with the statutory scheme established by Congress." *Id.* at 986. The Court further noted that it would be contrary to "congressional directive. . . [to] limit[] the scope of an ordered remedy to specific streams of paramount concern to the parties before the court." *Id.* at 985.

Here, no Congressional or statutory directive merits departing from the traditional application of the injury in fact requirement. The alleged injuries are potential exposures to PCBs in the buildings attended by Plaintiff's members' children. *See* Am Compl., Ex. A. Unlike the programmatic violation at issue in *Alaska Center*, limiting standing to the member schools would not interfere with explicit congressional directives. *Cf. Alaska Ctr.*, 20 F.3d at 985-86. Furthermore, the relief that Plaintiff seeks, which would require "hundreds of discrete and separate" projects at hundreds of different school buildings throughout the City, is fundamentally different from the relief sought in *Alaska Center* – the promulgation of a uniform set of standards by "a single EPA office." *Id.* at 985-86; *see also Wash. Toxics Coalition*, 2002 U.S. Dist. LEXIS at *35 (limiting standing where "the actions that plaintiffs challenge are not singular, as in *Alaska Ctr.*, but myriad" and the relief sought "is distinct with respect to each violation").

The R&R does not address this distinction, and instead reasons that "Defendants manage and control the operation of not only the 25 schools mentioned in the declarations, but all the New York City schools that allegedly contain similarly dangerous light fixtures" and "the City's own Plan for remediation deals with all of the schools in one single program." R&R, at 36. However, the fact that Defendants own and control the school system this does not relieve Plaintiff from meeting the injury in fact requirements. *See Wyble*, 308 F.Supp.2d at 753 (concluding that plaintiff's focus on defendants'

management as the "'source' of the violations . . . overly simplifies the relief that Plaintiffs actually seek" and that plaintiffs had not demonstrated standing to seek relief for many "sundry violations . . . across many miles"). Moreover, the City's ongoing voluntary plan to phase out PCB ballasts from all schools is fundamentally different from EPA's "precise duty. . . mandated by statute" under the CWA. *Alaska Ctr.*, 20 F.3d at 986.

The R&R also reasons that "like the waterbodies in Alaska, New York City schools are interrelated – a parent and her child have an interest in the safety of schools beyond the particular school the child attends." R&R, at 36-37. The R&R then notes that students may progress to different buildings, and may travel to other schools for recreational activities. *Id.* at 37. Notably, none of these factual averments is asserted as a basis for representational standing in the declarations. *See* Am. Compl., Ex. A. The R&R's analogy of the water bodies in Alaska to City schools is flawed. The Ninth Circuit's determination was based on its interpretation of CWA provisions, not on the notion that the plaintiffs may use other water bodies. *See Alaska Ctr.*, 20 F.3d at 985. Conferring standing based on the possibility that a small subset of students may potentially visit any of over 600 schools does away with the need for a plaintiff to demonstrate an "actual and imminent, not conjectural or hypothetical" threat of a "concrete and particularized" injury in fact. *Friends of the Earth*, 528 U.S. at 180. As Plaintiff has not alleged any facts or law that justify representational standing in the non-member schools, Defendants respectfully request that Your Honor dismiss any claims pertaining to these non-member buildings.[6]

## POINT II

**DEFENDANTS OBJECT TO RECOMMENDATIONS CONCERNING DEFENDANTS' DILIGENT PROSECUTION AND PRIMARY JURISDICTION DEFENSES**

---

[6] The R&R declined to make a recommendation concerning Plaintiff's contention that it has organizational standing, although the R&R distinguished the primary case that Plaintiff relied on. R&R, at 38 n.12. Thus, Defendants will not posit an objection here, but instead respectfully refer Your Honor to the motion papers and the post-argument briefs on this issue.

The R&R recommends that Your Honor deny Defendants' motion to dismiss for lack of subject matter jurisdiction based on the diligent prosecution doctrine and the doctrine of primary jurisdiction. R&R, at 9-16, 23-25. Defendants also requested a stay of the proceedings under the primary jurisdiction doctrine; the R&R does not appear to address this request. *Id.* Defendants respectfully object to these recommendations.

A.     **Defendants Respectfully Object to the R&R's Interpretation of the CAFO**

Defendants' diligent prosecution and primary jurisdiction arguments center on the interpretation of an existing, ongoing Consent Agreement and Final Order ("CAFO") entered into between Defendants and EPA under Section 2615 of TSCA. Greene Decl., Ex. A. In January 2010, Defendants entered into the CAFO with EPA to address the discovery of caulk containing PCBs in schools. As part of the CAFO, Defendants agreed to conduct a pilot program to investigate the presence of PCBs in caulk in schools and to develop strategies to assess and remediate the materials (the "Pilot Program"). The Pilot Program requires Defendants to select five schools as pilot schools; develop and implement a remedial investigation work plan for those schools; develop and implement a remediation plan; and evaluate the effectiveness of the chosen remedy. Greene Decl., Ex. A, attachment to the CAFO, Work Plan to Address PCB Caulk in New York City School Buildings ("NYC PCB Work Plan"), Part II.

In cases where the remediation of PCB caulk in the pilot schools does not bring PCB levels into the range recommended by EPA, the Pilot Program requires Defendants to track down additional possible sources of PCBs and develop measures to address those sources. *Id.* at Part II, ¶ H(b)-(c). As a result of this provision, Defendants determined that PCB ballasts can also be a source of PCBs. *See* Am. Compl. ¶ 54. While performing the Pilot Program itself, the City requested, and EPA approved, a revision to the Work Plan to modify the scope of work to include an evaluation of the effectiveness of PCB lighting replacement at PS 3R. *See* Am. Compl., Ex. D, Dec. 15, 2010 Letter from EPA Regional Administrator Judith Enck, at 1.

