UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
NEW YORK COMMUNITIES
FOR CHANGE,                                              ORDER ADOPTING
                                                        REPORT AND
                                                        RECOMMENDATION

                        Plaintiff,                      11CV3494 (SJ) (CLP)

                v.


NEW YORK CITY DEPARTMENT
OF EDUCATION, and NEW YORK
CITY SCHOOL CONSTRUCTION
AUTHORITY,

                        Defendants.
-------------------------------------------------X
**A P P E A R A N C E S**

NEW YORK LAWYERS FOR THE PUBLIC INTEREST
151 West 30th Street, 11th Floor
New York, NY 10001
By:     Christina Giorgio
        Miranda Massie
*Attorneys for Plaintiff*

WHITE & CASE
1155 Avenue of the Americas
New York, NY 10036
By:     Melissa Marie Laferriere
        Mihir Ashok Desai
        Richard Horsch
*Attorneys for Plaintiff*

NEW YORK CITY LAW DEPARTMENT
100 Church Street
New York, NY 10007
By:     Daniel Patrick Greene
        Amy McCamphill
*Attorneys for Defendants*

1

**JOHNSON, Senior District Judge:**

This case is about polychlorinated biphenyl ("PCB").  PCBs are a broad class of manmade chemicals used in various industrial applications from 1929 until 1979, when they were banned.  According to the Amended Complaint (and, incidentally, the Environmental Protection Agency ("EPA" or the "Agency")), PCBs were demonstrated to cause a host of physical ailments, from compromising the immune, reproductive and endocrine systems to causing cognitive development issues and cancer.[1]  On top of that, PCBs are slow to break down.  Once released into the environment, they can travel back and forth between air, earth, and water continually, and can do so over considerable distances.  Before they were banned, however, they were heavily used in many New York City Public School buildings ("Schools"), where some products containing PCBs indisputably remain. Defendants New York City Department of Education ("DOE") and New York City School Construction Authority (collectively "the City" or "Defendants") agree that exposed PCBs ought to be removed from the Schools, and have undertaken to remove them.  The problem is that the City wishes to do so in double the time recommended by the EPA.   This schedule was met with ire by New York Communities for Change ("NYCC" or "Plaintiff"), a coalition of low and moderate income communities whose aims are social and economic justice.  Several NYCC

_____
[1]See Health Effects of PCBs, http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/
effects.htm#Repro (incorporated by reference into the Amended Complaint) (last visited
March 26, 2013).

members have children attending the Schools, and seek an order compelling the City to abate past, present and future PCB leaks.  Given that the City has already agreed to remediate PCB exposure in all Schools, the instant legal wrangling is for all practical purposes a dispute over how quickly these chemicals must be removed and to whom the City should be held responsible in that regard.

BACKGROUND

Unless otherwise indicated, the facts as set forth in this decision are taken from the Amended Complaint.

In January 2010, the City entered into a Consent Agreement and Final Order ("CAFO") with the EPA, the purpose of which was to examine the caulks (a PCB-containing product) found in schools and to work on a system of remediation of caulk-containing products.  Caulk-containing products were identified as "any semi-drying or slow-drying plastic material used to seal joints or fill crevices around window frames or panes, doors, or other building components." (Green Decl. Ex A at I.(1).)

Defendants were required to select a small sample of schools, identify those with the presence of PCBs, and develop an abatement strategy over a 10-year period. A sample of five schools followed, and PCBs were found present not only in window frame caulking, as had essentially been expected, but also in certain leaking

fluorescent light ballasts[2] referred to as "T12 fixtures," which are not the subject of the CAFO.

Upon discovery of the leaking T12 fixtures, the City undertook to remove them from the three pilot schools in which they were found.  At P.S. 199 in Manhattan, 181 fixtures contained leaking ballasts, and 153 fixtures that were themselves not leaking were contaminated from prior leakage.  At P.S. 309 in Brooklyn, 114 fixtures that were labeled "No PCBs" were paradoxically found to have been contaminated.  By December 1, 2010, the City reported to the EPA that, of the 1,250 Schools and related DOE buildings, 772 of them contained T12 fixtures. The City estimated that 90% of these buildings had more than 100 T12 fixtures, and that 50% of the buildings were erected between 1950 and 1978, during which PCB use was legal.  The other half were built prior to 1950, but had fluorescent lighting fixtures installed thereafter.