Following the completion of the Pilot Program, the CAFO requires Defendants to proceed to Stage 2, which requires the development of a Citywide Remedy to be implemented in a

Citywide PCB Management Plan.  The Plan will include a "[s]chedule for remedial action that maximizes health protection consistent with City resources and avoidance of disruption of school activities"; an "[i]nitial focus on schools with the highest potential exposure risks"; "[c]ost-effective strategies to reduce PCB exposures"; and "[r]easonable testing or other methods of evaluation to characterize PCBs in Relevant Schools to help set priorities for remediation."  Greene Decl., Ex. A, NYC PCB Work Plan, Part III, ¶ C(c)(1)-(4).  It also must include "[w]here necessary for risk reduction, investigation of potential significant non-caulk sources and appropriate remedial action."  *Id.* at Part III, ¶ C(c)(6).  Following public comment and a peer review process, the CAFO requires Defendants and EPA to negotiate the terms of the PCB Management Plan for a period of at least sixty days.  *Id.* at Part III, ¶¶ B, C(a).  If agreement is reached, Defendants must commence implementation of the Citywide PCB Management Plan pursuant to the schedule set forth in the Plan.  Greene Decl., Ex. A, NYC PCB Work Plan, Part III, ¶ C(a); CAFO ¶ 66 (c).  If agreement cannot be reached, the CAFO terminates, and EPA and Defendants reserve their respective legal rights.  Greene Decl., Ex. A, NYC PCB Work Plan, Part III, ¶ C(d).[7]

In reaching the conclusion that the CAFO should not merit dismissal of the action, the R&R makes the following three main points:  *first*, that the CAFO was entered into to address PCBs in caulk and not ballasts, *see* R&R, at 14-15; *second*, that the investigative and remedial actions required by the CAFO are limited to the five pilot schools, *see* R&R, at 15; *and third*, the CAFO allows Defendants to opt out of the Citywide PCB Management Plan if Defendants and EPA cannot reach agreement on the Plan, *see* R&R, at 15.  The R&R too narrowly interprets the CAFO.

First, Defendants acknowledge that the CAFO was originally entered into to address PCBs in caulk.  However, the CAFO also contains provisions requiring Defendants to investigate and address other non-caulk sources in the pilot schools if necessary.  Through performance of these

---

[7] On August 21 2012, Defendants submitted the Final Revised PCB Pilot Study Remedial Investigation Report and Final PCB Pilot Study Feasibility Study to EPA.  *See* Greene Decl., Ex. A, NYC PCB Work Plan, II(D).  Upon EPA's acceptance of these documents, and its determination that work in the five pilot schools is complete, Defendants have 135 days to submit the report commencing Stage 2 of the CAFO.  *See Id.*, Part III(A).

provisions, Defendants studied and addressed PCB ballasts in the pilot schools.  EPA also accepted Defendants' request to modify the scope of work for one pilot school to evaluate the effectiveness of light fixture replacement as a remedy.  *See* Am. Compl., Ex. D, Dec. 15, 2010 Letter from EPA Regional Administrator Enck, at 1.  Thus, while the CAFO was originally intended to address caulk, the CAFO's provisions related to non-caulk sources led to an assessment of ballasts during the Pilot Program.

Second, Defendants acknowledge that the Pilot Program's requirements for both caulk and non-caulk sources apply to only the five pilot schools.  However, in emphasizing this point, the R&R does not consider the overall progressive structure of the CAFO, which allows for analysis of investigative and remedial methodologies on a smaller scale in order to serve as the technical basis for proposing the most effective remedial measures to be implemented citywide.

Third, it is correct that Defendants have the ability to opt out of performing the Citywide PCB Management Plan.  However, the R&R fails to give credit to the process that Defendants must first undertake in Stage 2 of the CAFO that *precedes* Defendants' ability to opt out.  Stage 2 of the CAFO requires Defendants to propose the remedy to be implemented in a Citywide PCB Management Plan; to subject that document to EPA review, peer review, and public participation; and then to engage in a mandatory period of negotiations with EPA regarding the Citywide PCB Management Plan.  Greene Decl., Ex. A, NYC PCB Work Plan, Part III.  If the City and EPA agree on the Citywide PCB Management Plan, Defendants must implement the Plan.  *Id.* at Part III, ¶ C(d).

The Court should allow this process – which will be driven by more than two years of data collection and study in the pilot schools, and informed by comments from EPA and the public, as well as peer review – to conclude before this litigation proceeds.  Although the final outcome of this forthcoming process is unresolved, this process presents the best opportunity to develop a science-based, implementable plan to holistically address potential PCB exposure (from caulk and non-caulk sources such as light ballasts) in the school buildings affected by this issue.  Thus, as explained further below, there is a basis to dismiss this matter under either or both the diligent prosecution and primary jurisdiction doctrines, or at least to stay this matter under the primary jurisdiction doctrine.

**B.      Defendants Respectfully Object to the R&R's Analysis of the CAFO Under the Diligent Prosecution Doctrine**

Defendants object to the R&R's application of the diligent prosecution doctrine to the CAFO, and to the R&R's reliance on *Hudson River Fisherman's Ass'n v. County of Westchester*, 686 F. Supp. 1044 (S.D.N.Y. 1988).  In *Hudson River*, the Court allowed a citizen suit under the CWA to proceed despite a consent order between the government and defendant.  *Id.* at 1052-53.  In its interpretation of the consent order, the Court reasoned:

> That judgment provides, *inter alia*, that, contingent on an effective capping or sealing of the landfill, the consent judgment 'shall not be deemed to apply to the discharge of leachate occurring due to the natural movement of water through, over or under the Landfill.' Thus, the consent judgment, for whatever reasons, does not address or include ground-water pollution under the landfill or, for that matter, storm runoff unrelated to the landfill.

*Id.* at 1052.  Thus, the consent order in that case excluded particular sources of contaminants that were the focus of plaintiff's lawsuit.

In contrast, the CAFO here contains provisions that expand the scope of Defendants' obligations, based on the findings of the Pilot Program.  While PCB ballasts are not explicitly mentioned in the CAFO, the provisions concerning "non-caulk" sources led to an assessment of ballasts which, while limited to the pilot schools, then set the stage for the Citywide PCB Management Plan process, which also contains provisions considering non-caulk sources.  *Cf. Carrier Corp. v. Piper*, 460 F. Supp. 2d 853, 859 (W.D. Tenn. 2006) (concluding that order required the respondent to take actions to address contaminants beyond those explicitly mentioned).  Defendants respectfully request that Your Honor reject the R&R's recommendation and dismiss this matter to allow the process set forth in the CAFO to reach its conclusion.