The problem is not the presence of T12 fixtures per se – not all T12 fixtures contain PCBs.  But, at this point, it is not known exactly how many schools have leaking T12 fixtures that either contain PCBs or were contaminated by since-removed leaking T12 fixtures containing PCBs.  It is worth noting, however, that T12 fixtures have a life expectancy of 10 to 15 years, during which the leakage rate is 10 percent.  After 15 years, the failure rate increases significantly.  Additionally,

> PCBs are persistent, bioaccumulative pollutants.  This means that they are most harmful when exposure accumulates over a prolonged period of time.  Since the risk of harm increases with

---

[2] Ballasts act as insulators with high heat tolerances.

4

increased exposure, the best protection is to remove leaking ballasts immediately.

Proper Maintenance, Removal, and Disposal of PCB-Containing Fluorescent

Light Ballasts, http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/ballasts.htm (last

viewed March 26, 2013).  Because PCBs have been illegal since 1979, any PCB-

containing ballast present in a School building will have been there for more than

double its life expectancy with an ever-increasing failure rate.  Any of those which

experienced leakages could have been spreading gas into the air for a considerable

time, and could still be doing so.  And any leak of PCBs from the ballast constitutes

an unauthorized disposal.

    News coverage of PCBs in the Schools led one Staten Island teacher to alert

her union representative to a light fixture in her P.S. 36 classroom that, a year earlier,

had been leaking.  Soon after, on Friday January 7, 2011, the City conducted an

inspection of the floor tiles and confirmed that they were contaminated with PCBs.

Parents of at least 75% of the students at P.S. 36 kept their children home on the

following Monday, demanding that the City replace all lights in P.S. 36 not found to

be PCB-free.  The City first closed two, then ten classrooms at P.S. 36, before finally

agreeing to inspect the entire school.  By February 23, 2011, the City announced a

voluntary plan to replace T12 lighting throughout all New York City schools within

10 years.

This plan was unacceptable to 41 of the 51 members of the New York City Council (the "Council"), who wrote to the EPA a letter objecting to the City's 10-year plan and asking instead that the City complete the work in two years. The Council indicated that the task was economically feasible and that the lighting would in any event be replaced in the near future due to regulations promulgated by the Department of Energy that will soon make obsolete both the ballasts and the bulbs.

The EPA, although not vested with the authority to reject the City's proposal, agreed that ten years was too long a period to delay, and recommended the City be limited to five years. Indeed, the EPA's own spot inspections revealed schools containing PCBs up to 20,000 times the regulatory limit. All of the schools cited by the EPA were elementary schools, meaning that the youngest of school children were being exposed to dangerous levels of PCBs.

On April 12, 2011, the Council and the EPA jointly urged the City to adopt a five-year plan. The following day, Plaintiff served its Notice of Intent Sue on the City and the EPA under the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., ("TSCA"). On August 17, 2011, Plaintiff served its Notice and Intent to Sue under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., ("RCRA") (collectively the "Notices"). Plaintiff seeks a declaration that the City is in violation of the TSCA and that PCBs present an imminent threat to health and the environment. Plaintiff also seeks an order compelling the City to immediately remediate all PCB leaks in the Schools.

Defendants move to dismiss on five grounds: (1) that Plaintiff may not sue under the TSCA if the EPA is "diligently" seeking compliance with same; (2) that Plaintiff's Notices were insufficient; (3) Plaintiffs fail to state a claim; (4) Plaintiffs lack standing; and (5) Plaintiff's claim is barred by the doctrine of primary jurisdiction in that resolution of the claim is "placed within the special confidence" of the EPA.  Alternatively, Defendants seek a stay.

The motion was referred to Magistrate Judge Cheryl Pollak who, on August 29, 2012, issued a Report and Recommendation ("Report").   Judge Pollak recommends denying Defendants' motion to dismiss on all offered grounds. Defendants, in turn, object on all grounds.