**C.      Defendants Respectfully Object to the R&R's Analysis of the CAFO Under the Primary Jurisdiction Doctrine**

Defendants respectfully object to the R&R's application of the primary jurisdiction doctrine's four factors.  R&R, at 24-25.  Although the R&R notes that courts are reluctant to apply this

doctrine in the context of environmental citizen suits, *see* R&R, at 23, the primary jurisdiction doctrine

has been applied in such suits. *See Friends of Santa Fe County v. Lac Minerals*, 892 F. Supp. 1333, 1349

(D.N.M. 1995) (while relying on Buford abstention, noting that primary jurisdiction is also appropriate);

*see also Davies v. Nat'l Coop. Refinery Ass'n*, 963 F. Supp. 990, 998-99 (D. Kan. 1997) (applying the

primary jurisdiction doctrine to abstain from exercising jurisdiction under RCRA so as not to interfere

with State agency). In the recent *McCormick v. Halliburton Co.*, 2012 U.S. Dist. LEXIS 46661 (W.D.

Okla. Apr. 3, 2012), the Court granted the defendants' motion to dismiss a RCRA citizen suit based on

the primary jurisdiction doctrine. Again, the best opportunity to achieve an holistic remedy is through

completion of the Citywide PCB Management Plan process, which includes negotiation with EPA, the

agency designated by Congress to regulate PCBs. Defendants respectfully request that Your Honor

dismiss this lawsuit based on the primary jurisdiction doctrine or stay this proceeding pending the

resolution of this process.

**POINT III**

**DEFENDANTS OBJECT TO RECOMMENDATIONS CONCERNING THE ADEQUACY OF PLAINTIFF'S TSCA AND RCRA NOTICE LETTERS**

**A.    Defendants Respectfully Object to the Recommendation Concerning Notice of Claims Based Upon Factual Allegations Not Contained in Mandatory Pre-Suit Notice Letters**

The Complaint makes RCRA and TSCA claims concerning "unremediated historic

leaks," or "historically leaked PCBs" – that is, past leaks where the ballast has been removed but the

PCBs have allegedly not been remediated. *See* Am. Compl. ¶¶ 7, 36, 37, 39, 55, 73, 87, 88(c).

Defendants moved to dismiss these claims because neither notice letter made reference to this distinctive

conduct. *See* 40 C.F.R. § 254.3(a) (RCRA regulation requiring that notice letter describe "activity alleged

to constitute a violation"); 40 C.F.R. § 702.62(a)(2) (TSCA regulation requiring that notice letter describe

"activity alleged to constitute a violation"). The R&R recommends denying Defendants' motion,

reasoning that the letters' reference to "past leaks" was sufficient to provide notice of this conduct. R&R,

at 22. Defendants object to this recommendation as the word "past" is far too generic to provide notice of

-13-

Plaintiff's specific allegations. Therefore, these particular allegations should be dismissed. *See, e.g.,* *Brod v. Omya*, 653 F.3d 156 (2d Cir. 2011) (affirming dismissal of claims for which notice provided did not identify the contaminants later alleged to be present in defendant's waste).

**B.      Defendants Respectfully Object to the Recommendation that the RCRA Notice Letter Provided Sufficient Notice of Plaintiff's Storage, Treatment, and Transportation Claims**

Defendants moved to dismiss RCRA claims concerning storage, treatment, and transportation because the RCRA notice letter contained no specific description of such conduct. The R&R recommends denying Defendants' motion, reasoning that the RCRA notice letter's citation of the statutory language provided sufficient notice. R&R, at 22. However, while Plaintiff's RCRA notice letter quotes the general statute, it focuses exclusively on disposal and handling. Greene Decl., Ex. E, at 2. The heading used in the letter states that Defendants "have contributed and are contributing to the illegal *disposal* of PCBs." *Id.* Moreover, the letter provides discussion of the conduct that it alleges constitutes disposal, stating "[l]eaking PCBs . . . constitutes the disposal of a solid waste." *Id.* The letter does not contain any accompanying explanation for the alleged storage, treatment, or transportation violations.

These claims should be dismissed because notice letters that merely recite the statutory language with no discussion of how that language resonates with the violations are "hardly more helpful than a letter telling Defendants merely that they have violated" the law; the letters "substitute sweeping language for the particularity required" by TSCA's and RCRA's regulations, and fail "to specify the activities that constituted the alleged violations." *Karr v. Hefner*, 475 F.3d 1192, 1201 (10th Cir. 2007). Defendants respectfully request that Your Honor reject the recommendation and dismiss Plaintiff's RCRA claims concerning alleged storage, treatment, and transportation violations.

### POINT IV

**DEFENDANTS OBJECT TO RECOMMENDATIONS CONCERNING DEFENDANTS' MOTION TO DISMISS THE TSCA CLAIM**

The R&R found that Plaintiff met the pleading standards of *Iqbal* and *Twombly* by alleging "the existence of numerous leaking light ballasts throughout the City schools," and thus recommended denying Defendants' motion to dismiss Plaintiff's TSCA claim pursuant to Rule 12(b)(6). R&R, at 42. Defendants object to this recommendation. As stated by the Supreme Court, where factual allegations "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

Here, Plaintiff makes allegations about ballast leaks identified in eleven schools by City or EPA inspectors, and refers to statements by EPA that there may be a prevalence of leaks in other schools still using the legally authorized light ballasts. However, Plaintiff does not identify a single instance where Defendants have discovered a ballast leak and not already taken corrective action. The R&R reasons that Plaintiff does not need to identify the location of specific ballast leaks, *see* R&R, at 41-42, but instead can assert a TSCA claim encompassing over 600 buildings based on inspections in eleven buildings and EPA's warning that other leaking light fixtures are likely present in the system. Defendants contend that Plaintiff's allegations concerning findings from eleven schools does "not permit the court to infer more than the mere possibility of misconduct" in the hundreds of other schools buildings at issue in this lawsuit, and therefore does not meet the pleading standard set forth in *Iqbal*. 556 U.S. at 679 (2009).

Additionally, the R&R does not fully consider the relevancy of the TSCA regulations in recommending that Plaintiff's far-reaching TSCA claim be permitted to proceed. Plaintiff's generic claim – that any leak in any of the over 600 buildings, whether known or unknown, constitutes a violation of TSCA – is inextricably related to Defendants' obligations under the TSCA regulations with respect to this type of equipment. The continued use of PCB ballasts is permissible under TSCA, and the regulations do not require this equipment be inspected at any point during its continued use.[8] *See supra* "Statutory and

---

[8] In contrast, EPA's use authorizations for other PCB equipment contain stringent conditions, in recognition of the greater hazards they present compared to PCB small capacitors. For example, PCB transformers in use or stored for reuse must be inspected at least once every three months, with a minimum of thirty days between inspections. *See* 40 C.F.R. § 761.30 (a)(1)(ix).