<u>DISCUSSION</u>

I.    *Diligent Prosecution*

Citizen suits under both the TSCA and RCRA are barred if the Administrator of the EPA is "diligently prosecuting" a proceeding seeking compliance with its mandates.  15 U.S.C. § 2619(b)(1)(B); 42 U.S.C. § 6972(b)(2)(C)(i).  The RCRA additionally bans citizen suits if the State, with or without the EPA, is seeking same. <u>Id.</u>  The City argues that the instant action is barred because the EPA is already engaged in prosecution aimed at abating PCB exposure in the Schools via the CAFO entered into between the EPA and the City.  However, Judge Pollak found that the

CAFO does not deal with the issue of PCBs in light ballasts but only those found in caulking.  Indeed, the preliminary statement to the CAFO defines the earlier proceeding as one "concerning the use of polychlorinated biphenyls ('PCBs') in caulk ('PCB Caulk')." Defendants do not dispute this.  Instead, they argue that the CAFO requires that in addition to PCB Caulk remediation, the CAFO requires that "significant non-caulk sources" be investigated and remedied.  However, the provision relied upon by Defendants is one that does not require but merely contemplates the inclusion of non-caulk sources:

> [The City] and the EPA shall meet to discuss implementing the Preferred Citywide Remedy in all Relevant Schools [the "Meeting"]. . .  If an agreement is reached on a Citywide PCB Management Plan, [the City's] shall commence implementation of the Citywide PCB Management Plan, pursuant to the schedule contained in the plan.

(Green Decl. Ex. A. at III.(C)(a) (emphasis added).)   Only if an agreement is reached does the subsection requiring non-caulk PCBs to be investigated come into play.  (Id. at III(C)(c)(6).)  This renders inapposite Carrier Corp. v. Piper, 460 F. Supp. 2d 853 (W.D. Tenn. 2006), the case cited by the City in its objection to the Report, because in Carrier Corp., an agency order specifically bound the remediating party to remove subsequently-discovered contaminants.  Id. at 859.

Defendants also argue that Judge Pollak failed to give credit to (1) the procedures leading up to the Meeting and (2) the overall "progressive structure" of the CAFO.  The City argues that either have the potential to encapsulate the remediation of leaking PCB-containing ballasts.  However, the potential for

something to happen does not on its own indicate the likelihood of its occurrence, and certainly does not imply any degree of "diligence" in pursuing a particular outcome.  Diligent prosecution is required.

In arguing that the EPA is in fact "diligently prosecuting" this issue, the City relies on a December 15, 2010 letter from the EPA, which memorializes the City's intent to expand the scope of the pilot study to include lighting at one single school. In that same letter, however, the EPA is actually imploring the City to both expand and expedite its inspections, and not just limit immediate removal of PCB-containing ballasts to the schools in which they were incidentally discovered:

> I realize my <u>request</u> that the City undertake a broad program to remove and replace PCB-containing lighting fixtures in all public schools in an expedited time frame is a major undertaking. . . . The EPA does not agree with your characterization of the potential health risks posed by PCB ballasts nor do we agree with your conclusion that there is no need for an expedited program to remove PCB containing lighting fixtures from schools. . . .

(Id. at 1 (emphasis added).)  The letter went on to address how PCBs particularly affect lighting fixtures, as opposed to door or window frame caulking:

> EPA is concerned with the consequences of ballast failures.  The manufacture of PCB ballasts has been banned since 1978. The youngest PCB containing ballasts have been in service for approximately 32 years. Ballasts containing PCB have an average useful life of 50,000 hours.  As they age, the failure rate for such ballasts increases dramatically. The actual service life of ballasts is dependent on the operating temperature and the service cycle of the fixtures.  PCB lighting ballasts usually did not contain a heat sensing element that would cut power if the ballast overheated. Without such a protective device, used in ballasts since 1984, the failure of a ballast could allow the release of PCBs to the atmosphere of the school and could even result in an electrical fire.

[. . .]

Before any additional non-thermally protected ballasts fail in other schools we urge you to work with us to produce a plan to remove them in an expedited manner.

(Id. at 2.)  Four months later, the EPA informed the Council that the Agency lacked the authority to approve or disapprove of the City's 10-year abatement plan, even though the Agency wanted the replacements completed within five years.  At no point in these correspondences does the EPA call on the CAFO as controlling on the issue of PCB-containing ballasts, nor does the City now claim that the EPA has taken action against it for insisting on a 10-year plan.