Regulatory Framework Governing PCBs"; *see also* EPA, Revisions to the PCB Question and Answer Manual (January 2009), *available at* http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/qacombined.pdf, at 74-75 (EPA guidance stating "[t]here is no regulatory requirement that you sample [PCB] equipment or stains near the equipment for PCB contamination"). EPA rejected imposing any risk reduction measures on the continued use of this equipment because the cost of these measures outweighed the potential environmental risks. 47 Fed. Reg. 37,342 (Aug. 25, 1982).

Plaintiff asserts that every leak is a violation, regardless of the lack of any regulatory obligation to discover such leaks from this equipment. Under Plaintiff's logic, if a leak is discovered, a violation is discovered. However, if a leak is not discovered, TSCA provides Plaintiff with no remedy because TSCA authorizes the use of PCB light ballasts. The application of Plaintiff's conception of TSCA to in-use light fixtures in more than 600 school buildings could result in an unprecedented fishing expedition to search for potential violations related to each individual light ballast. This type of intrusive, speculative discovery is what the pleading requirements are meant to prevent. *See, e.g., DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (discussing the importance of a "pleading threshold"). Defendants request that Your Honor reject the R&R's recommendation to deny Defendants' motion to dismiss the TSCA claim.

**POINT V**

**DEFENDANTS OBJECT TO RECOMMENDATIONS CONCERNING DEFENDANTS' MOTION TO DISMISS THE RCRA CLAIM**

**A.     Defendants Respectfully Object to Recommendations Concerning the Scope of Contributor Liability Under RCRA**

Defendants respectfully request that Your Honor reject the R&R's recommendation to deny Defendants' motion to dismiss Plaintiff's RCRA claim for failure to allege facts sufficient to establish contributor liability, and dismiss Plaintiff's RCRA claim.

Defendants' motion argued that Plaintiff's RCRA claim was chiefly based on Defendants' failure to take timely action with respect to PCB light ballasts.[9] Defendants primarily relied on two cases, *Sycamore Industrial Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847 (7th Cir. 2008) and *Ecological Rights Foundation v. Pacific Gas & Electric Co.*, 2011 U.S. Dist. LEXIS 37230 (N.D. Cal. March 31, 2011), to argue that allegations of passive conduct are not sufficient to establish RCRA contributor liability.

In *Sycamore*, the plaintiff brought a RCRA suit against a former owner who had sold a facility without remediating on-site asbestos, *see* 546 F.3d at 848; the plaintiff argued that the sale constituted disposal of hazardous waste, and that the abandoning of the asbestos constituted contribution to the "handling" and "storage" of such waste. *Id.* at 853-54. The Seventh Circuit held that these activities did not constitute disposal, and that contributor liability under RCRA requires "affirmative action rather than merely passive conduct – such as leaving a heating system in place when selling the real estate that houses it – for handling or storage liability." *Id.* at 854; *see also Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 851-52 (9th Cir. 2011) (Ninth Circuit endorsing the Seventh Circuit's interpretation of contributor liability).

Similarly, in *Ecological Rights*, plaintiff sued a utility company under RCRA on grounds that contaminants leaching from utility poles constituted the disposal of solid and hazardous waste. *See Ecological Rights*, 2011 U.S. Dist. LEXIS at *1-5. The District Court disagreed, holding that the

> flaw in Plaintiff's theory of disposal is that . . . there is no allegation that Defendants engaged in any conduct that resulted in the discharge of the chemical preservatives. To the contrary, Plaintiff merely alleges that the purported contamination is the result of natural forces – namely, rain and wind. Such allegations, on their face, are insufficient to establish that Defendants engaged in the 'disposal' of hazardous waste . . . .

---

[9] As the R&R notes, Plaintiffs do allege that Defendants replaced failed and leaking PCB ballasts with an intact ballast, but continued to use the overall fixtures housing the ballasts, which the ballast leak had contaminated. R&R, at 48-49. This factual scenario is distinct from the bulk of Plaintiff's allegations which concern in-use, undiscovered leaking ballasts. Moreover, as stated in Point III.A *supra*, Defendants object to the R&R's finding that Plaintiff provided notice of this improper replacement scenario.

*Id.* at *21 (internal citation omitted). Similarly, here, with the exception of the allegation concerning the improper replacement of now-removed ballasts, *see supra* n. 9, Plaintiff's RCRA claim is based entirely on passive conduct. *See* Am. Compl. ¶¶ 1 (alleging that Defendants' plan to replace the lighting is too "lax"); 35 (alleging Defendants are utilizing PCB ballasts "well past their predicted lifespan").

The limitation of RCRA liability to active, as opposed to passive, conduct is particularly important in this instance since EPA authorized the unconditional use of PCB ballasts and small capacitors. *See* 47 Fed. Reg. 37,342 (Aug. 25, 1982). If RCRA liability attached for using these legal, widely-dispersed devices, "virtually any owner of any building or structure . . . would be subject to liability"; "[s]uch a result is clearly well beyond what Congress intended in enacting RCRA." *Ecological Rights*, 2011 U.S. Dist. LEXIS at *25.

The R&R determined that "defendants may be liable for their more passive conduct with respect to the ballasts based on their authority and control over the fixtures." R&R, at 49. In reaching this conclusion, the R&R analogized PCB ballasts to underground petroleum storage tanks ("USTs"). *See* R&R, at 46-47, 49. This analogy misses the mark. The primary case regarding USTs, *Zands v. Nelson*, focused its holding on the circumstances surrounding the ownership and operation of gasoline stations, which inherently involves the active management of gasoline. 779 F. Supp. 1254, 810 (S.D. Cal. 1991). USTs are subject to myriad federal, state, and local regulations that govern their design, management, leak monitoring, and overall use and that affirmatively require owners to actively monitor and prevent leaks. *See, e.g.*, 40 C.F.R. Parts 280-82 (EPA's regulations concerning USTs). In contrast, EPA regulations do not impose risk reduction measures, such as leak inspections, on PCB ballasts. Thus, a RCRA claim based on Defendants' passive management should be rejected where the EPA regulations themselves allow for such management.