Like Judge Pollak, I am without "any confidence that the conclusion of the government's litigation [would] address or encompass the specific claims of the plaintiff."  (Report at 13 (quoting Hudson River Fisherman's Ass'n v. County of Westchester, 686 F. Supp. 1044, 1053 (S.D.N.Y. 1988)).)  In that regard, the Court adopts the Report's finding that the CAFO does not constitute "diligent prosecution" of Plaintiff's claims regarding PBC-containing ballasts.[3]

---

[3] In making this finding, the Court by no means relies on the press coverage of the City's PCB abatement strategy.  However, the Court notes that, as recently March 26, 2012, the City reportedly denied that PCBs pose a danger.  See Lindsey Christ, DOE Releases list of Schools With PCB Leaks, Critics Want Better Clean-Up Efforts, NY1 News, March 26, 2012,   http://www.ny1.com/content/top_stories/158301/ny1-exclusive--doe-releases-list-of-schools-with-pcb-leaks--critics-want-better-clean-up-efforts) (last viewed March 26, 2013) (quoting Deputy Schools Chancellor Kathleen Grimm as saying "We certainly do not think there is any threat to the health of any of our children under this [the ten year] timetable.").  On March 8, 2013, the New York Times reported that Marge Feinberg, a DOE spokeswoman, stated that the City "continue[s] to actively work with the [EPA]" even though, as stated, supra, the City has rejected the EPA's recommendation of a five-year plan. See Al Baker, City Says it Erred by Not Telling Parents of School PCB Leak, N.Y. Times, March 8, 2013 at A22.  In the same article, the City reportedly apologized to parents of P.S. 87 students for failing to abide by a local law that now requires the DOE to notify parents

II.     *Notice Requirement*

Both the TSCA and the RCRA contain a notice requirement.   15 U.S.C. §
2619(b)(1)(A); 42 U.S.C. § 6972(b)(2)(A).

The TSCA's notice requirement is promulgated in 40 C.F.R. § 702.62.   It
provides that a notice of intent to sue shall include the specific TSCA provision upon
which the lawsuit will rely, in addition to the alleged offending activity, described
with "reasonable specificity."   40 C.F.R. § 702.62(a)-(b).   The notice must also
identify the person(s) responsible, location, dates relevant, and the plaintiff(s)
name(s).

Similarly, notice under the RCRA requires "sufficient information to permit the
recipient to identify the specific permit, standard, regulation, condition, requirement
or order which has been violated," along with the name of the alleged perpetrator.
The RCRA also requires that the activity be described with "reasonable specificity."
40 C.F.R. § 254.3(a)-(b).

---

when a leaking ballast is discovered.  Id.   The City is quoted as promising to "work harder"
at keeping parents notified.  Id.  This is less than two weeks after a smoking light fixture was
reportedly found at P.S. 242 in Harlem.  Lindsey Christ, PCB Leaks Reported at 366 City
Schools, NY1 News, February 27, 2013,  http://www.ny1.com/content/top_stories/
177814/ny1-exclusive--pcb-leaks-reported-at-366-city-schools)  (last viewed March  26,
2013) ("[P.S. 242] is already on the [DOE] list of high priorities for every light fixture to be
changed, but so are hundreds of other schools.").  Inadvertent discovery of leaks are legion.
A simple internet search produces countless stories spanning several years and all five
boroughs, but consistent in reporting the City's stance that PCBs are not as dangerous as
parents think and setting forth a rolling basis of promises, some unfulfilled, while demanding
that parents be more patient and accommodating.  Community action has been significant.
See generally http://pcbfree.blogspot.com/.  The Court takes judicial notice of the existence
of these statements, but not of their truth.

The notice requirements serve to give an alleged offender the opportunity to comply with either the TSCA and/or RCRA.  See generally Brod v. Omya, Inc., 653 F.3d 156 (2d Cir. 2011).  If a notice fails to name a law that is being violated, a location of the violation, or the means of the violation, or provides any of those things in a conclusory manner, the opportunity for compliance is diminished. Defendants do not dispute that Plaintiff properly notified them that exposed PCBs are dangerous and illegal, present in the light fixtures in hundreds of Schools, and ought not to be present.  Defendants had actual notice of all of this by the time the Notices were filed, having already engaged as they did in volley with the EPA over the appropriate timeline for remediation.   However, the City still pushes for a technical finding that the Notices were insufficient.  That technicality is that the letters do not specifically mention so-called "historically leaked PCBs," those PCBs released from fixtures that were leaking and replaced, but left in their wake material that continues to contaminate classrooms.