The R&R also reasons that "[if] leaking PCBs constitute a RCRA violation, defendants cannot point to anyone more responsible for that violation than themselves; their theory of contributor liability would require the Court to hold that despite the RCRA violation, no one could be held liable pursuant to RCRA's enforcement provision." R&R, at 49. This reasoning is incorrect. First, there is no

requirement for Defendants to identify more culpable parties to escape from contributor liability.  Second, if Plaintiff has not made sufficient allegations against Defendants to meet the requirements of RCRA, Plaintiff has simply failed to state a claim under RCRA, regardless of whether there other entities before the Court.  R&R cites several cases cited supporting its reasoning, stating that none of these decisions dismissed a RCRA claim "based on lack of causation, even though a RCRA violation may have occurred and the court cannot identify any entity more responsible for the alleged violation than that Defendant." R&R, at 49.  This interpretation does not comport with these cases.

For instance, in *Interfaith Community Org. v. Honeywell International, Inc.*, the District Court plainly held that "a straightforward reading of RCRA compels a finding that only active human involvement with the waste is subject to liability." 263 F.Supp. 2d 796, 844 (D.N.J. 2003).  While another responsible party was before the court in *Interfaith*, that fact was not itself a determinative factor in the Court's interpretation of the statute.  In *Sycamore*, the Seventh Circuit also found that the phrase "'has contributed or is contributing' requires affirmative action" for handling or storage liability; the Court did not premise its analysis of contributor liability on whether it could identify another responsible entity.  546 F.3d at 854. The same is true regarding *Ecological Rights*, as no other entity was identified as responsible for the management of the utility poles.  803 F. Supp. 2d at 1058.

Defendants respectfully request that Your Honor reject the recommendation to allow Plaintiff to proceed with its RCRA claim based on such insufficient allegations of passive conduct.

**B.    Defendants Respectfully Object to Recommendations Concerning RCRA Disposal and Storage of Leaked PCBs**

Defendants object to the R&R's finding that Plaintiff had pled "sufficient facts" to supports its RCRA storage and disposal claims and to the R&R's recommendation that Defendants' arguments are "more appropriately considered after discovery has been conducted." R&R, at 52-53.

### (a) Objection to Recommendations Concerning the RCRA Disposal Claim

The R&R recommends that the Court find that Plaintiff has a viable RCRA disposal claim based on allegations that "the PCBs leak outside of the fixtures and into the classroom and beyond,

constituting 'disposal' for the purposes of RCRA." R&R, at 52. To reach this conclusion, the R&R rejected cases cited by Defendants holding that actions can constitute disposal under RCRA only if the waste at issue actually was placed "into or on any land or water." 42 U.S.C. § 6903(3). Instead, if the "only exposure . . . was inside the building" then "there was no apparent danger to air, land, or water outside of the building as required for 'disposal.'" *Sycamore*, 546 F.3d at 851 (citing *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 383 (7th Cir. 1995)); *see also 3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1360-61 (9th Cir. 1990) (holding use of asbestos in construction did not constitute disposal because the materials were "not placed 'into or on any land or water'"; even if the asbestos fibers happened to break off, "the resulting hazard is within the building"); *George v. Reisdorf Bros.*, 696 F. Supp. 2d 333, 344 (W.D.N.Y. 2010) *aff'd* 410 Fed. Appx. 382 (2d Cir. 2011) (dismissing RCRA claim because evidence of residue contained on wagons was insufficient to show disposal of waste onto land or water).

The R&R instead relies on several cases interpreting the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and then applies their rationale to Plaintiff's RCRA claim. *See* R&R, at 51. The R&R reasons that both statutes contain the same definition of the term "disposal," and therefore implies that the two statutes should be interpreted in the same way. *See* R&R, at 51 n.15. Defendants object to the R&R's reliance on these cases.

Although CERCLA and RCRA use the same definition of disposal, CERCLA contains several additional defined terms that are not included in RCRA, and these additional terms are essential to the analyses in each of the cases cited in the R&R. In *BCW Associates, Ltd. v. Occidental Chemical Corp.*, the Court based its interpretation on the CERCLA-specific defined term "facility," concluding that "Congress intended the term 'land' to encompass buildings and other types of real estate" because "[CERCLA] § 9607(a)(2) contemplates the disposal of hazardous substances at a 'facility' and [CERCLA] U.S.C. § 9601(a) defines 'facility' to include "any building, structure, [or]  installation." 1988 U.S. Dist. LEXIS 11275 (E.D. Pa. Sept. 29, 1988), at *45-46. As RCRA does not include the definition of "facility" that was the basis of the holding in *BCW Associates*, the R&R should not have

relied upon this case in finding that Plaintiff has a viable disposal claim under RCRA. *See also Emhardt Indus., Inc. v. Duracell Int'l, Inc.*, 665 F.Supp. 549, 574 (M.D. Tenn. 1987) (parties stipulated that factories qualify as "facilities" under CERCLA). The R&R also erred in relying on the portion of the *BCW Associates* opinion that interpreted the scope of the CERCLA-specific term "release, or a threatened release," 42 U.S.C. § 9607(a), which also is not used in RCRA. *See BCW Assocs.*, 1988 U.S. Dist. LEXIS at *46-47. The term "release" is itself a defined term under CERCLA, and not RCRA. *See* 42 U.S.C. § 9601(a)(22). Given *BCW Associates'* reliance on CERCLA-specific terminology, the R&R should not have relied on this case to interpret the scope of disposal liability under RCRA, which does not include the same terms.

The R&R also should not have relied on *Reading Co. v. City of Philadelphia*, 823 F. Supp. 1218 (E.D. Pa. 1993). The R&R refers to this case to support the notion that if PCB leaks are carried outside on clothing or other items, such activities can constitute disposal under RCRA. However, *Reading* was premised on the CERCLA-specific statutory phrase "release or threatened release . . . of a hazardous substance" into the environment and thus *Reading*'s analysis is not pertinent here. *See id.* at 1238-39.

Defendants respectfully request that Your Honor reject the recommendation in the R&R and adopt the interpretation of RCRA disposal set forth in the Seventh Circuit's *Sycamore* decision. *See Sycamore*, 546 F.3d at 850-54.