This argument is spurious.  If the point of the notice requirement is to give the City an opportunity to remedy the alleged violations prior to suit, the distinction between PCBs that remain in classrooms because of a replaced ballast and PCBs that remain in classrooms because of a present ballast is of no import.  As Judge Pollak pointed out, it is important to look at "what the particular notice given may reasonably be expected to accomplish." Catskills Mtns. Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 487 (2d Cir. 2001).  Here, we know what the Notices expected to accomplish – the removal of exposed PCBs.  The Schools

built or outfitted with T12 fixtures in the era of PCB use have been identified. Given the nature of PCBs, specifically that they can change physical form from solid to liquid to gas on a perpetual basis, and remain present for long periods of time, the removal of ballasts containing PCBs necessarily includes the removal of PCBs from surrounding areas, such as when the City tested a spot on the floor of a P.S. 36 classroom where a fixture was seen leaking a year prior.

By informing the City that ballasts were leaking PCBs, Plaintiff notified the City that PCBs could be present in any form around the location or prior location of a PCB-containing ballast. Therefore, the Court adopts Judge Pollak's finding that Plaintiff satisfied the TSCA and RCRA notice requirements.

### III. *Primary Jurisdiction*

"The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." Mathirampuzha v. Potter, 548 F.3d 70, 83 (2d Cir. 2008) (quoting United States v. W. Pac. R.R. Co., 352 U.S. 59, 63-64 (1956)). The doctrine serves to prevent the courts and agencies from working at "cross-purposes." Ellis v. Tribune Television Co., 443 F.3d 71, 81 (2d Cir. 2006) (quoting Fulton Cogeneration Assoc. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir. 1996)). It is a discretionary doctrine guided by the following factors:

[1] whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

[2] whether the question at issue is particularly within the agency's discretion;

[3] whether there exists a substantial danger of inconsistent rulings; and

[4] whether a prior application to the agency has been made.

National Comm'ns Ass'n, Inc. v. Amer. Tel. & Tel. Co., 46 F.3d 220, 222-3 (2d Cir. 1995).  The doctrine is meant to have a "relatively narrow scope."  Goya Foods, Inc. v. Tropicana Prods., Inc., 846 F.2d 848, 851 (2d Cir. 1988).

Here, the TSCA and RCRA both provide for citizen suits, so there is no question that Congress contemplated that suits would be brought in federal court.  This case does not turn on a technical interpretation of any Agency regulation, or any particular expertise.  PCBs have been defined, their potential effects are well known, the methods of testing and removal are known to the City, and the EPA has already made available an extensive amount of information on T12 fixtures and the retrofitting process.  See F.T.C. v. Verity Intern., Ltd., 194 F. Supp. 2d 270, 279 (S.D.N.Y. 2002) (declining to apply the doctrine where action "does not involve a technical determination within the FCC's particular domain in that there are many precedents" on the application of relevant terms); see also Proper Maintenance, Removal, and Disposal of PCB Containing Fluorescent Light Ballasts,  http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/ballasts.htm (last visited March 26, 2013).)

14

As stated, <u>supra</u>, the EPA has expressed that it cannot formally approve or disapprove of the City's 10-year plan and has not treated PCB ballasts as though covered by the PBC Caulk remediation plan outlined in the CAFO.  Therefore, there is no risk of inconsistent rulings and there is no application pending before the agency.   There is no basis for invoking the doctrine of primary jurisdiction and Judge Pollak's findings in this regard are hereby adopted.


IV.     *Standing*

Article III, section 2 of the United States Constitution limits federal jurisdiction to "cases" and "controversies."  U.S. Const. art. III, § 2.  "This limit is effectuated through the requirement of standing."  <u>Cooper v. U.S. Postal Serv.</u>, 577 F.3d 479, 489 (2d Cir. 2009) (<u>citing</u> <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 471–72 (1982).  For a party to establish standing, three factors must be met:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of [. . .] Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>McCormick v. Sch. Dist. of Mamaroneck</u>, 370 F.3d 275, 284 (2d Cir. 2004) (<u>quoting</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–61 (1992) (citations omitted)).  It

is important to note that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."  Lujan, 504 U.S. at 561.  This is because, "we presume that general allegations embrace those specific facts that are necessary to support the claim" on a motion to dismiss.  Id.