### (b) Objection to Recommendations Concerning the RCRA Storage Claim

The R&R recommends that this Court find that PCB leaks contained within light fixtures may give rise to a viable storage claim under RCRA.[10] R&R, at 52-53. Defendants object to the R&R's interpretation of the *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.* decision, in which the Second Circuit, in rejecting a storage claim, held that "[t]he lead shot and clay targets now scattered in

---

[10] As stated in Point III.B *supra*, the R&R should have dismissed the "storage" claim for lack of proper notice and, as stated in Point V.A *supra*, Plaintiff's storage claim is also inappropriate given that this claim is based on passive conduct.

the waters of Long Island Sound at no time have been contained or held." 989 F.2d 1305, 1316 (2d Cir. 1993). The R&R stated that this case is "easily distinguishable" because "defendants contend that any PCB leaks are contained 'inside the lighting fixtures' and that such 'leaks onto interior, largely inaccessible electrical equipment do not constitute placement of waste onto either 'land or water.'" R&R, at 52 (quoting Defs.' Br. at 25). However, *Connecticut Coastal*'s emphasis on the "contained" or "held" statutory language is analogous to the affirmative conduct standard imposed by other courts and does not suggest that any leak that happens to be contained gives rise to a RCRA storage claim. *See Conn. Coastal*, 989 F.2d at 1316. Under the R&R's rationale, any leak inside a lighting fixture that occurs through the normal use of the equipment constitutes storage of the leaked material regardless of whether Defendants have engaged in any affirmative conduct to "contain" or "hold" such material, let alone even discover the leak. This approach conflicts with the affirmative conduct standard applied by most courts. Defendants request that the recommendation concerning Plaintiff's storage claim be rejected and that this claim be dismissed.

## C.   Defendants Respectfully Object to Recommendations Concerning Claims for In-Use, Non-Leaking Ballasts

The R&R fully acknowledges that "it is unclear to the Court how RCRA, 'a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste' . . . can be extended to govern the use of substances that are not yet considered waste." R&R, at 55 (*quoting Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996)). Despite this acknowledgement, the R&R recommends against striking Plaintiff's claim regarding in-use, non-leaking PCB ballasts, which are legally authorized under TSCA. *See* R&R, 53-55. Defendants object, and contend there is no basis to extend RCRA beyond its statutory boundaries.

The allowance of RCRA claims directed at in-use, non-leaking ballasts creates conflict between RCRA and TSCA. Under the TSCA regulations, Defendants are permitted to use non-leaking PCB ballasts indefinitely. The R&R's recommendation that Plaintiff be entitled to pursue relief under RCRA pertaining to non-leaking ballasts would effectively allow Plaintiff to challenge the TSCA

regulations, and would place Defendants, along with other regulated entities, in a state of uncertainty. Defendants respectfully request that Your Honor reject the R&R's recommendation to allow Plaintiff to pursue its claim under RCRA concerning in-use, non-leaking ballasts.

**D.     Defendants Respectfully Object to the Recommendation that Plaintiff's RCRA Claim is Not Foreclosed by the TSCA Regulations**

Defendants respectfully object to the R&R's recommendation to deny Defendants' motion to dismiss the RCRA claim because in-use PCB electrical equipment and associated PCB waste management issues are regulated under TSCA and not RCRA. *See* R&R, at 56-63.

**(a) Statutory and Regulatory History**

The decision to regulate PCB electrical fluid and electrical equipment under TSCA and not RCRA is rooted in the legislative and regulatory history of both laws, which were enacted within days of each other in 1976. *See* 53 Fed. Reg. 37,436 (Sept. 26, 1988). Congress enacted RCRA to regulate the management, transport, and disposal of solid and/or hazardous wastes. *See* 42 U.S.C. § 6902. RCRA included no specific provisions concerning PCBs. *See* 42 U.S.C. §§ 6901 et seq. In contrast, Congress enacted TSCA to regulate the manufacture, processing, distribution, use and disposal of "chemical substance[s] or mixture[s]," 15 U.S.C. § 2605(a), and included statutory provisions directing EPA to specifically regulate the use and disposal of PCBs, PCB-containing equipment, and PCB waste. *See* 15 U.S.C. § 2605(e) et seq.

The potential for unwarranted duplicative regulation was recognized in the statutes' histories. *See, e.g.*, H.R. Rep. No. 1341, 94th Cong., 2d Sess., at 45 (1976) (in discussing TSCA, stating "[i]t is the intent of the Committee that any overlapping or duplicatory regulation be avoided"); Statement by the President on Signing S. 3149 [TSCA] Into Law (October 12, 1976) ("It is critical . . . that the legislation be administered in a manner so as not to duplicate existing regulatory and enforcement authorities"). To address concerns about duplication, both statutes contain provisions directing the EPA Administrator to integrate the statutes with other environmental laws. Section 6905(b) of RCRA requires the Administrator to "integrate all provisions of this Act for purposes of administration and enforcement

and [to] avoid duplication, to the maximum extent practicable." 42 U.S.C. § 6905(b).  Similarly, section

2608(b) of TSCA states:

> The Administrator shall coordinate actions taken under this Act with
> actions taken under other Federal laws administered in whole or in part
> by the Administrator.  If the Administrator determines that a risk to
> health or the environment associated with a chemical substance or
> mixture could be eliminated or reduced to a sufficient extent by actions
> taken under the authorities contained in such other Federal laws, the
> Administrator shall use such authorities to protect against such risk
> unless the Administrator determines, in the Administrator's discretion,
> that it is in the public interest to protect against such risk by actions taken
> under this Act.

15 U.S.C. § 2608(b); *see also, e.g.*, S. Rep. No. 698, 94th Cong., 2d Sess., at 23 (1976) (explaining that

section 2608(b) of TSCA "is intended to minimize overlap and duplication between this act and other

Federal laws").

In accordance with these statutory requirements, EPA evaluated whether to regulate PCB

wastes under RCRA or TSCA.  In its initial RCRA rulemakings, EPA stated a preference to "merge the

TSCA PCB rules into the final RCRA regulations." 45 Fed. Reg. 33,084, 33,086 (May 19, 1980).

However, EPA was unable to do this because "[b]oth rules are lengthy and complicated, and must be

carefully coordinated to avoid regulatory loopholes and disruption of the ongoing TSCA PCB program."

*Id.*  EPA determined that "the handling and disposal of waste PCBs will continue to be regulated under

TSCA and other EPA statutes."  *Id.*  EPA also denied a petition to transfer all PCB regulations from

TSCA to RCRA.  47 Fed. Reg. 2,379 (Jan. 15, 1982).  The EPA Administrator stated:

> The petitioner assumes that it is a simple process to integrate the
> rules promulgated under TSCA and RCRA. Unfortunately, this is not so.
> There are many complexities involved in integrating the PCB regulations
> into the RCRA. The TSCA rules for waste PCBs are in place, and they
> are well understood by the regulated community . . . . A major effort to
> integrate the PCB rules now could be confusing to the regulated
> community and could be inefficient . . . . Moreover, effective
> implementation of the waste PCB regulatory control program could be
> interrupted.
>
> For these reasons, EPA intends to leave these rules separate at
> this time, with waste PCBs controlled solely under the TSCA rules.