Under certain circumstances, an organization may sue as the representative of its members:

> The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . . So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

Hunt v. Washington Apple Adver. Comm'n, 432 U.S. 333, 342-343 (1977) (citations omitted).   This type of standing is referred to as "associational standing" or "representational standing." See, e.g., Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 477 U.S. 274, 281 (1986); Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc., 675 F.3d 149, 156-7 (2d Cir. 2012); Authors Guild v. Google, Inc., 282 F.R.D. 384, 388 (S.D.N.Y. 2012).  Plaintiff claims it has representational standing because at least one individual member of NYCC has standing; the issue is germane to NYCC's work; and participation of individual members of NYCC is not required.   It is

16

undisputed that this case concerns issues germane to NYCC's work and it is undisputed that individual participation of NYCC members is not required.  The City's only objection to NYCC's representational standing is that none of the individual members has individual standing.

As stated, <u>supra</u>, an individual has standing to bring suit if (1) the individual has suffered an injury in fact which is concrete, particularized and actual or imminent; (2) a causal connection exists between the injury and the behavior complained of; and (3) that the injury will be redressed by a favorable decision.  In its objection, the City argues that Plaintiff has not established an injury in fact.

### A.  *Injury in Fact*

"An injury that is concrete and particularized is one that affects the plaintiff in a personal and individual way."  <u>Lujan</u>, 504 U.S. at 561 n.1; <u>Valley Forge</u>, 454 U.S. at 472 ("[Article] III requires the party who invokes the court's authority to show that he [or she] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.") (citations omitted))  The individual must have a personal stake in the controversy.  <u>Baur v. Veneman</u>, 352 F.3d 625, 632 (2d Cir. 2003).  Otherwise, the federal courts could become a repository of general grievances over theoretical injuries borne by the public at large or of a purely aesthetic nature.  <u>Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.</u>, 204 F.3d 149, 154-156 (4th Cir. 2000).  For the same reasons, an

injury, for Article III purposes, must be actual or imminent and not merely speculative.

Judge Pollak found that Plaintiff alleged more than a generalized injury that any member of the public could assert, but a particular injury. The parents of students currently matriculated in New York City Public Schools have a personal stake in PCB abatement that is distinguishable (and far greater) than that of anyone who may happen to enter a school building.  (Report at 31-33.)  Not only are the children required to be in the Schools for approximately 180 days per year, but the children are children – meaning they are still developing, and are especially vulnerable to cognitive setbacks, as well as endocrine and immune system effects.  It is for this reasons that courts have been willing in certain cases to treat an increase in risk of harm as an injury in fact.  See Baur, 352 F.3d at 633-4 (enhanced risk of exposure to contaminated food products sufficient defeat motion to dismiss); Central Delta Water Agency v. United States, 306 F.3d 938, 950 (9th Cir. 2002) (“[A] credible threat of harm is sufficient to constitute actual injury for standing purposes, whether or not a statutory violation has occurred. The ability to challenge actions creating threatened environmental harms is particularly important because in contrast to many other types of harms, monetary compensation may well not adequately return plaintiffs to their original position.”) (emphasis added).  The EPA’s findings only bolster Plaintiff’s argument.  Baur, 352 F.3d at 637 (finding that government studies supporting plaintiff’s allegations of injury weigh in favor of concluding the existence of standing).

18

That Plaintiff's affiants only represent 25 schools changes neither this analysis nor this Court's conclusion.  In the Report, Judge Pollak draws on <u>Alaska Center for the Environment v. Browner</u>, 20 F.3d 981 (9th Cir. 1994), an action falling under the Clean Water Act ("CWA") in which various environmental organizations established standing to enforce CWA provisions throughout all waterways in the State of Alaska.  Judge Pollak likened the interrelatedness of Alaskan waterways to that of New York City Public Schools, in that parents have a stake not only in the school their children currently attend, but the schools their children will attend in the future, as they graduate from grade to middle to high school, and as they attend functions at other schools.  (Report at 35-37.)   In its objection, the City distinguishes <u>Alaska Center</u> as being wholly within the province of the CWA, and that in the absence of Congressional or statutory directive to treat the Schools as interrelated, such an interpretation is improper.