*Id.*

Similarly, in 1988, EPA stated:

> The significance of the PCB disposal program evaluation cannot be overstated, since EPA has decided to retain its disposal program for PCBs under TSCA authority for the foreseeable future . . . . The Agency found that after 10 years of experience with and adaptation to the TSCA disposal requirements, a wholesale transfer of the program to RCRA would be far more complex and potentially disruptive than originally anticipated. EPA concluded that the administrative process alone (i.e., the listing rulemaking and the necessity of numerous amendments to the RCRA system to accommodate PCBs) would be extremely resource intensive and time consuming with little, if any, additional benefit to health or the environment.

> . . . Indeed, EPA was very concerned that the pendency of a listing regulation during the peak period of PCB disposal would have a disruptive influence on the orderly disposal of large quantities of PCB waste, since some PCB users might be inclined to change their position by accelerating their rate of PCB waste generation, to avoid the costs of RCRA's more burdensome administrative requirements. From the Agency's standpoint, the pendency of a rule bringing PCB disposal under RCRA would essentially preempt any momentum for pursuing the needed amendments to the TSCA program that might be undertaken in time to meet the peak disposal period.

53 Fed. Reg. 37,436 (Sept. 26, 1988); *see also* 54 Fed. Reg. 52,716 (Dec. 21, 1989) (final rule).

In March 1990, EPA issued a rule to revise criteria used to classify certain compounds as hazardous wastes. 55 Fed. Reg. 11,798 (March 29, 1990). EPA was concerned that that the new criteria would have the unintended effect of encompassing PCB wastes. To avoid this, EPA crafted an exemption for PCB wastes in the RCRA rulemaking. EPA explained:

> EPA has decided to exempt from the application of this rule certain polychlorinated biphenyl (PCB) wastes that are regulated under the Toxic Substances Control Act (TSCA) and would be identified as hazardous because of today's rule. . . . The Agency has decided to exempt such wastes from the subtitle C management standards because new regulation of these wastes under RCRA may be disruptive to the mandatory phaseout of PCBs in certain electrical transformers and capacitors. In addition, the Agency believes that the regulation of these wastes under TSCA is adequate to protect human health and the environment . . . .
> ****
> The TSCA program, with which the regulated community is familiar, is specifically tailored to deal with the problem of widely dispersed waste generation and the timely disposal of a chemical that is no longer commercially produced. . . .

*Id.* Thus, with limited exception not at issue here, the final rule exempted PCB dielectric fluid and electrical equipment from the RCRA regulatory scheme, including the regulatory definitions of "solid waste" and "hazardous wastes." *See* 40 C.F.R. § 261.8.

      **(b) As PCB Waste and PCB Electrical Equipment Are Regulated Under TSCA and Not RCRA, Defendants Respectfully Object to the R&R's Recommendation that Plaintiff Can Proceed Under RCRA**

      The R&R's analysis centers on its evaluation of several cases that reached differing conclusions on whether the integration clause can bar enforcement actions. *See* R&R, at 57-61. The R&R follows the line of cases holding that TSCA does not bar claims under RCRA. *Id.* at 59. Defendants object to the R&R's reliance on these cases, as they are distinguishable from the issues here. The R&R should have instead followed the line of cases cited by Defendants. *See* R&R, at 57 (summarizing cases cited by Defendants).

      The R&R relies heavily on the holding in *United States v. Vineland Chem. Co.*, 692 F. Supp. 415 (D.N.J. 1988). The R&R concludes: "If the integration clause was intended only to encourage a limit on duplicative regulations, rather than to place a limit on enforcement options, then the *Vineland* decision was correctly decided and plaintiff's claim under RCRA would not be preempted." R&R, at 61. However, the R&R's conclusion that the integration clause was only intended to avoid duplicative regulations and not enforcement options conflicts with the language of clause, which requires the Administrator to "integrate all provisions of this Act for purposes of administration and enforcement and [to] avoid duplication, to the maximum extent practicable." 42 U.S.C. § 6905(b)(1).

      The R&R also relies on *U.S. v. Union Corp.*, 259 F. Supp. 2d 356 (E.D. Pa. 2003), which states: "nothing in the text of [TSCA], which also regulates PCBs, evinces Congress' intention to preempt RCRA." *Id.* at 403. Defendants have never argued that TSCA supplants RCRA in all contexts. For instance, *Union Corp.* concerned a thirty-year old industrial hazardous waste site at which thousands of gallons of PCB-contaminated oil had spilled into the Delaware River. *Id.* at 364-79. The other cases that the R&R relies upon also involve substantial soil and groundwater releases from past industrial

activities. *See Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.*, 138 F. Supp. 2d 482 (S.D.N.Y. 2001); *Vineland*, 692 F. Supp. 415. None of these cases applied RCRA to the use and management of authorized PCB electrical equipment or associated small interior leaks. This activity is clearly governed by TSCA.

Application of RCRA in the instant case would have a duplicative and disruptive effect, especially in light of other recommendations in the R&R. For instance, as discussed *supra* at Point V.C, the R&R recommends that Plaintiff be permitted to pursue phase-outs of non-leaking PCB ballasts under RCRA, even though TSCA authorizes their use. Moreover, the R&R does not address the implications of applying RCRA to small interior leaks from active PCB equipment, when the obligations concerning such leaks are defined under the TSCA regulations. *See, e.g.,* 40 C.F.R. § 761.30(p); 40 C.F.R. § 761, Subparts D, G. Thus, in the context of in-use electrical equipment, it is clear that the provisions of TSCA and not RCRA should govern.

Moreover, courts have sanctioned the dismissal of RCRA claims when a more applicable statute governs the conduct at issue. In addition to those decisions referenced in the R&R, *see* R&R, at 57, in the recently decided *Center for Community Action & Environmental. Justice v. Union Pacific Corp.*, 2012 U.S. Dist. LEXIS 83051 (C.D. Cal. May 29, 2012), the District Court dismissed a RCRA claim because the claim had the potential to interfere with the Clean Air Act ("CAA"). While the decision does not cite the integration clause, its reasoning is persuasive.