However, this Court finds that, with or without <u>Alaska Center</u>, Judge Pollak was correct to conclude that, in this case, the Schools should be treated as one entity for the purposes of standing.  The standing inquiry is "highly case-specific," <u>Baur</u>, 352 F.3d at 637, and this case is unique in that the City has already acknowledged the presence of a high number of T12 fixtures in a significant number of schools. The City does not doubt that students have reason to travel between schools, and any such argument would be insincere, especially if it should consider that, as recently as during the aftermath of Hurricane Sandy, students have been involuntarily relocated within the School system.

In sum, standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Lujan, 504 U.S. at 561. At the motion to dismiss stage, Plaintiff has met its burden and the Court adopts the findings of Judge Pollak on this issue.

V.    *Rule 12(b)(6)*

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 569 (2007).  A complaint need only give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  Erickson v. Pardus, 551 U.S. 89, 93 (2007).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 544.  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.

A. *TSCA*

Here, the Amended Complaint alleges that the City is violating the TSCA by failing to remove PCB-containing ballasts from the Schools, in violation of 15 U.S.C. §§ 2605(e)(2), (e)(3)(A).  Section 2605(e)(2) prohibits the use of PCBs "in any manner other than in a totally enclosed manner."  Id.  "Totally enclosed manner means any manner that will ensure no exposure of human beings or the environment to any concentration of PCBs."  40 C.F.R. § 761.3 ("Section 761.3").  Subpart D of 761.3 outlines the proper method of disposal of PCBs.

Nevertheless, the City argues that Plaintiff has failed to state a claim.  Each of the City's arguments is unavailing.  First, the City points out that "Plaintiff does not identify a single instance where Defendants have discovered a ballast leak and not already taken corrective action."  As stated, supra, Plaintiff has demonstrated (and the City does not dispute) that PCB-containing ballasts are present in hundreds of Schools and that the ballasts in many Schools have emitted the chemicals.  That the City has yet to discover every leaking ballast has no bearing on whether Plaintiff has sufficiently alleged a TSCA violation.

Next, the City argues that the regulations do not require inspection.  In support, the City cites a PCB-removal Questions and Answers brochure published by the EPA.  The full text of the paragraph cited by the city states:

> There is no regulatory requirement that you sample the equipment or stains near the equipment for PCB contamination.  However, you are responsible for properly disposing of the equipment and

21

> cleaning up and properly disposing of any contaminated surfaces
> or materials. When in doubt the EPA recommends that you
> sample.

See Revisions to the PCB Q and A Manual at 74-75 (January 2009)

http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/qacombined.pdf (last visited March 26,

2013) (emphasis added). This provision explicitly demands the proper disposal of

exposed PCBs, and recommends that an abundance of caution be used. Moreover, the

first page of this manual provides:

> This document is intended to be used as an informal reference, and
> as such, is not a complete statement of all the applicable PCB
> requirements. This document does not replace nor supplant the
> requirements of the Toxic Substances Control Act (TSCA) PCB
> regulations. Please refer to the regulations at 40 CFR Part 761 for
> specific regulatory and legal requirements.

Id. (emphasis added). Therefore, the argument that the regulations do not require the

City to remediate PCBs in Schools is without merit. It is also contrary to the City's

earlier position that the EPA's "diligent prosecution" precludes Plaintiff's suit, for if

there is no requirement to remediate, there is nothing PCB ballast-related for the EPA to

prosecute, diligently or otherwise.

The City goes so far as to argue that 12(b)(6) dismissal is appropriate because the

"EPA rejected imposing any risk reduction measures on the continued use of this

equipment because the costs of these measures outweighed the potential environmental

risk." The City supports this statement with an August 25, 1982 EPA ruling on certain

PCBs that makes only passing reference to fluorescent ballasts and to schools. This is

disingenuous because far more recently (i.e., December 15, 2010) the EPA specifically urged the City to reduce ballast-related PCB exposure "as quickly and completely as reasonably possible," and questioned the City's estimate of $1 billion in costs as excessive.

> Next, the City argues:

> Plaintiff asserts that every leak is a violation, regardless of the lack of any regulatory obligation to discover such leaks from this equipment.  Under Plaintiff's logic, if a leak is discovered, a violation is discovered.  However, if a leak is not discovered, TSCA provides Plaintiff with no remedy because TSCA authorizes the use of PCB light ballasts.  The application of Plaintiff's conception of TSCA to in-use light fixtures in more than 600 school buildings could result in an unprecedented fishing expedition.

(P. 16.)  The mischaracterizations in this paragraph are many.