In *Center for Community Action,* the plaintiffs sought relief under RCRA to abate diesel particular matter from railyards. *Id.* at *3-4. The defendants argued that the "CAA, not RCRA, provides the statutory framework applicable to this case"; that private railyards are categorized as "indirect sources"; and that the CAA prohibited "federal indirect source" regulation. *Id.* at *7-13. The plaintiffs attempted to bypass this "loophole" by seeking relief under RCRA. *Id.* at *16. The Court rejected this argument, holding "it is not for the Court to create a regulatory scheme where one does not exist or to apply a strained construction of RCRA to an area that Congress has chosen to regulate through the CAA." *Id.* at *17. Here, while there is not an analogous statutory provision, approximately thirty years of regulatory history under TSCA and RCRA, including an entire regulatory framework for addressing leaks

associated with in-use PCB equipment, demonstrate that EPA decided to regulate in-use PCB electrical equipment such as ballasts under TSCA. Similar to the relief sought by the plaintiffs in *Center for Community Action*, Plaintiff here seeks to use RCRA as a blank canvas to create injunctive relief, without regard to the fact that EPA has created an entire regulatory system under TSCA that governs. Defendants respectfully request that Your Honor reject the recommendation to deny Defendants' motion to dismiss the RCRA claim based on the applicability of TSCA to in-use PCB equipment.

**POINT VI**

**DEFENDANTS OBJECT TO CERTAIN CHARACTERIZATIONS MADE IN THE R&R**

As explained below, Defendants object to certain factual characterizations in the R&R.

**A.      Defendants Respectfully Object to the R&R's Characterization of the Greener Schools Plan**

Defendants submitted information concerning Defendants' ongoing voluntary ten-year plan to remove all light fixtures that use or used PCB light ballasts (the "Greener Schools Plan" or "Plan"). Defendants object to certain characterizations in the R&R regarding the Plan, as they create the impression that the Plan was solely proposed for energy efficiency and not in anyway developed to address PCBs. See R&R, at 1, 5, 15 n.9, and 26. While a core component of the Plan is improving overall energy efficiency, the Plan itself and the context in which it was created indicates that PCBs were also a core consideration.

For instance, the R&R does not consider that the prioritization of work under the Plan is linked to factors almost exclusively related to PCBs. Greene Decl., Ex. C, February 23, 2011 Letter to EPA Regional Administrator Judith Enck, at 3. Similarly, the R&R characterizes the Plan as a program solely designed to comply with Local Laws 87 and 88, but does not analyze what the laws require compared to the work being performed under the Plan. Local Law 87 requires the City to perform energy audits of base building systems (including, but not limited to, lighting) for buildings exceeding a certain size on a staggered schedule until the year 2022. There is no prioritization in Local Law 87 based on PCBs. Local Law 87 also requires the City to make "reasonable capital improvements" to base building

-28-

systems that would have a "simple payback" of not more than seven years.  Local Law 87, § 2.  While such improvements could include lighting system upgrades in many buildings, these improvements are tied to the "simple payback" formula.  In the Greener Schools Plan, Defendants have made an unqualified commitment "that all of the buildings must receive full lighting replacements, or at least to the extent necessary to replace all lights using PCB ballasts."  Greene Decl., Ex. C, February 23, 2011 Letter, at 2.[11]

Defendants also object to the R&R's statement that the Ballast Plan "was not developed in response to EPA's investigation into PCBs in schools."  R&R, at 15 n.19.  This statement does not fully consider the record.  First, in a December 10, 2010 letter to Deputy Mayor (and current School Chancellor) Dennis Walcott, EPA Regional Administrator Judith Enck requested that Defendants develop a plan to remove all fixtures relying on PCB ballasts from schools on a prioritized basis and that "replacing fixtures with PCB containing ballasts over several years could soften the financial impact."  Am. Compl., Ex. D at 2.  EPA requested this plan by March 15, 2011.  *Id*.  On December 29, 2010, EPA published a national guidance document recommending school districts phase out PCB ballasts and, in doing so, take advantage of possible funding or contracting measures tied to energy efficiency.  *See* Ballast Guidance.  Then, on February 23, 2011, then Deputy Mayor Walcott announced Defendants' plan in a letter to EPA Regional Administrator Enck, outlining the specific provisions of the program, including discussion of how it will address PCBs.  Greene Decl., Ex. C.  This chain of events at least indicates that PCBs played a role in the development of the Plan.  Thus, Defendants request Your Honor modify the findings about the Plan.

**B.     Defendants Respectfully Object to the R&R's Characterization of Defendants' Positions on Certain Issues**

The R&R contains statements which indicate that Defendants have conceded, at least in part, certain factual allegations.  *See* R&R, at 35 (stating "defendants do not challenge plaintiff's

---

[11] Local Law 88 also contains requirements that overlap but do not match the commitments made in the Ballast Plan.  That law requires the City to upgrade lighting systems to comply with the New York City Energy Conservation Code on or prior to January 1, 2025.  The Greener Schools Plan commits to full fixture replacements for all light ballasts that might contain PCBs by 2021.

characterization of the serious health risks posed by exposure to PCBs"), 41 (stating "defendants do not dispute, as the EPA found, 'there is a prevalence' of leaking PCB light ballasts throughout the City school system.") As Defendants moved to dismiss, they were required to accept the factual allegations of the complaint (unless contrary to undisputed documents) and could not appropriately challenge Plaintiff's factual statements. *See* R&R, at 6, 39. Moreover, Defendants' moving papers contained statements indicating that Defendants would challenge such averments at the appropriate stage, if necessary. *See, e.g.*, Defs.' Reply Mem., at 1 n.1. Thus, Defendants respectfully request that Your Honor modify or reject this particular language in the R&R.

### CONCLUSION

For the reasons discussed above, Defendants respectfully request that this Court grant Defendants' Motion to Dismiss the Complaint, or, in the Alternative, Stay the Proceedings based on the above identified objections.

Dated:     New York, New York
           September 17, 2012

                              MICHAEL A. CARDOZO
                              Corporation Counsel of the
                               City of New York
                              Attorney for Defendants
                              100 Church Street, Room 6-128
                              New York, New York 10007
                              (212) 788-1568

                        By: _____
                              Daniel Greene (DG 5839)
                              Amy McCamphill (AM 5109)
                              Assistant Corporation Counsel
                              Environmental Law Division

-30-