The only leaks at issue in this case are PCB-related leaks emanating from fluorescent light ballasts.  If a light fixture containing PCBs is leaking, it is not "totally enclosed."  If it is not "totally enclosed," its use is not permitted.  In this context, any leak is indeed a violation, whether or not the Code of Federal Regulations directs a PCB-user to survey PCB-containing products.

Contrary to the City's implication, the possibility that a particular examination fails to uncover PCBs does not render the Amended Complaint implausible.  Nor does the number of potentially affected buildings.  We are, after all, dealing with the largest school district in the United States.  The City itself has represented to the EPA that T12 fixtures are "very likely" to contain PCBs and are present in approximately half of all school buildings, with 90% of the buildings containing at least 100 of fixtures.  The City

itself informed after its own investigation that as many as 564,000 fixtures with PCB ballasts could be present in the Schools.  Given these odds, Plaintiff's demand for a thorough inspection is a far cry from a "fishing expedition."  <u>See</u> <u>Black's Law Dictionary</u>, 9th Ed. at 712 (2009) (defining "fishing expedition" as "[a]n attempt, through broad discovery or random questions, to elicit information from another party in the hope that something relevant might be found.").  The City has provided the results of its investigation and has indeed uncovered plausible support for Plaintiff's claims.

By moving to dismiss under Rule 12(b)(6), the City has taken the stance that no action is required unless and until it is notified that a specific fixture is leaking, as was the case at P.S. 36.  The City claims that no regulations exist to prompt them to take action, and – contrary to the statements made in the EPA's letter – that the EPA itself believes remediation to be too costly.  It bears repeating that the City's claim that PCB ballast remediation is being diligently prosecuted is absurd under these circumstances.  It is apparent not that the Amended Complaint is facially defective, but that the City just does not want to remediate expeditiously or be overseen by either the EPA or by a court of law.  All of this – in the face of the dangers of PCBs – makes the allegations in the Amended Complaint more plausible.

The City's motion to dismiss Plaintiff's TSCA claim is denied.

### B.  *RCRA*

The City's claim that Plaintiff has failed to state a claim under the RCRA fares no better.  Section 6972(a)(1)(B) requires Plaintiff to prove that the City is a "person" who

has "contributed" to past or present "handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." Id.   The City makes several claims but in essence they are one: that the City has not actually contributed to the handling, storage, treatment, transportation and disposal of PCB waste.[4]

This argument need not detain us long. The Amended Complaint specifically references the City's replacement of ballasts housed in fixtures that were themselves contaminated by prior PCB leaks but not themselves remediated.  The City concedes as much.   And it ought to go without saying that the approximately 564,000 PCB-containing ballasts that – well past their life expectancy – are still present in the Schools store PCBs.  Therefore, Plaintiff's RCRA claim cannot be dismissed at this stage, and the Report's findings in this regard are adopted.

---

[4] As to the City's argument that intact PCB-containing ballasts that are not yet leaking do not constitute "waste," the Court agrees with Judge Pollak's recommendation that this issue not be decided at the motion to dismiss phase.

<u>CONCLUSION</u>

All of the City's remaining arguments are without merit.  Contrary to the City's objections, Judge Pollak applied the proper legal standards and construed the evidence presented thoughtfully, fairly and correctly as to all claims.  On the other hand, the City sought and obtained leave of this Court to file oversized briefs, only to fill its memoranda with arguments that were often deceptive or illogical.  The Court will not begrudge the City its right to zealous advocacy, but neither will the Court abide the City's insouciant foot-dragging, which, in the end, is all that can be said for its position.[5]  Therefore, the motion is denied in its entirety.

With the cognitive development of children at stake, it would have been refreshing to see humanitarian concerns trump the compulsion to delay litigation with quite so many spurious arguments.  But some dreams remain deferred.

Discovery shall be expedited to the extent consistent with this opinion.

SO ORDERED.

Dated: March 26, 2013                                _____/s_____
       Brooklyn, New York                                Sterling Johnson, Jr., U.S.D.J.

_____

[5] <u>See</u>, <u>e.g.</u>, Despair, Inc.,® <u>Planning: Much Work Remains to be Done Before We Can Announce Our Total Failure to Make Any Progress</u>, *available at* http://www.davidmullin.com/despair/Planning.jpg (last viewed March 26, 2013).